## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No. 23-490 (SHS) |
| v. | *Document Electronically Filed* |
| ROBERT MENENDEZ, *et al.*, | |
| Defendants. | |

### BRIEF OF DEFENDANT WAEL HANA IN RESPONSE TO THE GOVERNMENT'S MOTIONS *IN LIMINE* REGARDING DEFENDANTS' PROPOSED EXPERTS

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................... 1

I.      LEGAL STANDARD.......................................................................................... 2

II.     THE GOVERNMENT'S MOTION RELIES ON A
MISCHARACTERIZATION OF DR. ALTERMAN'S PROPOSED
TESTIMONY, AND SHOULD BE DENIED......................................................... 4

        A.     THE PROPOSED TESTIMONY IS RELEVANT. ................................... 6

        B.     ALTERMAN'S PROPOSED TESTIMONY IS PROPERLY
CHARACTERIZED AS EXPERT TESTIMONY.................................... 10

        C.     THE PROPOSED TESTIMONY IS NOT INADMISSIBLE UNDER
RULE 403. ............................................................................................ 13

CONCLUSION............................................................................................................................. 16

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Khawaldeh v. Tackett*,
  2021 WL 5908401 (W.D. Tex. Dec. 14, 2021) ........................................................................5

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)....................................................................................................6

*Brooks v. Outboard Marine Corp.*,
  234 F.3d 89 (2d Cir. 2000)....................................................................................................10

*Brooks v. Outboard Marine Corp.*,
  47 F. Supp. 2d 380 (W.D.N.Y. 1999) ....................................................................................10

*Burton v. Am. Cyanamid*,
  2018 WL 3954858 (E.D. Wis. Aug. 16, 2018) ...............................................................5, 9, 13

*Cortez v. Garcia*,
  130 F. App'x 131 (9th Cir. 2005) ..........................................................................................14

*Crane v. Kentucky*,
  476 U.S. 683 (1986) ...............................................................................................................14

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)......................................................................................................3, 6, 13

*Dongguk Univ. v. Yale Univ.*,
  2012 WL 1977978 (D. Conn. June 1, 2012)...........................................................................5

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 523 (E.D.N.Y. 2012) ...................................................................................12

*Harris v. New York*,
  401 U.S. 222 (1971)...............................................................................................................10

*Holmes v. South Carolina*,
  547 U.S. 319 (2006)...............................................................................................................14

*Linde v. Arab Bank, PLC*,
  922 F. Supp. 2d 316 (E.D.N.Y. 2013) ...................................................................................12

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007)....................................................................................13

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013)..................................................................................6, 11

*Mesfun v. Hagos*,
    2005 WL 5956612 (C.D. Cal. Feb. 16, 2005)............................................................5

*In re Mirena IUD Prod. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016).......................................................................3

*Murphy v. Strack*,
    9 F. App'x 71 (2d Cir. 2001) ...................................................................................10

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005).......................................................................................3

*In re Pfizer Inc. Sec. Litig.*,
    819 F.3d 642 (2d Cir. 2016).......................................................................................6

*Restivo v. Hesseman*,
    846 F.3d 547 (2d Cir. 2017).......................................................................................3

*Strauss v. Credit Lyonnais, S.A.*,
    925 F. Supp. 2d 414 (E.D.N.Y. 2013) ...................................................................12

*In re Terrorist Attacks on Sept. 11, 2001*,
    2023 WL 3116763 (S.D.N.Y. Apr. 27, 2023)...........................................3, 6, 9, 12

*U.S. v. Zakaria*,
    2010 WL 3895383 (D. Md. Oct. 1, 2010) ................................................................6

*United States v. Allen*,
    864 F.3d 63 (2d Cir. 2017).......................................................................................10

*United States v. Amawi*,
    552 F. Supp. 2d 669 (N.D. Ohio 2008)...................................................................15

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003).......................................................................................13

*United States v. Locascio*,
    6 F.3d 924 (2d Cir. 1993)...........................................................................................3

*United States v. McCloud*,
    303 F. App'x 916 (2d Cir. 2008) ...............................................................................3

*United States v. Mendlowitz*,
    2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) .........................................................9

*United States v. Mostafa*,
16 F. Supp. 3d 236 (S.D.N.Y. 2014)........................................................................8

