UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
::::::::::::
UNITED STATES OF AMERICA

    -v-

ROBERT MENENDEZ, NADINE MENENDEZ,
WALE HANA, AND FRED DAIBES,

            Defendants.

------------------------------------------------------------x

(S4) 23-Cr-490 (SHS)

# DEFENDANT NADINE MENENDEZ'S OPPOSITION TO GOVERNMENT'S SUPPLEMENTAL MOTIONS IN LIMINE

### I. Introduction and Summary of Argument

On February 14, 2025, the government filed what it captions its "Supplemental Motions In Limine" (referenced here as "government's motion"), 44 pages long, seeking advance rulings on a series of evidentiary issues relating to affirmative evidence the government believes the defense might seek to elicit, and as to defense cross-examination of government witnesses. We of course understand that there is a legitimate impetus to protect the record in any case and preclude the introduction of irrelevant, improperly prejudicial material. Nonetheless, it is our respectful submission that the government's motion should not be granted, and is, in fact, significantly problematic, for the following reasons:

- As explained in more detail below, the government's motion is, in part, an untimely and otherwise impermissible "second bite at the apple" concerning, in part, issues that the Court previously addressed in a manner the government apparently believes was adverse to it.

- When the Court announced, at the pretrial conference on January 16, 2025, that it was denying both the government's and defense's motions in limine, it emphasized the importance of deciding evidentiary issues in the evidentiary context in which they arise at trial. This, in our view, was a potent observation with direct applicability to the government's instant motion, in which the government now has come back to the Court with a number of the same issues in the hope of achieving a different result.

- The instant supplemental motions in limine, in which the government seeks to elicit in advance, and vet in advance, aspects of the defense opening statement, cross-examination and its case-in-chief before the bell has rung on the commencement of our trial, is, we again submit respectfully, substantively impermissible. It is, in our view, an unconstitutional, overaggresive intrusion by the government upon the defense function in a serious criminal case, and hence we respectfully object to it. Further, in our view, it is not atypical of the governnment's overall approach in this case, which, in our view, is typified by an attempt to overreach into Ms. Menendez's constitutionally guaranteed right under the Sixth Amendment to effective assistance of counsel, as described in more detail below.

**II.     Applicable Legal Principles**

In *Davis v. Alaska,* 415 U.S. 308 (1974), then-Chief Justice Burger explained the signficance of the Confrontation Clause in the context of defense cross-examination of government witnesses at trial:

> The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." This right is secured for defendants in state as well as federal criminal proceedings under *Pointer v. Texas,*

380 U.S. 400 (1965). Confrontation means more than being allowed to confront the witness physically. "Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). Professor Wigmore stated: "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers." 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940). (Emphasis in original.)

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i. e., discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.[ ] The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his

> testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.
>
> *Greene v. McElroy*, 360 U.S. 474, 496 (1959).

The fundamental constitutional principles described in *Davis v. Alaska,* relating to the constitutionally mandated defense function, and particularly to the cross-examination of government witnesses at trial, have been embraced by the courts, federal and state, for decades. For example in *Owens v. State,* 251 Ga. 313,315-17, 305 S.E. 2d 102 (Ga. 1983), based on these principles and citing *Davis v. Alaska,* the Supreme Court of Georgia reversed a criminal conviction based on the grant of a motion in limine by the trial court that unconstitutionally restricted the scope of cross-examination.  These principles, which are equallly applicable here, were well-stated by the Court of Appeal of California in *People v. Delesantos,* No. 093091, 2003 Cal. App. Unpub. LEXIS 5216 *; 2003 WL 21224238 (Cal. App. May 28, 2003), also addressing the grant of a motion in limine restricting the scope of cross-examination:

> As a fundamental element of due process of law, a criminal defendant must be afforded a meaningful opportunity to present a complete defense, subject to the limitations imposed by the rules of evidence. (*People v. Lucas* (1995) 12 Cal. 4th 415, 464, 907 P.2d 373.) "The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' The right of confrontation . . . 'means more than being allowed to confront the witness physically.' [Citation.] Indeed ' "the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." ' [Citations.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678, 89 L. Ed. 2d 674, 106 S. Ct. 1431.) "Cross-

