UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                :

UNITED STATES OF AMERICA           :

                                :

        -*v.*-                   :         S4 23 Cr. 490 (SHS)

                                :

NADINE MENENDEZ,                :
  a/k/a "Nadine Arslanian,"      :

                                :

                 Defendant.      :

                                :
----------------------------------------------------------------x

## THE GOVERNMENT'S SECOND SUPPLEMENTAL MOTIONS *IN LIMINE*

                          MATTHEW PODOLSKY
                          Acting United States Attorney

Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Catherine Ghosh
Assistant United States Attorneys

- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................1

DISCUSSION ......................................................................................................................2

I.  MR. TATE SHOULD BE PERMITTED TO TESTIFY ABOUT MAKING A REFERRAL
    TO THE FEDERAL BUREAU OF INVESTIGATION..................................................2

    A.  Background ........................................................................................................2

    B.  Argument ...........................................................................................................3

II. UNDERSECRETARY MCKINNEY SHOULD BE PERMITTED TO EXPLAIN WHY
    HE DID NOT TAKE FURTHER STEPS AFTER HIS CALL WITH THEN-SENATOR
    ROBERT MENENDEZ..................................................................................................5

    A.  Background ........................................................................................................5

    B.  Argument ...........................................................................................................5

III. IF THE DEFENDANT ELICITS THAT UNDERSECRETARY MCKINNEY DID NOT
     TAKE NOTES OF OR OTHERWISE MEMORIALZE HIS CALL WITH THEN-
     SENATOR ROBERT MENENDEZ, UNDERSECRETARY MCKINNEY SHOULD BE
     PERMITTED TO EXPLAIN WHY HE DID NOT DO SO...........................................6

    A.  Background ........................................................................................................6

    B.  Argument ...........................................................................................................8

CONCLUSION....................................................................................................................9

## PRELIMINARY STATEMENT

The Government respectfully seeks rulings *in limine* in advance of trial concerning two witnesses currently or formerly employed by the United States Department of Agriculture (the "USDA"). Each of these two witnesses—former agricultural attaché James Bret Tate and former Undersecretary of Agriculture Ted McKinney—testified at the trial of the co-defendants last year and is expected to testify in the Government's case-in-chief on the same subjects at the upcoming trial. Indeed, their testimony on direct examination is expected to be substantively identical. Nevertheless, the defendant, despite having the transcript of the first trial, has declined to state whether she will object to certain material aspects of their expected testimony. Rather, in response to the Government inquiring as to the defendant's position on the three matters described below, defense counsel stated, without elaboration, that he could not "formulate" an answer "outside of the context of trial and hearing the testimony." Whatever the merits of such a position with respect to potential other matters, it is not reasonable with respect to these matters and in this case. *See generally Williams v. Florida*, 399 U.S. 78, 82 (1970) ("The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played."); *Wardius v. Oregon*, 412 U.S. 470, 473 (1973) (the "ends of justice" are served through pretrial disclosure that "gives both parties the maximum possible amount of information with which to prepare their cases and thereby reduces the possibility of surprise at trial").

In the interests of the Government having adequate time for witness preparation, ensuring the most efficient presentation of evidence, and maximizing respect for the jury's time, the Government accordingly now seeks rulings in advance of trial.[1]

## DISCUSSION

### I.  MR. TATE SHOULD BE PERMITTED TO TESTIFY ABOUT MAKING A REFERRAL TO THE FEDERAL BUREAU OF INVESTIGATION

#### A.  Background

Mr. Tate, a foreign service officer with the USDA who held the position of agricultural attaché during the relevant time period, testified early in the Government's case-in-chief at the first trial (*see* Tr. 370-706) and is expected to do so again.  As the Court is aware, Mr. Tate principally testified regarding his involvement with a so-called audit of American halal certifiers and interactions with the Egyptian government following its decision to grant a monopoly on certification to Wael Hana's new company, ISEG Halal, despite, among other things, Hana having no relevant experience and that a monopoly would raise prices for Egyptian consumers.

---

[1] In addition to the topics raised in this motion, the Government sought to confer about a different topic, namely, the scope of cross-examination for witnesses called solely for purposes of authentication or to present similar basic undisputed facts (*e.g.*, when a subpoena was served or a cellphone seized), in light of the defendant declining to sign any stipulations.  *See, e.g.*, *United States v. Koskerides*, 877 F.2d 1129, 1136 (2d Cir. 1989) (affirming limitation of cross-examination of case agent to scope of direct testimony); *United States v. Adeniyi*, No. 03 Cr. 86 (LTS), 2004 WL 1077963, at *3 (S.D.N.Y. May 12, 2004) ("The Court is also unpersuaded by Defendant's apparent contention that [the case agent's] acknowledgment during direct examination that he had participated in an investigation of Defendant, coupled with [the case agent's] testimony regarding certain specific aspects of that investigation, combined to give defense counsel carte blanche to inquire into any subject related to the investigation of Defendant.").  The Government is not filing a motion on this subject at this time based upon defense counsel's written representation that if a Government witness's testimony is limited only to authenticating a document or other similar basic undisputed facts, the defendant's cross-examination would be limited to that subject area, unless the defendant seeks leave of the Court.

