**Updated Defense Proffers**

**Wael Hana**: Would testify about the reasons he hired Nadine as a consultant, the work she did for IS EG Halal while consulting, and why he did not terminate their consulting arrangement early. Additionally, he would testify about the mortgage loan he provided to Nadine and the gifts he gave her over the course of their friendship. He would also testify about the constituent services he sought and received from Robert Menendez. Furthermore, Mr. Hana's testimony would be consistent with the following:

*I came to the United States from Egypt in 2006 as part of a visa lottery program and worked hard to learn the language and to build a business here. I developed friendships with fellow immigrants and people from the Middle East, with whom I shared a cultural connection, and I remained active in the Coptic Christian community. I made a life for myself in the United States and became a U.S. citizen in 2012.*

*One of the people I became friends with some 15 years ago was Nadine Arslanian, who was like a sister to me for many years. Like any close friends, we had meals together, exchanged gifts, and helped each other out when one of us was down on his or her luck. But we did these things not in expectation of something in return, but because it is what friends do. I knew that Nadine was divorced and had been in an abusive relationship, and particularly after she was hospitalized in 2017, I helped her out financially. For example, I tried to get her involved in my businesses so she could have a steady job and not have to rely on an abusive ex-boyfriend. I had been studying the halal business and talking with contacts in the Egyptian government about providing certification services for products imported to Egypt. I created a company, IS EG Halal Certified, Inc., in 2017, when it appeared from those discussions that Egypt may move forward with my proposal. Specifically, because I am a Christian, I proposed that my company would partner with the Egyptian government to handle the administrative component of certifying products as halal, and that the government would provide a specialist veterinarian and sheikh to ensure compliance with the technical specifications required by the Koran and Egypt. The current government has been trying to root out the Muslim Brotherhood from Egypt for years (since President el-Sisi took power in 2014); the Brotherhood was extremely oppressive to Coptic Christians when it was in power, and I thought removing the halal business from religious groups was a good business opportunity for me.*

*I was formally awarded the contract with an Egyptian government-owned entity, Medi Trade Co., in May 1, 2019, after an audit confirmed that the existing certifiers in the U.S. were not doing their job. And to date, including since the trial in this case, this is the contractual arrangement I maintain with the Egyptian government, memorialized most recently in an April 2021 agreement between my company and a joint stock company in Egypt owned by three Egyptian government ministries: technical experts are seconded to IS EG Halal Certified, Inc., and my company oversees the administrative components of halal certification with thirty percent of sales from certificates coming to IS EG Halal and seventy percent going to the Egyptian government. I have carefully built this business, learning from past mistakes in prior ventures (mistakes, resulting in business setbacks, which the Government unfairly says shows I was unqualified to build another business), and developed a professional operation with exceptional staff. My company has now expanded internationally to include offices in Latin America, Australia, New Zealand, Germany, India, and China.*

*I originally offered Nadine a job working in my office in New Jersey when it opened, but she had started dating Senator Menendez and traveling with him and did not want a typical stationary office job that she needed to report to eight hours every day. So she never ended up being hired, and I accordingly did not pay her. But Nadine continued to communicate to me that she was having financial trouble, so I offered her a consulting role several months later and anticipated that she would assist with setting up international offices as the company expanded from the U.S and Latin America to India, Australia, Germany, and beyond. We negotiated an agreement and set a term as a means of ensuring for some consideration of her performance after three months. In September, 2019, she had some communications with a colleague of mine in Uruguay, Carolina Silvarredonda, but ultimately, and repeatedly, Nadine did not deliver when she said she would, so I put someone else on the job and decided not to renew her contract. Although I could have terminated her contract early, she was my friend and I paid her what I had agreed under the consulting agreement (three months at $10,000 per month) and hoped Nadine and I would remain friends, but I decided that I could not rely on her professionally and did not think that we should have a business relationship after that experience.*

