Gmail

**Barry Coburn <barry@coburngreenbaum.com>**

---

## additional proffer re Lewin
1 message

---

**Barry Coburn** <barry@coburngreenbaum.com>                                      Fri, Apr 4, 2025 at 5:10 AM
To: Daniel Richenthal <Daniel.Richenthal@usdoj.gov>, Paul Monteleoni <Paul.Monteleoni@usdoj.gov>, Lara Pomerantz
<Lara.Pomerantz@usdoj.gov>, "Ghosh, Catherine (USANYS)" <Catherine.Ghosh@usdoj.gov>
Cc: Sarah Schwietz <sarah@coburngreenbaum.com>, Marc Eisenstein <marc@coburngreenbaum.com>
Bcc: Barry Coburn <barry@coburngreenbaum.com>

   Additional detail about Mr. Lewin's anticipated testimony is reflected in the following text from a letter motion filed by Mr.
   Menendez's counsel.  Best, Barry


   --------------

   Dear Judge Stein:
   We write at the Court's request concerning the relevance and admissibility of documents and
   testimony sought from Jose Uribe's former counsel.
   Evidence of Uribe's Successful Effort to Mislead His Counsel Is Admissible to Prove
   Senator Menendez's Lack of Knowledge Defense
   As it relates to Uribe, the government has charged Senator Menendez with accepting bribes from
   Uribe and participating with Uribe in a conspiracy to obstruct justice. The government's
   evidence to date is that Uribe made car payments on behalf of Nadine Arslanian, and that he and
   Nadine entered into a scheme to deceive others (and thereby obstruct justice) by falsely claiming
   that the car payments from Uribe were a loan to Arslanian. In his defense, Senator Menendez
   contends that he did not know that Uribe was making payments for Arslanian's car, and that
   when he learned of such payments, which he believed in good faith were a loan from Uribe, he
   insisted that the loan be paid back. At trial, Uribe has acknowledged that he never talked to
   Senator Menendez about Arslanian's car, let alone who was paying for the car.
   Given the absence of any direct evidence of the Senator's knowledge, the government relies on
   inferential leaps that Senator Menendez knew about the car payments and that the loan was a
   cover-story by Uribe and Arslanian. But inferences are not a one-way street. We intend to
   present competent evidence for the jury to infer that Senator Menendez was duped by the other
   members of the alleged conspiracy and therefore did not know about the car payments and
   believed that the payments were made by Uribe as a loan. Among such evidence is critical
   testimony from Nick Lewin, Uribe's former counsel, regarding Uribe's efforts to deceive Mr.
   Lewin into concluding and representing to others that the car payments were a loan
   Evidence that Uribe misled his attorney about the very acts central to the government's case is
   plainly relevant to Senator Menendez's lack of knowledge defense. In United States v.
   Aboumoussallem, 726 F. 2d 906 (2nd Cir. 1984), the Second Circuit held that the district court
   "improperly excluded as irrelevant evidence tending to corroborate [the defendant's] defense that
   he was unwittingly 'duped' into the [alleged conspiracy]," because evidence that a co◇conspirator duped one person
   "tends to make the existence of a consequential fact, the
   [defendant's] knowledge, less probable." Id. at 912. See also United States v. Amuso, 21 F.3d
   1251, 1262 (2nd Cir. 1994) (clarifying that Aboumoussallem "involved evidence directly
   relevant to the defendant's own knowledge which was an element of the offense.").1
    For this
   reason alone, evidence that Uribe duped his lawyer into believing that the car payments were a
   loan is admissible evidence that Uribe's and Arslanian's scheme worked, and makes it more
   likely that the scheme similarly duped Senator Menendez. Indeed, Uribe directly communicated
   with Senator Menendez in an effort to obtain his assistance to protect his "daughter" Ana, and
   Mr. Lewin's testimony on how Uribe similarly duped him is plainly admissible.

   Mr. Lewin's Testimony is Independently Admissible to Impeach Mr. Uribe
   Separately, Mr. Lewin's testimony is admissible to impeach Uribe, who falsely claimed at trial
   that he (Uribe) believed Senator Menendez knew that Uribe made payments on Nadine
   Arslanian's car:
   Q. Did you ever tell Robert Menendez that you had been making payments on a
   Mercedes for Nadine?
   A. I never talked to Mr. Menendez about making payments for the car.