*United States v. Paracha*,
2006 WL 12768 (S.D.N.Y. 2006)..........................................................................12

*United States v. Rahm*,
993 F.2d 1405 (9th Cir. 1993) .........................................................................10, 11

**Rules**

Fed. R. Evid. 401 ....................................................................................................6

Fed. R. Evid. 702 .................................................................................................1, 3

Fed. R. Evid. 702(a).................................................................................................3

Fed. R. of Evid. 403 .............................................................................1, 13, 14, 15

**Constitutional Provisions**

U.S. Const. amend. V.............................................................................................10

U.S. Const. amend. VI ...........................................................................................14

U.S. Const. amend. XIV .........................................................................................14

## PRELIMINARY STATEMENT

Defendant Wael Hana respectfully submits this brief in response to the Government's motion *in limine* seeking to exclude the proposed testimony of Dr. Jon Alterman, an expert in Egyptian history and current affairs, ECF No. 367 ("Gov. Br.").  As set forth in the expert disclosure notice, Mr. Hana may offer the expert testimony of Dr. Alterman on two issues:  (1) "the historical context in which Mr. Hana obtained and has maintained IS EG's Halal contract"; and (2) to explain that the military in Egypt is currently "the largest single economic actor in Egypt" and, as a result, "it is not uncommon for military officials to be involved in contracting and private business ventures, also an important issue in this case."  ECF No. 367-4 at 6.  The Government's motion, though seeking to exclude Dr. Alterman's testimony in its entirety, only addresses the first of these two topics.  But Dr. Alterman's testimony on both is permissible and appropriate.

As a threshold matter, the Government's motion does not challenge that Dr. Alterman is "qualified as an expert by knowledge, skill, experience, training or education."  Fed. R. Evid. 702; *see generally* Gov. Br. at 35-38.  Indeed, as is discussed further, *infra*, courts have routinely admitted the testimony of historians, academics, and researchers in order to provide clarifying historical and sociopolitical context.  The Government's argument, though it purports to be grounded initially in some deficiency of the expert notice provided by Mr. Hana, is in truth an attack on the relevance of this expert testimony and a claim that, even if admissible, it should be precluded under Federal Rule of Evidence 403.  The Government's argument, however, is predicated on a mischaracterization of the proposed substance of Dr. Alterman's testimony, which—as the defense clearly informed the Government when asked—will not attempt to address the specific details underlying IS EG Halal's acquisition of its exclusive certification contract, or

whether IS EG Halal in fact replaced halal certifiers that were members of the Muslim Brotherhood.

In fact, Dr. Alterman's testimony will be critical to assisting the jury to determine two separate issues. *First*, the Government has made it clear—including in its brief in support of this very motion—that it intends to elicit testimony on the circumstances that led to Hana's selection as Egypt's exclusive Halal certifier as well as the circumstances under which he has kept it. Gov. Br. at 4, 37. As part of that evidence, the Government will either directly or indirectly attempt to show that those circumstances cannot be explained other than by improper or corrupt conduct by Mr. Hana and Senator Menendez. In fact, part of Mr. Hana's defense is that no such improper conduct occurred and that his contract for halal certification was properly awarded and maintained due to, among other proper bases, sociopolitical events uniquely occurring in Egypt. Thus, Dr. Alterman's testimony will assist the jury by providing context that bears on Mr. Hana's having obtained and then maintaining his halal certification contract, showing that it occurred for reasons having nothing whatsoever to do with bribery or corruption. In this regard, it will help to undermine the Government's theory of the case. *Second*, Mr. Hana anticipates that the Government will present testimony and evidence as to his relationship and interactions with members of the Egyptian military. As set forth in the expert notice and below, those interactions and the involvement of the Egyptian military in commercial transactions, including private business, though they may otherwise appear to be unusual or suspicious to lay jurors, is not in fact uncommon, but is a feature of Egyptian society about which the jury should be informed. Dr. Alterman's testimony, therefore, will also assist the jury to understanding this factual issue.

## I.    LEGAL STANDARD

An expert witness may testify in the form of an opinion or otherwise if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the

evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert testimony is generally limited to situations in which the subject matter is beyond the ken of the average juror. *See United States v. McCloud*, 303 F. App'x 916, 918 (2d Cir. 2008); *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993). Although courts serve a "gatekeeping" function for expert testimony, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005); *see also In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 411 (S.D.N.Y. 2016) ("Rule 702 represents a liberal standard of admissibility for expert opinions, as compared to the previous and more restrictive standard set out in *Frye v. United States*[].") (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588–89 (1993)).