> examination is the principal means by which the believability of a witness and the truth of his testimony are tested." (*Davis v. Alaska* (1974) 415 U.S. 308, 316, 39 L. Ed. 2d 347, 94 S. Ct. 1105.)
>
> " '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' [Citations.]" (*People v. Frye* (1998) 18 Cal. 4th 894, 946, 959 P.2d 183.) Confrontation clause questions arise where restrictions imposed by the trial court effectively " 'emasculate the right of cross-examination itself.' " (*Delaware v. Fensterer* (1985) 474 U.S. 15, 19, 88 L. Ed. 2d 15, 106 S. Ct. 292, *quoting Smith v. Illinois* (1968) 390 U.S. 129, 131, 19 L. Ed. 2d 956, 88 S. Ct. 748.) " 'It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. . . .' [Citations.]" (*Alvarado v. Superior Court* (2000) 23 Cal. 4th 1121, 1139-1140.)

We understand and appreciate a legitimate interest in identifying, pre-trial, issues that may arise so as to avoid mention of impermissible material before the jury, streamline the trial and be considerate of the jurors' time. However, we respectfully submit, there are constitutional limitations upon this endeavor. Pretrial restrictions upon defense cross-examination are perhaps the principal example of such a limitation. In this regard, it is significant that documents for use solely for impeachment are *specifically exempted* from the advance disclosure requirements otherwise mandated by Fed.R.Crim.P. 16. *See, e.g., United States v. Encarnacion,* No. 19-CR-118, 2019 U.S. Dist. LEXIS 210790 (S.D.N.Y. December 6, 2019) ("Rule 16 requires

Defendants to identify all *non-impeachment exhibits* they intend to use in their defense at trial") (citation omitted; emphasis added); *accord, United States v. Vasquez,* No. S2 92 CR 101, 1993 U.S. Dist. LEXIS 3245; 1993 WL 78130 (S.D.N.Y. March 19, 1993) (Rule 16 does not mandate disclosure of documents to be used solely for impeachment).

In the context of these fundamental principles, we turn to the particular areas of examination that the government seeks, via its instant motion, to limit before our trial commences.

### III.   Procedural Context

By Order entered on December 20, 2024, following a telephonic pretrial conference, the Court mandated that "Motions in limine" . . . would be due on December 20, 2024.  Both parties complied with this deadline.  The motions in limine filed by the parties were argued at an in-person pretrial conference on January 16, 2025, resulting in an order, entered that date, stating:  "The Court denies the pending motions in limine for the reasons set forth on the record." The government now has filed its instant "supplemental motions in limine" out of time, without ever mentioning the deadline of December 20, 2024 or seeking an exemption from it.  Further, the government now raises a number of the *same evidentiary issues* that were addressed and resolved by the Court on January 16, 2025, despite the fact that motions for reconsideration -- even unacknowledged motions for reconsideration -- are subject to a fourteen-day deadline in this Court.  *See, e.g., United States v. Pope,* No. 94-CR-641, 2023 U.S. Dist. LEXIS 66991, n.1 (S.D.N.Y. April 17, 2023).  We realize that the process of addressing motions in limine may continue throughout the trial.  Under these circumstances, however, it is respectfully submitted that the Court should adhere to its ruling of January 16, 2025, and deny the government's motion on these procedural bases.

IV.     **Responses to Each Item In the Government's Motion**

The government professes concern about a pattern of improper conduct by the defense, seeking, *inter alia,* to provoke nullification by the jury. This concern is without any demonstrated foundation. The government demanded that we (1) provide reciprocal discovery documents well in advance of trial, and (2) that we provide exhibits we *might* use in the government's case-in-chief, plus an exhibit list, again well before trial. We did so. We cannot, however, legitimately be hoist on the petard of intending any inappropriate use of any such materials, in which we sought to be expansive in our production or risk being procedurally defaulted. We were not part of the first trial. We do not know precisely what the government will do in this one, and we are simply trying to be ready.

How would the Court respond if the defense filed a motion in limine, asking for an order barring the government from commenting adversely on Ms. Menendez decision not to testify, were she to decide? We suspect that, quite appropriately, that the Court would wonder if we needed a mental health referral, and would ask us if we had the slightest predicate for believing the government would do anything so inappropriate. Similarly, the government has no basis for believing that the defense will do anything impermissible in this case. In our view, it is important, and of constitutional significance, that the parties in this case not be treated differently from one another in this regard.