As is relevant to this motion, after conferring with counsel at sidebar (Tr. 515-28), the Court permitted Mr. Tate to testify on direct examination that he made a referral to the Federal Bureau of Investigation (the "FBI") through the legal attaché's office (commonly known as the "LEGAT"), regarding Mr. Tate's concerns about the circumstances of the monopoly grant to IS EG Halal. (*See* Tr. 530-31.) Specifically, Mr. Tate explained that he informed the FBI that the USDA was "concerned with the relationship Mr. Hana had with the Egyptian government officials and how he had obtained the business" and that Mr. Tate understood that the FBI would look into the matter. (Tr. 531.) Co-defendants' counsel did not cross-examine Mr. Tate on this subject.

**B.    Argument**

As it did at the first trial, the Court should permit Mr. Tate to testify on direct examination that he made a referral to the FBI and understood that the FBI would look into the matter. This narrow testimony—which, as noted above, was not the subject of cross-examination at the first trial—takes minimal time, yet is material to the story the jury will learn. This is so because, as the Government explained at the first trial (Tr. 516-17), former Undersecretary McKinney is expected to testify that he took no meaningful steps following his call with then-Senator Robert Menendez, notwithstanding how alarming he found that call, because Undersecretary McKinney understood that there was an FBI investigation. (*See* Tr. 1822-23 (Undersecretary McKinney testifying that he did not follow up with Menendez or take further steps with respect to Egypt in light of that understanding).) Without the context provided by Mr. Tate, the jury would have a material misimpression, or worse, an unjustified basis to doubt Undersecretary McKinney's testimony that, although deeply alarmed and capable of taking additional steps, he did not follow up with then-Senator Menendez, ask that others investigate what had occurred, or take further steps with respect to Egypt. Indeed, if the jury were precluded from knowing the true reason why Undersecretary

McKinney did not take further steps, it might conclude that the USDA did not have the ability to take additional steps, an argument that certain defense counsel pressed at the first trial in a (meritless) attempt to claim that the USDA did not have the ability to take official acts. (*See, e.g.*, Tr. 149 ("But McKinney and Menendez never again discussed the issue.  And Will [Hana] kept his business, because, honestly, it was never in jeopardy in the first place.").)

To be sure, as the parties at the first trial discussed (*see* Tr. 519-21), in theory, the Government could elicit from Undersecretary McKinney that he understood there was an investigation, and what impact that understanding had, without eliciting from Mr. Tate that he actually made a referral for such an investigation.  But there are three problems with that approach.

*First*, given defense counsel's non-response to the Government's inquiry, it is far from clear that defense counsel would not object to the Government eliciting Undersecretary McKinney's understanding (although any such objection should be overruled, for the reasons explained below).

*Second*, without the underlying fact from Mr. Tate, Undersecretary McKinney's understanding would likely seem baseless or speculative to the jury—when it was not.  The defendant is not entitled to leave the jury with such a misimpression.

*Third*, and relatedly, the Government expects that (as the co-defendants did), the defendant will try to undermine the credibility of Undersecretary McKinney.  It would be deeply unfair to the Government if the Government were not able to corroborate Undersecretary McKinney's understanding, when that understanding directly rebuts any suggestion that the USDA did not take further steps because it could not, or that Undersecretary McKinney was not really alarmed by then-Senator Menendez's call or concerned about Egypt's inexplicable decision.

4

## II.  UNDERSECRETARY MCKINNEY SHOULD BE PERMITTED TO EXPLAIN WHY HE DID NOT TAKE FURTHER STEPS AFTER HIS CALL WITH THEN-SENATOR ROBERT MENENDEZ

### A.  Background

As described above, on direct examination at the first trial, Undersecretary McKinney testified that he became aware that there was an FBI investigation concerning IS EG Halal and that this was the reason why he did not follow up with then-Senator Menendez or Egypt about the halal certification monopoly.  (*See* Tr. 1822-23.)  Specifically, he testified that this awareness was the "sole reason" he did not follow up with Menendez and, with respect to further conversations with Egypt, this "stopped it cold.  I put the word out within foreign ag. service to please stand down; it was in the hands of the FBI at this point."  (Tr. 1823.)

### B.  Argument

As at the first trial, Undersecretary McKinney should be permitted to explain in direct examination why he did not follow up with then-Senator Menendez or engage further with Egypt. Without such context, the jury would have a misleading understanding of the facts—and one that would be unfair to the Government.  As described above, a jury that was precluded from learning the reason Undersecretary McKinney did not direct further steps might be misled into discrediting his testimony regarding his alarm, or might form the misimpression that the USDA did not take further steps because it did not have the ability to do anything more.  Of course, the Government would have no objection to an appropriate limiting instruction, should the defendant request one, concerning the relevance of Undersecretary McKinney's understanding.  But the defendant should not be permitted to leave the jury with a materially inaccurate understanding of why, despite his serious alarm over both his phone call from Menendez and Egypt's decision, Undersecretary McKinney and his staff took no further steps.