*Even earlier in 2019, she told me that she was behind on her mortgage payments, and because, as a I said earlier, I wanted to help her out when she was in financial difficulty, I gave her a loan with no interest because that is what I believe friends do. We even had a promissory note drawn up by an attorney, and although I know Nadine thought that was too formal for a loan between friends, I continue to believe that Nadine understood it to be a loan and intended to pay it back. Indeed, she did pay it back when she was able to.*

*While all of this was going on, Nadine started dating the senator for New Jersey, Robert Menendez in 2018. In fact, she came to a couple of meetings I had in Washington D.C. with Egyptian officials and the Senator because she wanted to see him early in their relationship. He later became part of our social group through her and we had some dinners together, though we were never really friends (he didn't even have my phone number, for example, and I usually communicated with him through Nadine just because that is my friend – not because I was trying to hide something). But as a U.S. citizen and resident of New Jersey, where my company was also incorporated, he was also my senator and my representative (in Arabic, I would call him "my man"), regardless of whether he was dating or eventually married to my friend. When I started meeting with him, I wanted him to understand my country of origin better, including the impact that the Muslim Brotherhood had on my community and the possibility for better relations between the U.S. and the current Egyptian government. I introduced him to people I knew in the Egyptian embassy and attended social dinners with them and Nadine – all contacts that I understand the Senator's own staff on the Senate Foreign Relations Committee recommended he meet with, independent of me. I shared with him and Nadine points about Egypt's position with respect to particular policy issues, including that Egypt bears a disproportionate burden in maintaining security and stability in the region with respect to Libya, but maintains an ongoing commitment to bilateral relations with the U.S., which I believe is true and hoped the Senator would agree with and recognize in his interactions with colleagues and Egyptian officials. But to be clear, I never gave anything to Senator Menendez or Nadine to get him to agree with this or any other position regarding Egypt (honestly, I did not think that what I was telling him was particularly controversial); I was just working with my representative on issues that are important to me regarding Egypt – a country where most of my family continue to reside.*

*At trial, there was much discussion of information that was supposedly non-public and shared by Senator Menendez with Nadine and me – specifically falling into two categories: the number of*

*embassy employees in Cairo and information about congressional approval of arms sales to Egypt. The idea that providing this information to me means that I was conspiring to make Senator Menendez an agent of Egypt is, honestly, complete nonsense. Egypt knows who is working in embassies in Cairo – if Egyptian, they pay taxes and have health insurance; if American, they have records of their entry and position in the country. Egypt did not ask me to get this information from the Senator and would have no reason to do so. I had previously talked with the Senator, Nadine, and Ahmed Helmy about the number of Egyptians who worked at the US embassy who were also members of the Muslim Brotherhood, and he shared it with me to demonstrate that the number of Egyptians there overall was not as high as I had assumed. I shared that with Ahmed Helmy, who was at the meeting where I raised this issue, to let him know the follow up. In any event, the information about U.S. employees is publicly published by the U.S. government on a regular basis and the number of staff, whether Americans or Egyptians, does not change materially over time. With respect to the information on the ban of small arms sales to Egypt being lifted, that too was not secret information – in fact, it appears from the evidence at trial that it was almost immediately made public to Egypt and one of its lobbyists. But at the time, I had been submitting responses to Requests for Quotations and was hoping to win a contract for some of these sales, so I had a commercial interest in this information. Indeed, I knew that the U.S. and Egypt have a longstanding and active defense partnership, which included the U.S.'s regular grants of military financing and arms sales to Egypt for decades. But I certainly did not bribe the Senator to get it. And the fact that he shared it with me as one of his constituents does not even begin to suggest that he was acting at the direction or under the control of Egypt as an agent. And even beyond that, this was all long before I was awarded the halal contract that the Government incorrectly alleges was something I bribed the Senator to support, in order to funnel bribes to the Senator and his wife.*