Q. Why not?
A. It was – I have no reason to believe that he didn't know I was making those payments.
Q. And why do you say that?
A. Just my understanding that at this point he would have known that I'm making the payments on the car.
Trial Tr. 3107:7–16.
Q. THE COURT: What was the basis of your understanding, sir, that he knew you were making the payments on the car? Why did you believe he knew you were making payments on the car?
A. You Honor, in this point, I provided the car. I made the payments. Nadine have try a number of times to accommodate meetings between me and the senator. The senator seem to be reluctant and agreeing to try to meet with me; just the timing hasn't been appropriate. I saw he, or I felt he's -- she's trying her best and he's not denying it. The only reason why she's trying this is because I'm doing – I'm complying with my part of the deal. I have no doubt to believe that Mr. Menendez knew I was making payment for the car.
Trial Tr. 3107:20–3108:7 (emphasis added).
Uribe's testimony is flatly contradicted by his prior statements to his counsel, Mr. Lewin. According to the government's notes of Mr. Lewin's July 19, 2023 proffer, Mr. Lewin informed the government at the proffer as follows:
Jose [Uribe] has a long relationship with Nadine, friends for years before dating the senator. [Uribe] remembers agreeing to make the payments because she was in a tough spot financially, that she would pay him back when able to do so. He did it in part because he wanted to be close to someone who was close to someone that was a big deal, but [Uribe] was not directed or asked to make the payments, didn't tell the senator about the payments, [and] doesn't know if [Senator Menendez] knew about the payments. The messages are clear on this, [Nadine Arslanian] expresses her gratitude to [Uribe].
See Fee Decl. Ex. A (emphasis added).
Mr. Lewin's prior statements to the government on Uribe's behalf directly impeach Uribe's testimony. Uribe testified that he authorized his prior counsel to convey what he now claims to be false information about whether the car payments were a loan, but he said nothing about conveying inaccurate information about Senator Menendez's lack of contemporaneous knowledge of Uribe's payments. Trial Tr. 3172:4–3173:12.

Barry Coburn
Coburn, Greenbaum & Eisenstein PLLC
1710 Rhode Island Avenue, NW
Second Floor
Washington, DC  20036
Universal direct dial (work and cell):  202-643-9472
Firm main number:  202-630-2844
Fax:  866-561-9712 (toll-free)
www.coburngreenbaum.com


On Fri, Apr 4, 2025 at 4:51 AM Barry Coburn <barry@coburngreenbaum.com> wrote:
In addition, we anticipate Mr. Hana would testify to the following:

I came to the United States from Egypt in 2006 as part of a visa lottery program and worked hard to learn the language and to build a business here. I developed friendships with fellow immigrants and people from the Middle East, with whom I shared a cultural connection, and I remained active in the Coptic Christian community. I made a life for myself in the United States and became a U.S. citizen in 2012.
One of the people I became friends with some 15 years ago was Nadine Arslanian, who was like a sister to me for many years. Like any close friends, we had meals together, exchanged gifts, and helped each other out when one of us was down on his or her luck. But we did these things not in expectation of something in return, but because it is what friends do. I knew that Nadine was divorced and had been in an abusive relationship, and particularly after she was hospitalized in 2017, I helped her out financially. For example, I tried to get her involved in my businesses so she could have a steady job and not have to rely on an abusive ex-boyfriend. I had been