Thus, expert testimony should be excluded only "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Restivo v. Hesseman*, 846 F.3d 547, 577 (2d Cir. 2017) (internal quotation marks omitted). Absent such a degree of unreliability, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (internal quotation marks omitted). Generally, "[c]ourts faced with questionable witness testimony opt for the mildest effective remedy." *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at *4 (S.D.N.Y. Apr. 27, 2023). Ultimately, the Court should make a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Locascio*, 6 F.3d at 936.

II.     **THE GOVERNMENT'S MOTION RELIES ON A MISCHARACTERIZATION OF DR. ALTERMAN'S PROPOSED TESTIMONY, AND SHOULD BE DENIED.**

First, contrary to what the Government has stated in its moving brief, Dr. Alterman will not testify as to any particular facts underlying the government of Egypt's choice to either grant IS EG Halal an exclusive halal certification contract, or allow IS EG Halal to maintain that contract, as it has to this day.  Nor will Dr. Alterman testify that halal certifiers replaced by IS EG Halal were affiliated with the Muslim Brotherhood—a fact that the Government complains was missing from the expert notice regarding Dr. Alterman's testimony.  Indeed, in response to the Government's query as to just this issue, counsel for Mr. Hana advised the Government in writing prior to the Government filing the instant motion:  "we do not intend to elicit testimony from Dr. Alterman that he has personal knowledge that the Halal certifiers prior to IS EG were Muslim Brotherhood-operated and owned businesses, or that he has personal knowledge of the circumstances of Mr. Hana's contract being awarded."  [April 30, 2024 Email to D. Richenthal].  For this reason, the Government's argument that Mr. Hana's notice is "materially deficient" for failing to identify "Muslim Brotherhood business owners" or to explain Dr. Alterman's basis for any related opinions simply misses the point.  Gov. Br. at 3, 35.

Instead, Dr. Alterman will testify as to the sociopolitical undercurrents at play in the period leading up to and at the time the Egyptian government granted Mr. Hana the exclusive halal certification contract, and that continued throughout the period of the alleged conspiracy.  Specifically, Dr. Alterman's testimony will explicate President el-Sisi's efforts to wrest control and influence from entities and persons with any perceived affiliation with the Muslim Brotherhood, which, for a time following the 2011 Egyptian Revolution, had gained control of Egypt's presidency and exerted significant influence over the Egyptian population.  Dr. Alterman will also describe el-Sisi's longstanding and inextricable relationship with the Egyptian military,

and the military's unique role as "the largest single economic actor in Egypt," to elaborate on the business activities of the military and defense communities, activities that feature in the Government's narrative about this case, *see, e.g.*, Ind. ¶ 36 (alleging that Mr. Hana asked "Egyptian Official-3"—identified elsewhere in the Indictment as "an Egyptian intelligence official"—whether there is "any message we need or anything for ISEG?"); ECF No. 180 (Gov. Opp. to Motion to Dismiss) at 6-7 (describing alleged scheme wherein Menendez offered assistance to Egypt and Hana, including briefing a senior Egyptian intelligence official); GX A101-BB, -DD, -101 (text message from Mrs. Menendez to Senator Menendez, dated March 6, 2018, asking the Senator to forward an invitation "for the General" to Mr. Hana "so he looks it over[,]" attaching photographs of Mr. Hana and an Egyptian official's business cards); GX A101-12 (text message from Mrs. Menendez to Senator Menendez dated July 9, 2018 stating "We just came to meet current General for Fred's project"), and could be viewed—indeed, they are portrayed—as somehow sinister, such as in Paragraph 36 of the Indictment quoted, *supra*, though they are not at all unusual in Egypt, as Dr. Alterman will explain. The Government does not even seek to address this latter point, though it does, conclusorily and without mentioning this issue, argue that Dr. Alterman's testimony should be precluded in full. Gov. Br. at 3 ("the Government seeks a ruling precluding in its entirety the testimony of Dr. Jon Alterman").[1]