A.      **"Materials Related to the Ex-Boyfriend"**

The government seems particularly exercised about the possibility that the defense would engage in an improper play for sympathy, and hence nullification by the jury, by eliciting evidence that Ms. Menendez was physically abused by an ex-boyfriend. Hence, addressing once again an issue that the Court previously addressed and resolved in a prior round of motions in

limine, but not going much further than it did when it raised the issue previously, the government now demands that the Court enter a blanket order, before trial, excluding every possible reference to abuse of Ms. Menendez by this person.

In support of this demand, the government asserts that the Court *granted* a prior motion in limine relating to this issue. Government's Motion at 6. Specifically, the government states:

> For the reasons set forth above, in light of the Government's present intention to narrow the evidence and argument that it intends to offer in its case-in-chief, the defendant should be precluded from offering any evidence or argument concerning alleged abuse or mistreatment by the Ex-Boyfriend. In any event, as stated above, the Court already ruled that even if the Government were to present the same evidence and argument that it did at the first trial, the details or nature of such alleged abuse or mistreatment are not admissible. (See Dkt. 663 (Gov't Mots. in Limine) (seeking to preclude "details or inflammatory descriptions of alleged physical or emotional abuse" by the Ex-Boyfriend, consistent with the Court's rulings in the prior trial); Jan. 16 Tr. at 6-7 (***granting motion***).)

Government's motion at 5-6 (emphasis added). We are puzzled by this argument. As noted above, the Court issued an unambiguous Order on January 16, 2025, denying all of the parties' motions in limine. While unfortunately we are unable to afford to order transcripts of every hearing and hence cannot check the transcript citation in the quotation above, and the government did not see fit to append it as an exhibit, it would appear irreconcilable with the Court's express Order of January 16.

In any event, in support of this request, the government announces that it has deleted certain materials from its "summary charts." The government has not, however, deleted such materials from the minds of its witnesses, particularly investigating FBI agents, and it is unknown at this time whether references to, *e.g.,* the "007 phone" or the "Find My Friends" feature might be referenced, directly or obliquely, intentionally or inadvertently, in the testimony of government witnesses or in particular exhibits that will be introduced into evidence. Further,

we note that the government makes no reference in its motion to the following argument, which it expressly and vigorously pursued in the first trial:

> Now, you've heard from Menendez's counsel that nine of these envelopes were found in places where they claim that Menendez didn't go: Nadine's safe deposit box and the bedroom closet that you heard a lot about.
>
> Let's talk about the closet first.
>
> First of all, there is zero reason to believe that Menendez was locked out of the closet of his own bedroom. This suggestion is absurd. The closet was locked when the FBI arrived at his house, but you know what else was locked? The bedroom was locked. Was the man locked out of his own bedroom? Of course not. The house was all locked up because Menendez and Nadine were not there.
>
> And when the FBI conducted the search they even found that ***the door to the patio was barricaded with a chair.*** Was Menendez barricaded out of his own house? He was not. The fact that the closet was locked and that the door -- when the FBI arrived that means as much as the fact that the bedroom door was locked and that the patio door was propped. It was barricaded against outsiders, not against Menendez, which just shows you that they know the value of what they had stashed all over the house.
>
> How did it even work for him to be locked out of the closet in his own bedroom? Does Nadine make him clear out of the room when she needs to get her clothes from the closet? When she's getting dressed and he's still in bed, does she kick him out of bed so that she can get dressed without him being present when she opens the closet door? Or what about the fact that Nadine's son stores his ties in the closet? Does Nadine say, Bob, you have to clear out of the bedroom, I need to open the closet so that Andre can get his skull tie? Of course not. The idea is preposterous. You should reject it. He obviously had access to the closet in his own bedroom.

Tr. of trial, July 9, 2024, at 6480-82 (emphasis added).  We are deeply uncomfortable about needing to proffer this issue before trial as a result of the government's instant *in limine* motion, and respectfully object to the motion for this reason, but why does the government think that Ms.