5

### III.  IF THE DEFENDANT ELICITS THAT UNDERSECRETARY MCKINNEY DID NOT TAKE NOTES OF OR OTHERWISE MEMORIALZE HIS CALL WITH THEN-SENATOR ROBERT MENENDEZ, UNDERSECRETARY MCKINNEY SHOULD BE PERMITTED TO EXPLAIN WHY HE DID NOT DO SO

#### A.  Background

Prior to the first trial, Undersecretary McKinney informed the Government, in sum, that he did not take notes of his call with then-Senator Menendez because Undersecretary McKinney felt that Menendez was seeking improperly to influence him and had potentially engaged in corruption with respect to IS EG Halal, and Undersecretary McKinney did not want to create notes that might be subject to the Freedom of Information Act (commonly known as "FOIA").  (*See* 3527-36; *see also* 3527-42.)

At trial, pursuant to prior discussions with co-defendants' counsel, the Government did not ask Undersecretary McKinney on direct examination if he took notes.   On cross-examination, Robert Menendez's counsel raised this subject, asking whether Undersecretary McKinney took notes, to which he said no.  (Tr. 1974.)  Defense counsel also asked Undersecretary McKinney whether he otherwise wrote down what occurred.  (Tr. 1975; *see also* Tr. 1926.)  On re-direct examination, the Government accordingly sought to ask Undersecretary McKinney *why* he did not take notes, and defense counsel objected.  (Tr. 2011-13.)  The Court then heard from the parties at sidebar, during which the Court noted that defense counsel had opened the door:

> You did, indeed, try to leave the impression that he never said that in the phone call because you kept on saying: Did you write it down here?  Did you write it down there?  Did you write it down there?  And the answer was no, no, no.  Obviously, because, I mean, I would think you want the inference to be because it was never said?

(Tr. 2016.)  The Court explained that the Government was "entitled to combat" the misimpression.

(*Id.*)  At the same time, the Court stated that it was concerned that, without being narrowly targeted,

a question asking Undersecretary McKinney why he did not take notes might result in Undersecretary McKinney volunteering his view that then-Senator Menendez had engaged in corruption with respect to IS EG Halal. (*See* Tr. 2015 (Government counsel: "[T]he truthful answer is the one he has to say which is that he was concerned that Senator Menendez was involved in some way with the IS EG Halal and didn't want to put that down in writing because he didn't know whether or not it was true or accurate. And he thought that was a serious concern and he didn't want to put that into a document at the time. He is not going to say that he knew what it was, he is going to say that is what his concern was and he was concerned he didn't know the answer to that, he didn't want to memorialize that in a document.").) The Court accordingly directed the Government: "Try to think of a leading question that will adduce the answer without getting into his conjecture of suspicion." (Tr. 2017.)

After the parties conferred, the Government proposed to ask two questions, in sum: first, whether there was anything about the call that Undersecretary McKinney did not want to reduce to writing, and second, what was the nature of the concern that led him to prefer to speak live with his staff about the call with then-Senator Menendez. The Court agreed. (Tr. 2019-20.) When questioning resumed, Undersecretary McKinney testified: "What I was sharing with my team and did share with the team, I didn't want to go on the record that could then be acquired by Freedom of Information [Act]." (Tr. 2022.) While the Government believed that a more detailed inquiry would be appropriate, in light of the record as a whole, and that the sidebar had already significantly disrupted the testimony, the Government did not ask Undersecretary McKinney to explain further why he did not want there to be something "on the record."

### B.    Argument

As at the first trial, if the defendant elicits that Undersecretary McKinney did not take notes or otherwise memorialize his call with then-Senator Menendez, the Government should be permitted to ask Undersecretary McKinney *why* he did not do so. Any other approach, as the Court recognized (Tr. 2016), would permit the defendant to leave an unfair and material misimpression regarding an important call. In particular, the Government should be permitted to adduce—which it can do through leading questions so as to avoid eliciting detail, to the extent the defendant does not open the door to such detail—that Undersecretary McKinney had serious concerns that there was an improper purpose behind Menendez's call, but Undersecretary McKinney did not take notes in case his concerns turned out to be incorrect in light of how serious those concerns were.

Given that defense counsel has stated, as noted above, that he could not "formulate" his position on this issue "outside of the context of trial and hearing the testimony," the Government seeks a ruling in advance of trial so that it has more clarity, without the need for a sidebar, about what may be elicited from Undersecretary McKinney in a manner that will make sense to the jury and avoids a misimpression. A ruling in advance of trial will both ensure that the Government has adequate time to prepare former Undersecretary McKinney on this subject and ensure the most efficient presentation of evidence, maximizing respect for the jury's time.

8

**CONCLUSION**

For the foregoing reasons, the Government's second supplemental motions *in limine* should be granted.

Dated: New York, New York
      March 5, 2025

                       Respectfully submitted,

                       MATTHEW PODOLSKY
                       Acting United States Attorney

By:    s/ Daniel C. Richenthal
                       Daniel C. Richenthal
                       Paul M. Monteleoni
                       Lara Pomerantz
                       Catherine Ghosh
                       Assistant United States Attorneys
                       (212) 637-2109/2219/2343/1114