*When I was actually later awarded the contract in 2019, the USDA's Foreign Agriculture Service published a report regarding my company's status as the sole halal certifier for imports into Egypt. I thought this was out of place for them to be commenting negatively about my company and a decision that was not within their purview. Senator Menendez openly and appropriately made a call expressing concern that the report was unfair towards my New Jersey business, which Egypt had selected in its sole discretion. I never gave Senator Menendez or Nadine anything in exchange for this – let alone the envelopes of cash or large gold bars that the Government falsely suggested came from me at trial. I consider that just part of his job as my representative.*

*In fact, I never gave Senator Menendez or Nadine cash or kilogram gold bars at all. Unsurprisingly, my fingerprints were not found on any of the cash or gold at their residence. And I certainly didn't ask anyone to pass cash or gold to them – in fact, Nader Moussa, who the Government suggested (but in no way proved) I used to give cash to Nadine, told the Government that this did not happen – something that the Government did not disclose to the Court or jury. The gifts I did give to Nadine and Bob, for example, an air purifier, an exercise bike, gift baskets of cigars and alcohol at Christmas, or treating them to dinner, were not in exchange for anything. They were just gifts to a long-time friend and her husband.*

*As for Jose Uribe paying for a car for Nadine and trying to get the Senator to do something illegal with respect to his insurance scams, I had nothing to do with any of that. Jose testified that he assumed I was going to do something improper with Nadine through the Senator to "stop and kill" the investigation, but that did not happen and was certainly never my intention. In fact, that was the phrase used by our mutual friend and attorney, Andy Aslanian, who initially represented Jose's "daughter," Anna Peguero. All I did was try to help them get an attorney to legally deal with Elvis*

*Parra's case and the investigation of Peguero and case when I learned that Jose was concerned about these issues. I knew that Nadine had a referral for an attorney other than Andy and tried to coordinate sharing information among Nadine, Andy, and Jose in order to help someone who I thought was my friend through legitimate means. Beyond that, I didn't know what was going on with it, including when he hired new counsel. I certainly had no idea that Jose was paying for a car for Nadine, though of course I knew that she didn't have one and asked Fred Daibes to let her borrow one around the same time. But I was never a part of Jose and Nadine's agreement. Nor was I ever given any payment of cash by Jose or his associates, and I never discussed having Nadine or the Senator do anything to assist with any investigation or prosecution. I had nothing to do with that case.*

*The same is true of the alleged schemes involving Fred Daibes and influencing the DNJ prosecution and a development involving Qatar – and though there was no testimony or evidence that I was involved in those allegations, I was charged in one large conspiracy involving them. In any event, I want to be clear that I had nothing to do with any of those events, nor did I even know of them at the time.*

**Katia Tabourian**: Would testify about the Defendant's family history with gold and jewelry, personality (including her attitude toward gift-giving and receiving), and her character and reputation for honesty and truthfulness, in addition to other relevant character traits. Testimony would include information about Nadine's sources of income following her first divorce, Nadine's luxury belongings, and gold and other luxury gifts received on various special occasions. Testimony would also include information about how Nadine and her family catalogued and listed their gifts and valuable belongings.

**Jamela Maali:** Would testify about her experience working with Fred Daibes, her knowledge of gift giving from Mr. Daibes to Nadine Menendez, and his reputation for gift giving. She would further testify about a handbag purchased by Mr. Daibes for Ms. Menendez as a gift in or around spring of 2022. She would describe the handbag, recount how Ms. Menendez became interested in the bag, and Mr. Daibes reaction. She would further testify about her understanding of how Mr. Daibes purchased the bag and gave it to Ms. Menendez. Additionally, Ms. Maali would testify about her knowledge of Mr. Daibes' interest in owning Ms. Menendez's home. She would further testify about Ms. Menendez's interest in looking to purchase a new home in early 2022. She would describe her involvement connecting Ms. Menendez with a realtor and her understanding of the actions Ms. Menendez took with respect to the realtor and her search for a home.