*studying the halal business and talking with contacts in the Egyptian
government about providing certification services for products imported to
Egypt. I created a company, IS EG Halal Certified, Inc., in 2017, when it
appeared from those discussions that Egypt may move forward with my
proposal. Specifically, because I am a Christian, I proposed that my
company would partner with the Egyptian government to handle the
administrative component of certifying products as halal, and that the
government would provide a specialist veterinarian and sheikh to ensure
compliance with the technical specifications required by the Koran and
Egypt. The current government has been trying to root out the Muslim
Brotherhood from Egypt for years (since President el-Sisi took power in
2014); the Brotherhood was extremely oppressive to Coptic Christians
when it was in power, and I thought removing the halal business from
religious groups was a good business opportunity for me.
I was formally awarded the contract with an Egyptian government-owned
entity, Medi Trade Co., in May 1, 2019, after an audit confirmed that the
existing certifiers in the U.S. were not doing their job. And to date, including
since the trial in this case, this is the contractual arrangement I maintain
with the Egyptian government, memorialized most recently in an April 2021
agreement between my company and a joint stock company in Egypt owned
Case 1:23-cr-00490-SHS Document 628 Filed 11/08/24 Page 41 of 83*

*Hana, Wael 40 P8717563 - DiMaria, Nicolo
by three Egyptian government ministries: technical experts are seconded to
IS EG Halal Certified, Inc., and my company oversees the administrative
components of halal certification with thirty percent of sales from
certificates coming to IS EG Halal and seventy percent going to the
Egyptian government. I have carefully built this business, learning from
past mistakes in prior ventures (mistakes, resulting in business setbacks,
which the Government unfairly says shows I was unqualified to build
another business), and developed a professional operation with exceptional
staff. My company has now expanded internationally to include offices in
Latin America, Australia, New Zealand, Germany, India, and China.
I originally offered Nadine a job working in my office in New Jersey when
it opened, but she had started dating Senator Menendez and traveling with
him and did not want a typical stationary office job that she needed to report
to eight hours every day. So she never ended up being hired, and I
accordingly did not pay her. But Nadine continued to communicate to me
that she was having financial trouble, so I offered her a consulting role
several months later and anticipated that she would assist with setting up
international offices as the company expanded from the U.S and Latin
America to India, Australia, Germany, and beyond. We negotiated an
agreement and set a term as a means of ensuring for some consideration of
her performance after three months. In September, 2019, she had some
communications with a colleague of mine in Uruguay, Carolina
Silvarredonda, but ultimately, and repeatedly, Nadine did not deliver when
she said she would, so I put someone else on the job and decided not to
renew her contract. Although I could have terminated her contract early,
she was my friend and I paid her what I had agreed under the consulting
agreement (three months at $10,000 per month) and hoped Nadine and I
would remain friends, but I decided that I could not rely on her
professionally and did not think that we should have a business relationship
after that experience.
Even earlier in 2019, she told me that she was behind on her mortgage
payments, and because, as a I said earlier, I wanted to help her out when
she was in financial difficulty, I gave her a loan with no interest because
that is what I believe friends do. We even had a promissory note drawn up
by an attorney, and although I know Nadine thought that was too formal for
a loan between friends, I continue to believe that Nadine understood it to
be a loan and intended to pay it back. Indeed, she did pay it back when she
was able to.
While all of this was going on, Nadine started dating the senator for New
Jersey, Robert Menendez in 2018. In fact, she came to a couple of meetings
I had in Washington D.C. with Egyptian officials and the Senator because
she wanted to see him early in their relationship. He later became part of*

*our social group through her and we had some dinners together, though we*
*were never really friends (he didn't even have my phone number, for*
*Case 1:23-cr-00490-SHS Document 628 Filed 11/08/24 Page 42 of 83*

*Hana, Wael 41 P8717563 - DiMaria, Nicolo*
*example, and I usually communicated with him through Nadine just because*
*that is my friend – not because I was trying to hide something). But as a*
*U.S. citizen and resident of New Jersey, where my company was also*
*incorporated, he was also my senator and my representative (in Arabic, I*
*would call him "my man"), regardless of whether he was dating or*
*eventually married to my friend. When I started meeting with him, I wanted*
*him to understand my country of origin better, including the impact that the*
*Muslim Brotherhood had on my community and the possibility for better*
*relations between the U.S. and the current Egyptian government. I*
*introduced him to people I knew in the Egyptian embassy and attended*
*social dinners with them and Nadine – all contacts that I understand the*
*Senator's own staff on the Senate Foreign Relations Committee*
*recommended he meet with, independent of me. I shared with him and*
*Nadine points about Egypt's position with respect to particular policy*
*issues, including that Egypt bears a disproportionate burden in maintaining*
*security and stability in the region with respect to Libya, but maintains an*
*ongoing commitment to bilateral relations with the U.S., which I believe is*
*true and hoped the Senator would agree with and recognize in his*
*interactions with colleagues and Egyptian officials. But to be clear, I never*
*gave anything to Senator Menendez or Nadine to get him to agree with this*
*or any other position regarding Egypt (honestly, I did not think that what I*
*was telling him was particularly controversial); I was just working with my*
*representative on issues that are important to me regarding Egypt – a*
*country where most of my family continue to reside.*