---

[1] It should not. Caselaw establishes that foreign culture and practices are a particularly appropriate subject for expert testimony, especially where they are, indeed, foreign to the experiences of American jurors. *See, e.g.*, *Al-Khawaldeh v. Tackett*, 2021 WL 5908401, at *5 (W.D. Tex. Dec. 14, 2021) ("[n]umerous courts have allowed expert testimony on background material, when cultures or locations would be foreign to a jury.") (internal citation omitted); *Dongguk Univ. v. Yale Univ.*, 2012 WL 1977978, at *8 (D. Conn. June 1, 2012) (admitting expert testimony where background testimony on Korean culture would help the jury better understand statements made in the Korean media); *Burton v. Am. Cyanamid*, 2018 WL 3954858, at *4 (E.D. Wis. Aug. 16, 2018) ("a trained historian can contribute tremendously to the accuracy and completeness of the juror's understanding by situating the document in its historical context—a context with social, economic, [], [and] linguistic … dimensions, to name but a few."); *Mesfun v. Hagos*, 2005 WL

**A.    THE PROPOSED TESTIMONY IS RELEVANT.**

The relevance of expert testimony "is measured against the proffering party's theory of the case." *Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at *3 (citing *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 659 (2d Cir. 2016)).  It turns on whether the testimony "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (cleaned up); *accord* Fed. R. Evid. 401.  Unlike lay witnesses, qualified expert witnesses are "permitted wide latitude to offer opinions" on relevant subjects, "including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592.  In particular, historical experts may be well-positioned to "synthesize dense or voluminous . . . texts," "offer background knowledge or context that illuminates . . . past events," or "identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013).

In this case, Dr. Alterman's testimony is undeniably relevant, as it would provide context from which the jury could fairly infer that IS EG Halal's having obtained, and to this day maintained its status as the exclusive halal certifier was based not on any sort of bribe paid to Senator Menendez by Mr. Hana, IS EG Halal's owner, but occurred for the Egyptian government's own reasons; namely, to consolidate a lucrative and significant industry, and reroute associated assets from actors that were political and economic enemies of Egyptian President el-Sisi.  In

---

5956612, at *8 (C.D. Cal. Feb. 16, 2005) (admitting expert testimony where cultural expert's "knowledge, experience and education qualify her to offer an expert opinion regarding the political, cultural, social, and economic ties that Eritreans in the United States maintain with their homeland"); *U.S. v. Zakaria*, 2010 WL 3895383, at *2 (D. Md. Oct. 1, 2010) (admitting expert cultural testimony where "'cultural norms' of Ghana may be outside the purview and common experience of the jury"), *aff'd*, 469 F. App'x 192 (4th Cir. 2012).

arguing that such testimony is irrelevant, the Government first contends that "it does not intend to argue that Menendez took actions that in fact caused Egypt to grant that monopoly," but rather that "Senator Menendez took actions to stop the [USDA] from helping to get Egypt to remove the monopoly, which is a separate point."  Gov. Br. at 36.  Thus, the Government suggests that while such testimony may be relevant to Mr. Hana first being granted an exclusive certification contract, it would not be relevant to IS EG Halal *maintaining* its monopoly.  However, the Government goes on to undermine the very distinction upon which it relies, between obtaining versus maintaining the contract.  Specifically, the Government states it "intends to call at least one [] witness, a USDA official, who is expected to testify about the circumstances through which Hana *was granted* his monopoly[,]" Gov. Br. at 37 (emphasis added), "including that Hana had no relevant experience and that the Egyptian officials who traveled to the United States to perform an 'audit' of existing halal certifiers—and met with Hana—offered no cogent explanation as to why Hana should be grated a monopoly," *id.* at 4.  The import of this statement is clear:  the Government attacks as corrupt the circumstances by which Mr. Hana both obtained and then maintained his exclusive halal certifier status, infusing each with a suggestion of illicit activity.

The Government nevertheless argues that "the actual internal decision-making of the Government of Egypt" is irrelevant.  *Id.*  In other words, according to the Government, what "*actually caused* the Government of Egypt's actions, untethered in any way to a defendant's contemporaneous knowledge or state of mind," is irrelevant.  Gov. Br. at 36.  This argument again mischaracterizes both the substance and purpose of Dr. Alterman's testimony.  Specifically, Dr. Alterman's testimony as to the Egyptian government's methods and means of confiscating and quashing perceived Muslim Brotherhood sources of revenue, and the separate issue of military's role in the process, does not amount to Dr. Alterman testifying as to what "actually caused" Mr.