Menendez had a chair propped up as a barricade against the door to the patio? Perhaps the government thinks that Ms. Menendez has manufactured evidence concerning her past abuse by her ex-boyfriend, but this suspicion is utterly without evidentiary basis. The government might be surprised to learn how many abused women prop chairs against doors for precisely this purpose -- to seek to protect themselves against a home invasion by a prior abuser -- and this is a perfect example of the fundamental hazard of seeking a widely encompassing bar of defense cross-examination and other defense evidence before trial.

        **B.**     **"Materials Related To a Former Spouse**

Evidence concerning funds Ms. Menendez received from a former spouse, and relating to her prior business activities, is directly relevant in this case. The government repeatedly argued in the first trial that Ms. Menendez had become impecunious and desperately needed money, which was presented as motive for the alleged bribery and other related criminal conduct at issue. Evidence that Ms. Menendez had significant monetary resources of her own directly refutes that contention.

        **C.**     **"Materials Related to Alleged Business Activities Post-Dating . . . .**

Accordingly, evidence relating to Ms. Menendez's legitimate, income-earning business activities, before and/or after the events charged in the Indictment, is directly relevant in this case. The government's theory of this case is that Ms. Menendez was, in essence, an impecunious "dead-beat" who desperately needed money and hence participated in the charged illegal conduct to accrue money and other things of value. The evidence at issue here tends to refute this proposition, demonstrating that she was a competent person able to earn funds who did not need to depend upon illegal bribes. *See* Government's Closing, Trial Tr. 6412:19–20 ("Why is Nadine getting paid by IS EG? What does she bring to the table? She brings

Menendez's power and influence."). It also refutes the proposition that she had nothing of substance to offer when she was hired as an employee by one of her codefendants. Additionally, evidence of Ms. Menendez's legitimate business activities prior to the creation and use of SIBC directly refutes the government's contention that such a business was solely created as a vehicle for the alleged bribery scheme.

        **D.**     **"Materials Related to Alleged Business Activities Prior to the Defendant's Creation and Use of" SIBC**

Evidence relating to Ms. Menendez's income-earning activities prior to the charged conduct are directly relevant in this case, for the same reasons noted immediately above. The government castigates us for not "proffering" to it the relevance of such materials. This, in our view, is emblematic of what we regard as governmental conduct overreaching into the defense function. It is, fundamentally, not right, and violative of Ms. Menendez's fundamental rights to due process and the effective assistance of counsel, for the government to demand a pretrial "proffer" of the defense's intentions at trial, and then, when such a proffer is not forthcoming, for the government to file a motion in limine seeking to elicit, before trial, the defense's intentions concerning cross-examination of government witnesses yet to be called to testify in order to aid the government's trial preparation.

        **E.**     **"Materials Related To Maintenance and Other Expenditures . . . ."**

Evidence concerning Ms. Menendez's prior car accident, and related insurance coverage, is directly relevant in this case. The government itself appears to recognize its relevance as it directly references Ms. Menendez's car accident in its closing in the trial of Ms. Menendez's codefendants. Trial Tr. 6431:21–22 ("Nadine's lost her car in an accident in December, a month before this").

Evidence relating to car expenditures also is relevant to Ms. Menendez's understanding of the vehicle payments as a loan from Mr. Uribe. Ms. Menendez's treatment of the car and its expenses is directly probative of her mindset that Mr. Uribe was providing assistance which she was later to be required to reimburse. Further, evidence relating to the litigation Ms. Menendez faced following her prior serious car accident relates to her state of mind when receiving help from Mr. Uribe and Mr. Hana, in a manner that is directly relevant to her knowledge and intent. It relates to Ms. Menendez's concerns about being held personally liable for damages following her accident and her understanding of why her longtime friends were helping her with these loans.

      **F.**      **"Materials Related to Appraisals of Jewelry**

Evidence of Ms. Menendez's appraisals of her jewelry are directly relevant to her allegedly desperate need for the monetary proceeds of the alleged bribery and related conduct at issue, her knowledge of the state of her own assets during the relevant time period, and the correctness of the government's repeated assertion in the first trial that friends to not give friends such things of great value.