**Carolina Silvarredonda:** Would testify that she began working for IS EG Halal in Uruguay around September 2019. She would testify about her experience working at IS EG Halal in 2019. More specifically, she would testify about her experience working with Nadine Menendez with respect to IS EG Halal. Ms. Silvarredonda would testify about her knowledge of the work Ms. Menendez was expected to complete for IS EG Halal, including establishing an office for IS EG Halal in India. She would further testify about the work actually performed by Ms. Menendez to establish an office in India and her experience working with Ms. Menendez to complete such work. Ms. Silvarredonda would further testify about her satisfaction with the work performed by

Ms. Menendez and she would testify about her understanding of Mr. Hana's satisfaction of the work performed. Additionally, she would testify about her knowledge of the termination of Ms. Menendez's work with IS EG Halal.

**John Moldovan**: Would expand upon his testimony during the government's case, including all of the substance of his testimony in Trial 1. More specifically, his testimony would include his understanding of the initial terms he understood Mr. Hana to be expecting in relation to the promissory note for the mortgage loan, namely that the loan would need to be paid back in full in five years, it would not accrue interest, and it would not have a payment schedule. He would further testify about the investments he received from Mr. Hana and Mr. Daibes relating to his law firm.

**Fred Daibes**: Would testify about his friendship with Ms. Menendez and his gift giving to Ms. Menendez over the course of their friendship. He would further testify about his interest in purchasing her home and the actions he took in furtherance of that goal.

**Robert Menendez**: If we call him, would testify about every aspect of the indictment as it relates to his wife, as well as his relationship with her and her character and reputation for truthfulness.

**Jonathan Cohen**: Would testify about Mr. Menendez's policies and practices, while a senator, relating to the Middle East, particularly the way he handled issues with Egypt before and during the relevant time period. His testimony would include details about Mr. Menendez's Congressional Delegation trip to Egypt in October 2021, including planning for the Congressional Delegation and meetings Ambassador Cohen attended with Senator Menendez during it.

**Garbis Tabourian**: Similar to his daughter Katia.

**Nicholas Lewin**: Would testify about a financial transaction in which he was involved with Jose Uribe and the Defendant. Additionally, Mr. Lewin's testimony would be consistent with the following text from a letter motion filed by Mr. Menendez's counsel.

> Dear Judge Stein:
> We write at the Court's request concerning the relevance and admissibility of documents and testimony sought from Jose Uribe's former counsel.
> Evidence of Uribe's Successful Effort to Mislead His Counsel Is Admissible to Prove Senator Menendez's Lack of Knowledge Defense
> As it relates to Uribe, the government has charged Senator Menendez with accepting bribes from Uribe and participating with Uribe in a conspiracy to obstruct justice. The government's evidence to date is that Uribe made car payments on behalf of Nadine Arslanian, and that he and Nadine entered into a scheme to deceive others (and thereby obstruct justice) by falsely claiming that the car payments from Uribe were a loan to Arslanian. In his defense, Senator Menendez contends that he did not know that Uribe was making payments for Arslanian's

car, and that when he learned of such payments, which he believed in good faith were a loan from Uribe, he insisted that the loan be paid back. At trial, Uribe has acknowledged that he never talked to Senator Menendez about Arslanian's car, let alone who was paying for the car.

Given the absence of any direct evidence of the Senator's knowledge, the government relies on inferential leaps that Senator Menendez knew about the car payments and that the loan was a cover-story by Uribe and Arslanian. But inferences are not a one-way street. We intend to present competent evidence for the jury to infer that Senator Menendez was duped by the other members of the alleged conspiracy and therefore did not know about the car payments and believed that the payments were made by Uribe as a loan. Among such evidence is critical testimony from Nick Lewin, Uribe's former counsel, regarding Uribe's efforts to deceive Mr. Lewin into concluding and representing to others that the car payments were a loan.