*At trial, there was much discussion of information that was supposedly non-*
*public and shared by Senator Menendez with Nadine and me – specifically*

*falling into two categories: the number of embassy employees in Cairo and*
*information about congressional approval of arms sales to Egypt. The idea*
*that providing this information to me means that I was conspiring to make*
*Senator Menendez an agent of Egypt is, honestly, complete nonsense. Egypt*
*knows who is working in embassies in Cairo – if Egyptian, they pay taxes*
*and have health insurance; if American, they have records of their entry*
*and position in the country. Egypt did not ask me to get this information*
*from the Senator and would have no reason to do so. I had previously talked*
*with the Senator, Nadine, and Ahmed Helmy about the number of Egyptians*
*who worked at the US embassy who were also members of the Muslim*
*Brotherhood, and he shared it with me to demonstrate that the number of*
*Egyptians there overall was not as high as I had assumed. I shared that with*
*Ahmed Helmy, who was at the meeting where I raised this issue, to let him*
*know the follow up. In any event, the information about U.S. employees is*
*publicly published by the U.S. government on a regular basis and the*
*number of staff, whether Americans or Egyptians, does not change*
*materially over time. With respect to the information on the ban of small*
*arms sales to Egypt being lifted, that too was not secret information – in*
*fact, it appears from the evidence at trial that it was almost immediately*
*made public to Egypt and one of its lobbyists. But at the time, I had been*
*Case 1:23-cr-00490-SHS Document 628 Filed 11/08/24 Page 43 of 83*

*Hana, Wael 42 P8717563 - DiMaria, Nicolo*
*submitting responses to Requests for Quotations and was hoping to win a*
*contract for some of these sales, so I had a commercial interest in this*
*information. Indeed, I knew that the U.S. and Egypt have a longstanding*
*and active defense partnership, which included the U.S.'s regular grants of*
*military financing and arms sales to Egypt for decades. But I certainly did*
*not bribe the Senator to get it. And the fact that he shared it with me as one*
*of his constituents does not even begin to suggest that he was acting at the*
*direction or under the control of Egypt as an agent. And even beyond that,*
*this was all long before I was awarded the halal contract that the*

Government incorrectly alleges was something I bribed the Senator to support, in order to funnel bribes to the Senator and his wife.

When I was actually later awarded the contract in 2019, the USDA's Foreign Agriculture Service published a report regarding my company's status as the sole halal certifier for imports into Egypt. I thought this was out of place for them to be commenting negatively about my company and a decision that was not within their purview. Senator Menendez openly and appropriately made a call expressing concern that the report was unfair towards my New Jersey business, which Egypt had selected in its sole discretion. I never gave Senator Menendez or Nadine anything in exchange for this – let alone the envelopes of cash or large gold bars that the Government falsely suggested came from me at trial. I consider that just part of his job as my representative.

In fact, I never gave Senator Menendez or Nadine cash or kilogram gold bars at all. Unsurprisingly, my fingerprints were not found on any of the cash or gold at their residence. And I certainly didn't ask anyone to pass cash or gold to them – in fact, Nader Moussa, who the Government suggested (but in no way proved) I used to give cash to Nadine, told the Government that this did not happen – something that the Government did not disclose to the Court or jury. The gifts I did give to Nadine and Bob, for example, an air purifier, an exercise bike, gift baskets of cigars and alcohol at Christmas, or treating them to dinner, were not in exchange for anything. They were just gifts to a long-time friend and her husband.