Hana to be granted IS EG Halal's contract—instead, this nuanced sociopolitical backdrop, which is decidedly beyond the ken of the average American juror, provides context from which a factfinder could conclude that Mr. Hana could not have benefitted from some official action taken by Senator Menendez because, in light of the Egyptian government's own motives for granting and maintaining an exclusive halal certification contract with IS EG Halal, that contract was never in danger of being lost and in need of protection by an unrelated United States Senator.

Moreover, the Government's argument that this expert testimony would be "untethered in any way" to Mr. Hana's beliefs or contemporaneous state of mind—which the Government concedes are relevant, *see* Gov. Br. at 4, 36; *see also United States v. Mostafa*, 16 F. Supp. 3d 236, 259 (S.D.N.Y. 2014) (finding evidence bearing on "state of mind . . . probative of, *inter alia*, motive, knowledge, intent, and lack of mistake[,] [and thus] sufficient to establish relevance")—is predicated on the same misunderstanding.  A factfinder could infer Mr. Hana's understanding of the broader sociopolitical context underlying el-Sisi's government's practices, as an Egyptian-American who has worked in Egypt and with Egyptians for decades, on the basis of the testimony Dr. Alterman intends to offer, and conclude that under the circumstances, Mr. Hana's actions in providing anything of value to Mrs. Menendez would not have been for the purpose of obtaining or retaining the IS EG Halal contract with Egypt.  That is, Dr. Alterman's testimony goes directly to the validity of the Government's theory with regard to Mr. Hana's "contemporaneous intentions, expectations, and beliefs regarding whether or why Egypt would or did grant Hana the monopoly," which the Government concedes is "relevant to his motive and intent to cultivate a relationship with and bribe Menendez."  Gov. Br. at 36.

Nor, as Mr. Hana has made clear, will Dr. Alterman testify as to Mr. Hana's subjective state of mind, which is a factual determination for the jury.  But the jury should make that

determination with an understanding of the dynamics at play in Egypt during the relevant timeframe, and may properly infer, from the sociopolitical context Dr. Alterman can provide, the Egyptian government's own financial and national security-based reasons for awarding and maintaining IS EG Halal's certification contract. *See, e.g.*, *Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at *6 (admitting as relevant expert testimony as to "background [that] may help the jury understand the relationships between various individuals and groups," while expert testimony as to "an actor's subjective intent" was excluded); *see also id.* at *7 ("[the expert witness] may address the organization's history, structure, tactics, and stated aims, but he may not speculate about the intent of individuals or the organization as a whole without dispositive support.") (internal citation omitted); *Burton v. Am. Cyanamid*, 2018 WL 3954858, at *6 (E.D. Wis. Aug. 16, 2018) ("it is certainly within the scope of a historian's expertise to draw inferences about historical actors' knowledge and beliefs based on evidence about the availability of information at a given historical moment in combination with contextual knowledge of that moment's general practices and mechanisms regarding information dissemination. To the extent that defendants wish to challenge the facts and assumptions underpinning such inferences, they may do so in the course of cross examination").[2]  And, again, Dr. Alterman's testimony is plainly

---

[2] At a minimum, the Government's suggestion that Dr. Alterman's testimony does not "fit" into a relevant defense theory is unripe at this stage, without a clearer sense of the Government's evidence, including the testimony that the Government will elicit from its own witnesses. The Government states that "[a]s is relevant here, the questions before the jury, in sum, are whether Hana agreed to and did pay bribes and agreed to have Menendez act as an agent of Egypt." Gov. Br. at 38. This statement elides its previously described position that it will argue that Mr. Hana was unworthy of that contract, and even that it was unwise because the contract was monopolistic. Mr. Hana's expert would seek to rebut that theory by showing a different reason for the Egyptian government's awarding of the contract, one based upon the history and politics of that Republic. Of course, if the proofs, as adduced by the Government, are different than as proffered, then this evidence may not be necessary, but it is entirely premature at this juncture, before any evidence has been presented, and thus impossible to conclude, as the Government urges, that Dr. Alterman's testimony is irrelevant. *See, e.g.*, *United States v. Mendlowitz*, 2019 WL 6977120, at *1 (S.D.N.Y.

relevant and essential for elucidating the distinctive role the Egyptian military and intelligence community play in the country's economic sector, and to respond to the Government's clear suggestion that these activities are, accordingly, nefarious.  As previously mentioned, the Government has not addressed this separate topic of Dr. Alterman's testimony in any way, let alone argued that it is irrelevant, which it certainly is not.