      **G.**      **"Materials Referencing the Involvement of Lawyers in Making Supposed Repayments and Out of Court Statements . . . ."**

The government advances a pretrial hearsay objection to the documents it references here. This objection is baseless. The government's theory is that its cooperating witness, Jose Uribe, made bribe payments to Ms. Menendez and her husband. Our theory is that, at least in part, any such payments were a loan repayment. Ms. Menendez has a fundamental right to seek to elicit such evidence, and if there are documents corroborative of the proposition that this was the nature of the transaction, then they are patently admissible into evidence, in precisely the same manner that hundreds of *reg gestae*-related documents marked as exhibits by the

government are relevant. We do not know where the government derives an "advice of counsel" issue from this, but nothing in that doctrine prohibits the defendant from presenting such a defense in this context. If payments were made *by* a lawyer, or *through* a lawyer, this is not the same as, and has no conceivable bearing on, an advice-of-counsel defense, and no such bearing is proffered by the government. This in no way suggests that Ms. Menendez engaged in any conduct that the government seeks to characterize as criminal because of the advice of counsel. With respect to potential redactions, that question is, we submit, grossly premature, but we dispute the proposition that documents directly relevant to the testimony of one of the government's principal witnesses should be redacted to lessen their probative value.

Further, the government objects to a handwritten document created by Ms. Menendez's father (Defense Exhibit 54), listing items of value owned by the Tabourian family. We do not understand this objection. We understand that this document was proffered as an exhibit by Senator Menendez's lawyers in the first trial.

The government argues that "to the extent that the defendant wishes to offer evidence of her transmission, after the fact, of checks to Hana or Uribe, that she did so via counsel should be redacted," however, this argument is directly undermined, and contradicted, by testimony the government specifically elicited during the trial of Ms. Menendez's co-defendants. The government elicited the following testimony from Mr. Uribe during its direct examination in the prior trial:

> Q. How did you get the letter and the check?
> A. It was sent in formal overnight payment from my attorneys
> at the time, Mr. Lewin, to my home.
> A. Yes, I do.
> Q. Who is Mr. Lewin?
> A. He was my attorney at the time.

Trial Tr., June 10, 2024, at 3167:5–8.  Further, the government elicited this testimony from Mr. Uribe during its direct examination:

> Q. How did you get the letter and the check?
> A. It was sent in formal overnight payment from my attorneys at the time, Mr. Lewin, to my home.

Trial Tr., June 10, 2024, at 3167:18–19.  Given that the government apparently thought it was relevant and appropriate to seek testimony from Mr. Uribe about the fact that he received a check through his lawyer in the prior trial, it is unclear to us why they take the opposite position now.

### **Precluding Cross-Examination of Witness 1**

With respect to certain areas of cross-examination about which the government has manifested concern, we expressly proffered to the government that we had no present intention of going into them but that we were not willing to enter into a pretrial contractual commitment concerning the scope of our future cross-examination at trial.  The government's demand for such a commitment is, we respectfully suggest, the kind of unconstitutional overreaching into the defense function to which we have objected here.  The government proffers:

> As is relevant here, Witness-1 previously advised the Government that (a) for a period of several years ending over 3 years ago, Witness-1 was a heavy consumer of alcohol, ▮▮▮▮▮▮▮▮▮▮ but Witness-1 has not used alcohol ▮▮▮▮▮▮▮▮▮▮ the past 3-plus years; (b) during the same time period as Witness-1's prior alcohol and ▮▮▮▮ Witness-1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ None of these subjects, except alcohol and marijuana use, should be inquired about on cross-examination.



Government's motion at 20. We have no present intention of cross-examining on these subjects, but it is our submission that we should not be compelled now to commit not to do so, and an order should not issue precluding us from doing so, prior to the witness' testimony. We will not mention these issues in opening statement. We envision our opening in this case to be quite general in its orientation, though of course we have not yet heard the government's opening and would not think of demanding a proffer of it before trial.

### Precluding Cross-Examination of Witness 2

Similarly, with respect to Witness 2, we have no present intention of cross-examining him about his political views concerning the Middle East, but we submit that an order should not issue at this time precluding us from doing so. We simply do not know at this time whether such views could become relevant when he testifies. We will not mention this issue in opening statement, unless of course the government were to do so in its own opening.