Evidence that Uribe misled his attorney about the very acts central to the government's case is plainly relevant to Senator Menendez's lack of knowledge defense. In *United States v. Aboumoussallem,* 726 F. 2d 906 (2nd Cir. 1984), the Second Circuit held that the district court "improperly excluded as irrelevant evidence tending to corroborate [the defendant's] defense that he was unwittingly 'duped' into the [alleged conspiracy]," because evidence that a coconspirator duped one person "tends to make the existence of a consequential fact, the [defendant's] knowledge, less probable." Id. at 912. See also *United States v. Amuso*, 21 F.3d 1251, 1262 (2nd Cir. 1994) (clarifying that Aboumoussallem "involved evidence directly relevant to the defendant's own knowledge which was an element of the offense.").1 For this reason alone, evidence that Uribe duped his lawyer into believing that the car payments were a loan is admissible evidence that Uribe's and Arslanian's scheme worked, and makes it more likely that the scheme similarly duped Senator Menendez. Indeed, Uribe directly communicated with Senator Menendez in an effort to obtain his assistance to protect his "daughter" Ana, and Mr. Lewin's testimony on how Uribe similarly duped him is plainly admissible.

Mr. Lewin's Testimony is Independently Admissible to Impeach Mr. Uribe
Separately, Mr. Lewin's testimony is admissible to impeach Uribe, who falsely claimed at trial that he (Uribe) believed Senator Menendez knew that Uribe made payments on Nadine Arslanian's car:
Q. Did you ever tell Robert Menendez that you had been making payments on a Mercedes for Nadine?
A. I never talked to Mr. Menendez about making payments for the car.
Q. Why not?
A. It was – I have no reason to believe that he didn't know I was making those payments.
Q. And why do you say that?

A. Just my understanding that at this point he would have known that I'm making the payments on the car.
Trial Tr. 3107:7–16.
Q. THE COURT: What was the basis of your understanding, sir, that he knew you were making the payments on the car? Why did you believe he knew you were

making payments on the car?
A. You Honor, in this point, I provided the car. I made the payments. Nadine have try a number of times to accommodate meetings between me and the senator. The senator seem to be reluctant and agreeing to try to meet with me; just the timing hasn't been appropriate. I saw he, or I felt he's -- she's trying her best and he's not denying it. The only reason why she's trying this is because I'm doing – I'm complying with my part of the deal. I have no doubt to believe that Mr. Menendez knew I was making payment for the car.
Trial Tr. 3107:20–3108:7 (emphasis added).

Uribe's testimony is flatly contradicted by his prior statements to his counsel, Mr. Lewin. According to the government's notes of Mr. Lewin's July 19, 2023 proffer, Mr. Lewin informed the government at the proffer as follows:
Jose [Uribe] has a long relationship with Nadine, friends for years before dating the senator. [Uribe] remembers agreeing to make the payments because she was in a tough spot financially, that she would pay him back when able to do so. He did it in part because he wanted to be close to someone who was close to someone that was a big deal, but [Uribe] was not directed or asked to make the payments, didn't tell the senator about the payments, [and] doesn't know if [Senator Menendez] knew about the payments. The messages are clear on this, [Nadine Arslanian] expresses her gratitude to [Uribe]. See Fee Decl. Ex. A (emphasis added).

Mr. Lewin's prior statements to the government on Uribe's behalf directly impeach Uribe's testimony. Uribe testified that he authorized his prior counsel to convey what he now claims to be false information about whether the car payments were a loan, but he said nothing about conveying inaccurate information about Senator Menendez's lack of contemporaneous knowledge of Uribe's payments. Trial Tr. 3172:4–3173:12.

**Michael Critchley:** Would testify that he represented Parra and negotiated the plea for him, he would describe his conversations with Robert Menendez about the case, including why he believed it was an unfair and inappropriate prosecution. Testimony would be consistent with his deposition testimony.

**Ana Peguerro**: Expected to testify about the criminal investigation, her knowledge regarding Jose Uribe's related actions, and her related interactions with Jose Uribe.

**Meirna Hanna**: Would testify about her experience working at IS EG Halal, interactions with Wael Hana and Nadine Menendez, and Wael's reputation for gift giving in business community