As for Jose Uribe paying for a car for Nadine and trying to get the Senator to do something illegal with respect to his insurance scams, I had nothing to do with any of that. Jose testified that he assumed I was going to do something improper with Nadine through the Senator to "stop and kill" the investigation, but that did not happen and was certainly never my intention. In fact, that was the phrase used by our mutual friend and attorney, Andy Aslanian, who initially represented Jose's "daughter," Anna Peguero. All I did was try to help them get an attorney to legally deal with Elvis Parra's case and the investigation of Peguero and case when I learned that Jose was concerned about these issues. I knew that Nadine had a referral for an attorney other than Andy and tried to coordinate sharing information among Nadine, Andy, and Jose in order to help someone who I thought was

Case 1:23-cr-00490-SHS Document 628 Filed 11/08/24 Page 44 of 83

Hana, Wael 43 P8717563 - DiMaria, Nicolo

my friend through legitimate means. Beyond that, I didn't know what was going on with it, including when he hired new counsel. I certainly had no idea that Jose was paying for a car for Nadine, though of course I knew that she didn't have one and asked Fred Daibes to let her borrow one around the same time. But I was never a part of Jose and Nadine's agreement. Nor was I ever given any payment of cash by Jose or his associates, and I never discussed having Nadine or the Senator do anything to assist with any investigation or prosecution. I had nothing to do with that case.

The same is true of the alleged schemes involving Fred Daibes and influencing the DNJ prosecution and a development involving Qatar – and though there was no testimony or evidence that I was involved in those allegations, I was charged in one large conspiracy involving them. In any event, I want to be clear that I had nothing to do with any of those events, nor did I even know of them at the time.


Barry Coburn
Coburn, Greenbaum & Eisenstein PLLC
1710 Rhode Island Avenue, NW
Second Floor
Washington, DC 20036
Universal direct dial (work and cell): 202-643-9472
Firm main number: 202-630-2844
Fax: 866-561-9712 (toll-free)
www.coburngreenbaum.com


On Thu, Apr 3, 2025 at 10:35 PM Barry Coburn <barry@coburngreenbaum.com> wrote:

Hello government, per my letter to the Court of a few hours ago, here is a start to our more detailed defense witness proffers. We will continue to enhance and refine them tomorrow and over the weekend, in accordance with my letter. By the end of the weekend, we will make a unitary, consolidated set of more detailed defense proffers available so that the government can evaluate them all together. We also will respond further to Dan's email of yesterday about these proffers. Best regards, Barry

Barry Coburn
Coburn, Greenbaum & Eisenstein PLLC
1710 Rhode Island Avenue, NW
Second Floor
Washington, DC 20036
Universal direct dial (work and cell): 202-643-9472
Firm main number: 202-630-2844
Fax: 866-561-9712 (toll-free)
www.coburngreenbaum.com

**Wael Hana**: Would testify about the reasons he hired Nadine as a consultant, the work she did for IS EG Halal while consulting, and why he did not terminate their consulting arrangement early. Additionally, he would testify about the mortgage loan he provided to Nadine and the gifts he gave her over the course of their friendship. He would also testify about the constituent services he sought and received from Robert Menendez.

**Katia Tabourian**: Would testify about the Defendant's family history with gold and jewelry, personality (including her attitude toward gift-giving and receiving), and her character and reputation for honesty and truthfulness, in addition to other relevant character traits. Testimony would include information about Nadine's sources of income following her first divorce, Nadine's luxury belongings, and gold and other luxury gifts received on various special occasions. Testimony would also include information about how Nadine and her family catalogued and listed their gifts and valuable belongings.

**Jamela Maali:** Would testify about her experience working with Fred Daibes, her knowledge of gift giving from Mr. Daibes to Nadine Menendez, his reputation for gift giving, and her knowledge of Mr. Daibes' interest in owning Ms. Menendez's home. She would further testify about Ms. Menendez's interest in looking to purchase a new home in early 2022.