### B.    ALTERMAN'S PROPOSED TESTIMONY IS PROPERLY CHARACTERIZED AS EXPERT TESTIMONY.

The Government further argues that Dr. Alterman's testimony cannot properly be considered expert testimony, as he has "no firsthand knowledge of Hana, IS EG Halal, how IS EG Halal got its monopoly[,]" and that evidence that Mr. Hana "was granted the monopoly for good reasons" is more properly a lay witness topic to which Mr. Hana could himself testify.  Gov. Br. at 37.[3]  Put differently, the Government suggests that Dr. Alterman's proposed testimony somehow

---

Dec. 20, 2019), *aff'd*, No. 21-2049, 2023 WL 2317172 (2d Cir. Mar. 2, 2023) (reserving an order on whether proposed expert testimony was irrelevant as "it was premature to make a ruling without hearing the testimony of [certain other] witnesses"); *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91 (2d Cir. 2000) (noting that rulings on the admissibility of expert testimony "are usually made on a more complete record"); *Brooks v. Outboard Marine Corp.*, 47 F. Supp. 2d 380, 388 (W.D.N.Y. 1999) ("Rulings on expert witness qualification or admissibility of expert opinion testimony usually occur at a considerably more advanced stage of the litigation, and on a more complete record[,]" generally during trial) (string cite).

[3] The Government argues that "Hana could testify," suggesting Mr. Hana's testimony would obviate the need for Dr. Alterman's.  Gov. Br. at 4.  That argument flippantly ignores Mr. Hana's constitutional right not to testify; it is well established that "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so."  *Harris v. New York*, 401 U.S. 222, 225 (1971); *see* U.S. Const. amend. V ("[n]o person ... shall be compelled in any criminal case to be a witness against himself"); *United States v. Allen*, 864 F.3d 63, 81 (2d Cir. 2017) ("[T]he right not to testify against oneself at trial is absolute.  Even a negative comment by a judge or prosecutor on a defendant's silence violates that defendant's constitutional right.") (internal citations omitted); *Murphy v. Strack*, 9 F. App'x 71, 73 (2d Cir. 2001) (recognizing defendant's "constitutional right not to testify," which is "hardly new").

Specifically, the notion that Mr. Hana could himself further bolster what Dr. Alterman would testify to, or vice versa, is certainly not a valid basis to exclude Dr. Alterman's testimony, or to deny Mr. Hana his constitutional right not to testify.  *United States v. Rahm* is instructive; there,

amounts to evidence that Mr. Hana "contemporaneously believed he was qualified or otherwise received the monopoly on the merits[.]"  Gov. Br. at 4.  The Government's argument is again predicated on a misinterpretation of Dr. Alterman's proposed testimony, which does not seek to explicate Mr. Hana's state of mind, but instead describes context from which a factfinder could infer why and how Mr. Hana was granted and has since maintained the sole source contract at issue, based upon broader sociopolitical reasons that comport with el-Sisi's government's pattern of rejecting opposition-affiliated businesses.  Nothing in Dr. Alterman's proposed testimony suggests that he will opine on whether Mr. Hana was in fact "qualified" to receive IS EG Halal's exclusive contract.  And to be clear, counsel has no intent of eliciting such testimony, mooting this component of the Government's argument.