### Precluding Cross-Examination of Witness 3

Our argument is the same as those above with respect to the items about which the government expresses concern regarding Witness 3. We have no present intention of examining on the issues on which the government is focused and will not mention the issue in our opening statement, but submit that a pretrial order precluding such cross-examination should not issue before trial.

### Precluding Cross-Examination of Witness 4

Our argument is the same as to Witness 4.

### Precluding Cross-Examination of Cooperating Witness 1

Our argument is the same with respect to the evidence flagged by the government as to its cooperating witness. We simply do not know if any of the conduct referenced by the government

could become relevant in the context of Ms. Menendez's constitutionally guaranteed right to cross-examine this critically significant witness. We respectfully submit that there is no basis to circumscribe such cross-examination at this time. We will not mention any of these items in our opening statement.

### Precluding Cross-Examination of Law Enforcement Witness 1

Our argument is the same as to Law Enforcement Witness 1.

### Precluding Cross-Examination of Law Enforcement Witness 2

Our argument is the same as to Law Enforcement Witness 2.

### Precluding Cross-Examination of Law Enforcement Witness 3

Our argument is the same as to Law Enforcement Witness 3.

### Precluding Cross-Examination of Law Enforcement Witness 4

Our argument is the same as to Law Enforcement Witness 4.

Evidence or Argument About Others Who Were On Trial

It appears that the government is seeking to bar us from referencing the fact that Ms. Menendez had codefendants in this case. She is, however, specifically charged with conspiring with them. If the government is seeking to proscribe us from mentioning the names of the other persons with whom she is charged with conspring in the Indictment, then this argument does not even merit a response, other than to say that we oppose it. We do not presently view the dates of the respective defendants' arrests as having any significance in this case, but this could conceivably change, and we submit that no basis exists to enter a pretrial order *in limine* with respect to it.

V.       **The Government's Approach to the Defense Function In This Case**

We recognize that the prosecutors in this case are experienced and well-qualified to appear for the government.  As a general matter we have no interest in opining on the government's function in prosecuting this case, notwithstanding the government's steady stream of commentary concerning our appproach as Ms. Menendez's counsel.  Nonetheless, we respectfully object to what we perceive to be an unconstitutional infringement by the government on the constituionally mandated defense function in this case.  The instant motion, in which the government, essentially, is demanding that defense (and only defense) cross-examinations at trial be vetted and approved by the Court in advance, is an example.  Another is a recent email exchange in which the government sought a commitment from undersigned counsel that by electing not to object to certain government exhibits, we were waiving related issues *on appeal and in any post-conviction challenge to a conviction.*  See email exchange appended as Exhibit 1.

We have a related concern, stemming mainly from our observation of parts of the first trial.  It sometimes happens in criminal trials that the government takes a large amount of time to present its case-in-chief, and does so virtually completely unimpeded by defense objections.  Then, however, when it is the defense's turn to present a case-in-chief, the fundamental tenor of the trial changes.  Defense witness testimony is greeted by frequent, angry prosecutorial objections, sometimes resulting in extensive demands for sidebars.  This disrupts the flow of the defense evidence and sends a message to the jury that defense evidence should be viewed with particular suspicion.  This is inconsistent with the "level playing field" required in order to achieve due process of law in criminal cases.  *See, e.g., United States v. Ming He,* Crim. No. 95-1331, 1996 U.S. App. LEXIS 28744 (2d Cir. September 3, 1996).  Were we to perceive this

occurring in our case, we simply will interpose objections, without elaboration, since there is no one or two-word shorthand for noting such an objection in open court short of a speaking objection. We of course hope that an occasion will not arise for us to do so.

                                          Respectfully submitted,

                                          /s/ Barry Coburn

                                          _____
Barry Coburn, NYS Bar No. 5221338
Coburn & Greenbaum PLLC
1710 Rhode Island Avenue, N.W.
Second Floor
Washington, DC  20036
Tel:  202-643-9472
Fax:  1-866-561-9712
barry@coburngreenbaum.com

Certificate of Service

     I hereby certify that on February 24, 2025, this opposition will be served on all counsel of record via this Court's electronic filing system.

                                          /s/ Barry Coburn

                                          _____