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Southern District of New York**

### Notice of Electronic Filing

The following transaction was entered by Coburn, Barry on 4/3/2025 at 8:05 PM EDT and filed on 4/3/2025

| | |
|---|---|
| **Case Name:** | USA v. MENENDEZ |
| **Case Number:** | 1:23-cr-00490-SHS |
| **Filer:** | Dft No. 2 - Nadine Menendez |
| **Document Number:** | 816 |

**Docket Text:**
**LETTER by Nadine Menendez addressed to Judge Sidney H. Stein from Barry Coburn dated 04/03/2025 re: Defense Witness Proffers (Coburn, Barry)**

**1:23-cr-00490-SHS-2 Notice has been electronically mailed to:**

Adam Fee     adamfee@paulhastings.com, hectordurant@paulhastings.com, paulgross@paulhastings.com, tatianathomas@paulhastings.com

Andrew James Marino     Amarino@gibbonslaw.com

Ann M. St. Peter-Griffith     astpetergriffith@kasowitz.com, courtnotices@kasowitz.com

Anne Michelle Collart     acollart@gibbonslaw.com, nmitchell@gibbonslaw.com, tthomas@gibbonslaw.com

Avi Weitzman     aviweitzman@paulhastings.com, DennisCairns@paulhastings.com, henryfinkelstein@paulhastings.com, ritafishman@paulhastings.com

Barry Coburn     barry@coburngreenbaum.com

Catherine Elaine Ghosh     catherine.ghosh@usdoj.gov, CaseView.ECF@usdoj.gov, USANYS.ECF@USDOJ.GOV

Cesar De Castro     cdecastro@cdecastrolaw.com

Christina A. Clark     christina.clark3@usdoj.gov

Christina LaBruno     clabruno@gibbonslaw.com

Daniel Charles Richenthal     daniel.richenthal@usdoj.gov, CaseView.ECF@usdoj.gov, usanys.ecf@usdoj.gov

Daniel J. Fetterman     dfetterman@kasowitz.com, autodocket@kasowitz.com, courtnotices@kasowitz.com

Elena Cicognani     ecicognani@gibbonslaw.com

Eli Jacob Mark     eli.mark@usdoj.gov, CaseView.ECF@usdoj.gov, USANYS.ECF@USDOJ.GOV

Fria Rohinton Kermani     FKermani@kasowitz.com, courtnotices@kasowitz.com

Jacob Moshe Roth     yaakster@gmail.com, courtalert@jonesday.com

Jessica L. Guarracino     jguarracino@gibbonslaw.com

Kelsey A Ball     kball@gibbonslaw.com

Lara Elizabeth Pomerantz     Lara.Pomerantz@usdoj.gov, CaseView.ECF@usdoj.gov, USANYS.ECF@USDOJ.GOV

Lawrence S. Lustberg     llustberg@gibbonslaw.com, ktolson@gibbonslaw.com, Mbrech@gibbonslaw.com

Marc Jason Eisenstein     marc@coburngreenbaum.com

Marc E. Kasowitz     MEKcourtnotices@kasowitz.com, autodocket@kasowitz.com, courtnotices@kasowitz.com

Paul Gross     paulgross@paulhastings.com, ageritano@wsgr.com

Paul Michael Monteleoni     paul.monteleoni@usdoj.gov, CaseView.ECF@usdoj.gov, USANYS.ECF@USDOJ.GOV

Ricardo Solano , Jr     rsolano@gibbonslaw.com

Rita A Fishman     ritafishman@paulhastings.com

4/4/25, 5:12 AM   Columbia University LLC Mail - Electronic Notice Lew...

Case 1:23-cr-00490-SHS   Document 817-5   Filed 04/06/25   Page 8 of 8

Robert David Luskin     robertluskin@paulhastings.com

Sarah Schwietz     sarah@coburngreenbaum.com

Seth Hugh Agata     sagata@cdecastrolaw.com

Shannon Michael McManus     smcmanus@cdecastrolaw.com

Valerie Alice Gotlib     valerie@gotliblaw.com, vgotlibecf@gmail.com

**1:23-cr-00490-SHS-2 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=4/3/2025] [FileNumber=32812687-0
] [42b28a4340f5cabee6512b755371add4d79965f24db056cce7915b0647b619d4dc3
09ca8c45554bd3b23d2dce012de0491881d7bf13d5f2af61719b7151aeb2a]]