That Dr. Alterman would properly be deemed an expert witness is consistent with the law of this Circuit, which has repeatedly acknowledged that historical, sociopolitical, and cultural context testimony such as that which Dr. Alterman would provide—grounded in decades of academic and field research and firsthand interactions with Egyptian government officials—fall squarely within the category of "specialized knowledge" offered by expert witnesses.  *See Marvel Characters, Inc.*, 726 F.3d at 135–36 ("We have no doubt that a historian's 'specialized knowledge' could potentially aid a trier of fact in some cases. A historian could, for example, help to identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or

---

the Ninth Circuit reversed the trial court's order excluding the defendant's expert witness, disagreeing with the trial court's adoption of the Government's argument that the expert's testimony "was inadmissible because it would simply have consisted of her opinion about the credibility of [the defendant's] 'story,'" while the defendant herself chose not to testify.  993 F.2d 1405, 1413-14 (9th Cir. 1993).  The Ninth Circuit concluded that to hold otherwise "would eviscerate several constitutional rights.  [The defendant], like all criminal defendants, had the right not to testify. By choosing not to testify, she did not forfeit her right to present a defense or to introduce testimony." *Id.* at 1414.

remain opaque to a layperson."); *see also Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at \*3; *see also Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 322-24 (E.D.N.Y. 2013) (finding that expert's "professional experience and independent research" qualified him to offer the opinions regarding "the establishment and organization of Hamas[,] whether certain charities were under the Control of Hamas," and the practices of certain charitable organizations, noting that the expert "authored, reviewed, and approved documents" on foreign governmental and quasi-governmental organizations during his time as a foreign government official); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 542 (E.D.N.Y. 2012) (admitting a Saudi Arabia expert witness's testimony regarding "the legitimacy of Saudi Arabian humanitarian efforts," including with respect to a specific non-governmental organization, where his "books about Saudi Arabia [were] the products of extensive study of modern Saudi Arabia through research of news and academic articles, the Saudi Committee website, bank-documents produced in this litigation, and interviews," and where the proposed testimony bears on a Saudi entity's "conduct"); *United States v. Paracha*, 2006 WL 12768, at \*22–23 (S.D.N.Y. 2006), *aff'd*, 313 F. App'x 347 (2d Cir. 2008) (approving expert opinion evidence regarding "the origins and structure of al Quaeda, its leaders, and its use of cells and individuals to provide logistical support[,]" where the expert "relied on multiple sources of information that he gathered and vetted through his process of cross-referencing and peer review, and explained that he has been gathering information relevant to [his subject] for several years"); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 443–44 (E.D.N.Y. 2013), *on reconsideration in part*, 2017 WL 4480755 (E.D.N.Y. Sept. 30, 2017) ("Shaked has established that he has specialized 'knowledge, skill, experience, training, or education,' about Hamas.  Among other things, he served for over a decade in the ISA, has worked

as a consultant for the FBI, authored a published book about Hamas and covered Palestinian affairs and terrorism for Israel's largest newspaper for over twenty years.").

Courts have, moreover, found historian expert witnesses uniquely positioned to add clarifying context that can be helpful to a factfinder, even where a specific event, document, or policy in isolation may be comprehensible to the lay juror on its face, which is unlikely to be the case here. *See e.g.*, *Burton*, 2018 WL 3954858, at *4 ("Even when the words on the face of an historical document are comprehensible to the lay juror, a trained historian can contribute tremendously to the accuracy and completeness of the juror's understanding by situating the document in its historical context—a context with social, economic, [], [and] linguistic … dimensions, to name but a few."). To the extent the Government challenges how clearly Dr. Alterman's testimony as to historical context or el-Sisi's governance supports a defense theory, or Dr. Alterman's lack of firsthand knowledge regarding IS EG Halal, it is well established that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### C.    THE PROPOSED TESTIMONY IS NOT INADMISSIBLE UNDER RULE 403.

The Government, finally, argues that Dr. Alterman should be inadmissible under Rule 403. Gov. Br. at 38. And certainly, "expert testimony, like other forms of evidence, 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,'" confusion, or misleading the jury. *United States v. Dukagjini*, 326 F.3d 45, 51–52 (2d Cir. 2003) (quoting Fed. R. Evid. 403); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 580 (S.D.N.Y. 2007). But the Government's position that Dr. Alterman's testimony poses a risk of unfair prejudice and confusion that substantially outweigh its probative value is unsupported. First, the Government's

argument that Dr. Alterman's testimony "would turn a trial about whether Hana paid bribes into a trial about the history of Egypt, the Muslim Brotherhood, and complicated and contestable political issues far afield from what the jury has to decide" is disingenuous. Gov. Br. at 5. Of course, Mr. Hana does not intend to turn this trial into a political debate about the Muslim Brotherhood, or any alternative to it. But the Government has brought these charges, and has included in its theory of the case the argument that Mr. Hana obtained, or at least retained, these contracts as a result of corruption. The expert testimony, which promises to be quite brief, would place the award of the contract in its proper context, a context that includes some limited history of Egypt's political backdrop. That context is highly relevant; certainly, "its probative value is substantially outweighed by a danger of . . . confusing the issues," Fed. R. Evid. 403, so much so that its exclusion would deny Mr. Hana the full and fair opportunity that the Constitution requires to confront the evidence against him. *See Cortez v. Garcia*, 130 F. App'x 131, 133 (9th Cir. 2005) (finding that the trial court's "erroneous exclusion of evidence," including expert witness testimony, "violated [defendant's] constitutional right to present a defense"); *see generally Holmes v. South Carolina*, 547 U.S. 319, 319 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). Of course, any such danger of unfair prejudice—and Mr. Hana does not believe there is any—can be addressed with a limiting instruction that focuses the jury on the purpose of this testimony. Moreover, the Government, as previously stated, has not in any way addressed Dr. Alterman's proposed testimony as to the prevalence of the Egyptian military and intelligence communities in the country's economic sector,

or how that highly relevant context would be unduly prejudicial or confusing to the jury in violation of Rule 403.

Finally, the Government's citation to a 2008 case in which Dr. Alterman's expert testimony was precluded under Rule 403 only underscores the comparative relevance of Dr. Alterman's testimony in this case.  Gov. Br. at 38.  Specifically, *United States v. Amawi*, 552 F. Supp. 2d 669 (N.D. Ohio 2008), concerned charges that three defendants had conspired to "kill and maim American service personnel in Iraq," provided resources to persons seeking to kill U.S. Nationals outside the United States, and that the co-defendants had distributed a "how to video" relating to bomb making.  *Id.* at 671.  The court ultimately ruled that Dr. Alterman's proposed testimony about "Middle Eastern cultural norms, attitudes toward the United States . . . and the new media and its impact on younger persons in the Arab world can, at most, possibly give some insight into Amawi's mind set," but held that "[w]hether [the co-defendants'] views and their origins may conform to those held by others like him elsewhere" did not matter to the charges in that case.  *Id.* at 675.[4]  The court in sum found that *Amawi* was "not a case about the rise and role of new media in the Arab world[,]" nor about "Arab attitudes or geo-political dynamics in the Middle East."  *Id.* By contrast, in this case, Dr. Alterman's proposed testimony is considerably narrower, focusing only on two highly relevant questions: the first has to do with the question, raised by the Government, of how Mr. Hana and his business were selected for the sole-source contract that they obtained, which can only be understood by understanding the Egyptian  historical and political context.  And the second explains the omnipresence of the Egyptian military in the meetings and

---

[4] The court in *Amawi* described Dr. Alterman's qualifications, and did not at any point state that he was unqualified to provide expert testimony, or that his methodology provided unreliable support for the historical and cultural testimony proposed.  *See Amawi*, 552 F. Supp. 2d at 674 (discussing Dr. Alterman's qualifications).

communications at issue, a matter that could be viewed as somehow suspicious without the expert testimony of Dr. Alterman, which would show that "the military's economic interests are wide and deep," permeating virtually every significant industry in Egypt, and that it is thus "common for military officials to be involved in contracting and private business ventures[.]" ECF No. 367-4 at 6. The nexus between these topics and the charges brought and evidence to be adduced—which unquestionably center on the Egyptian government granting a significant and lucrative contract to Mr. Hana, and allowing Mr. Hana to maintain it to this day, and feature the involvement of the Egyptian military—is evident.

## **CONCLUSION**

For the reasons set forth above, Dr. Alterman's testimony, properly characterized as it is set forth in his expert disclosures, is relevant and appropriate expert testimony under Rules 401, 403, and 702. The brief context about matters unfamiliar to jurors that he can provide will assist the jury in evaluating the allegations in this case and is not inadmissible under Rule 403.

Dated:  May 7, 2024

Respectfully submitted,

*s/ Lawrence S. Lustberg*
Lawrence S. Lustberg
Ricardo Solano, Jr.
Anne M. Collart
Kelsey A. Ball
Andrew J. Marino
Christina M. LaBruno
Jessica L. Guarracino
Elena M. Cicognani
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com