**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

NADINE MENENDEZ et al.,

         Defendants.

Case No. S4 23-cr-490 (SHS)

## NADINE MENENDEZ'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF HER RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL AND RULE 33 MOTION FOR A NEW TRIAL

**COZEN O'CONNOR**

Sarah R. Krissoff, Esq.
Andrew Vazquez, Esq.
3 WTC
175 Greenwich St.
New York, N.Y. 10007
(212) 908-1388 / (212) 453-3886

*Attorneys for Defendant Nadine Menendez*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD ......................................................................................... 3

ARGUMENT ...................................................................................................... 5

I.    THE GOVERNMENT VIOLATED MRS. MENDENDEZ'S SIXTH AMENDMENT
      RIGHT TO COUNSEL ................................................................................ 5

      A.    Factual Background ......................................................................... 6

            1.    The Attorney Proffer ............................................................ 6

            2.    The Fourth Superseding Indictment and Obstruction Charges .................. 6

            3.    The *Curcio* Hearing and Mr. Schertler's Withdrawal ................................. 8

            4.    The Government's Use of Attorney Proffers at the Relevant Trials .......... 9

      B.    The Government's Actions Amounted to Improper Government Interference
            with Mrs. Menendez's Right to Be Represented by Counsel of Her Choice .........11

II.   THE GOVERNMENT'S USE OF SUMMARY EXHIBITS WAS IMPROPER,
      USURPED THE ROLE OF THE JURY, AND LEGITIMIZED UNWARRANTED
      INFERENCES REGARDING CIRCUMSTANTIAL EVIDENCE ................................ 16

      A.    The Government Turned Summary Exhibits into Early Summations .................. 19

      B.    The Government Witnesses' Testimony Prejudicially Skewed the Jury's
            Understanding and Analysis of the Evidence ........................................ 22

III.  THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT
      THAT ANY BRIBERY OCCURRED ................................................................ 24

      A.    Mrs. Menendez Did Not Aid or Participate in Any Bribery Because No Official
            Acts Were Performed ......................................................................... 25

            1.    The Hana-Egypt Bribery (Counts Five, Seven, and Eight) ..................... 26

            2.    The Uribe Bribery (Counts Nine and Ten) .............................................. 28

            3.    The Daibes Bribery (Counts Eleven, Thirteen, and Fourteen) ................ 29

      B.    Mrs. Menendez Could Not Have Aided or Participated in Any Bribery
            Because Neither She Nor Senator Menendez Agreed to a *Quid Pro Quo* ............ 32

            1.    The Hana-Egypt Bribery (Counts Five, Seven, and Eight) ..................... 32

            2.    The Uribe Bribery (Counts Nine and Ten) .............................................. 35

3.    The Daibes Bribery (Counts Eleven, Thirteen, and Fourteen) ................ 37

IV.    THE EVIDENCE WAS INSUFFICIENT TO CONVICT MRS.
MENENDEZ ON THE OBSTRUCTION OF JUSTICE COUNTS. .............................. 39

A.    The Evidence Regarding Counts Seventeen and Eighteen Was Insufficient to
Support the Jury's Verdict. ................................................................................... 39

B.    The Evidence Regarding Count Four Was Insufficient to Support the Jury's
Verdict. ............................................................................................................... 41

V.    THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION FOR THE
FARA CONSPIRACY ................................................................................................... 42

VI.    THE GOVERNMENT FAILED TO PROVE VENUE AS TO COUNTS
ONE THROUGH FIFTEEN ......................................................................................... 45

A.    The Constitution Twice Guarantees Mrs. Menendez's Right to Be
Tried in a District of Proper Venue ...................................................................... 46

B.    The Evidence at Trial Did Not Support Venue in the Southern
District of New York for Counts One Through Fifteen ......................................... 47

1.    Hana-Egypt Substantive Bribery (Counts Five, Seven, and Eight). ......... 47

2.    Uribe Substantive Bribery (Counts Nine and Ten) ................................... 48

3.    Daibes Substantive Bribery (Counts Eleven, Thirteen, and Fourteen)..... 49

4.    Bribery Conspiracy (Counts One, Two, and Three) ................................. 49

5.    Daibes Obstruction of Justice Conspiracy (Count Four) .......................... 50

VII.    COUNTS ONE AND FIFTEEN ARE MULTIPLICITOUS AND CANNOT BOTH
STAND ........................................................................................................................ 50

A.    Legal Standard ................................................................................................... 51

B.    The Government Proved, At Most, Only One Conspiracy ................................... 52

CONCLUSION .................................................................................................................. 54

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Arizona v. Fulminante,*
    499 U.S. 279 (1991)...................................................................................4, 5

*Bentley v. Scully,*
    41 F.3d 818 (2d Cir. 1994).................................................................................5

*Fagiola v. Nat'l Gypsum Co. AC&S,*
    906 F.2d 53 (2d Cir. 1990).................................................................................20

*Fischer v. United States,*
    603 U.S. 480 (2024)...................................................................................44

*Geders v. United States,*
    425 U.S. 80 (1976)...................................................................................14

*Herring v. New York,*
    422 U.S. 853 ...................................................................................14

*Jackson v. Virginia,*
    443 U.S. 307 (1979)...................................................................................3

*Luis v. United States,*
    578 U.S. 5 (2016)...................................................................................15

*Maine v. Moulton,*
    474 U.S. 159 (1985)...................................................................................13, 14

*McDonnell v. United States,*
    579 U.S. 550 (2016)................................................................... *passim*

*Snyder v. United States,*
    144 S. Ct. 1947 (2024)...................................................................................36

*U.S. Sec. & Exch. Comm'n v. Alpine Sec. Corp.,*
    354 F. Supp. 3d 396 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 68 (2d Cir. 2020) ...........................20

*United States v. Aguilar,*
    515 U.S. 593 (1995)...................................................................................41, 43, 44

*United States v. Beech-Nut Nutrition Corp.,*
    871 F.2d 1181 (2d Cir. 1989)...................................................................................48

*United States v. Benjamin*,
    95 F.4th 60 (2d Cir. 2024) ...........................................................................38

*United States v. Bezmalinovic*,
    962 F. Supp. 435 (S.D.N.Y. 1997) .............................................................48

*United States v. Blackwood*,
    366 F. App'x 207 (2d Cir. 2010) ................................................................20

*United States v. Bongiovanni*,
    No. 19-CR-227, 2024 WL 3487914 (W.D.N.Y. July 19, 2024).............36, 37

*United States v. Bray*,
    139 F.3d 1104 (6th Cir. 1998) ...................................................................22

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005)......................................................................3, 39

*United States v. Chacko*,
    169 F.3d 140 (2d Cir. 1999).......................................................................52

*United States v. Citron*,
    783 F.2d 307 (2d Cir. 1986).......................................................................20

*United States v. Clark*,
    740 F.3d 808 (2d Cir. 2014).........................................................................3

*United States v. Conlin*,
    551 F.2d 534 (2d Cir. 1977)..................................................................17, 20

*United States v. Curcio*,
    680 F.2d 881 (2d Cir. 1982)................................................................1, 8, 13

*United States v. Davis*,
    689 F.3d 179 (2d Cir. 2012).......................................................................48

*United States v. Eisenberg*,
    No. 23-CR-10, 2025 WL 1489248 (S.D.N.Y. May 23, 2025)................49

*United States v. Fassnacht*,
    332 F.3d 440 (7th Cir. 2003) .....................................................................41

*United States v. Ferguson*,
    246 F.3d 129 (2d Cir. 2001).........................................................................4

*United States v. Fishman*,
    No. 20-CR-160, 2022 WL 1744698 (S.D.N.Y. May 31, 2022) .................53

*United States v. Gaskin*,
  364 F.3d 438 (2d Cir. 2004)................................................................53

*United States v. Gentile*,
  No. 21-CR-54, 2024 WL 3046193 (E.D.N.Y. June 18, 2024) ................................20

*United States v. Ginsberg*,
  758 F.2d 823 (2d Cir. 1985)................................................................14

*United States v. Gonzalez*,
  No. 23-10999, 2025 WL 48071 (5th Cir. Jan. 8, 2025)....................................18, 23

*United States v. Gonzalez-Lopez*,
  548 U.S. 140 (2006).................................................................4, 5, 6, 12

*United States v. Gotti*,
  9 F. Supp. 2d 320 (S.D.N.Y. 1998) ........................................................12

*United States v. Ho*,
  984 F.3d 191 (2d Cir. 2020)................................................................23

*United States v. Jones*,
  393 F.3d 107 (2d Cir. 2004)...............................................................3, 34

*United States v. Korfant*,
  771 F.2d 660 (2d Cir. 1985)................................................................53

*United States v. Locasio*,
  6 F.3d 924 (2d Cir. 1993)..................................................................12

*United States v. Lorenzo*,
  534 F.3d 153 (2d Cir. 2008).................................................................3

*United States v. Maxwell*,
  No. 20-CR-330, 2022 WL 1294433 (S.D.N.Y. Apr. 29, 2022), *aff'd*, 118 F.4th
  256 (2d Cir. 2024).........................................................................53

*United States v. Menendez*,
  759 F. Supp. 3d 460 (S.D.N.Y. 2024).....................................................33, 34

*United States v. Morrell-Corrada*,
  343 F. Supp. 2d 80, 91 (D.P.R. 2004)......................................................15

*United States v. Morrison*,
  449 U.S. 361 (1981)........................................................................16

*United States v. Pauling*,
  924 F.3d 649 (2d Cir. 2019).................................................................3

*United States v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006)..................................................................40, 41

*United States v. Ramirez*,
    420 F.3d 134 (2d Cir. 2005)................................................................47

*United States v. Reed*,
    773 F.2d 477 (2d Cir.1985)................................................................48

*United States v. Rodriguez-Moreno*,
    526 U.S. 275 (1999)..........................................................................47

*United States v. Rosato*,
    No. CR-88-66E, 1989 WL 153790 (W.D.N.Y. Dec. 7, 1989) ................15

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992)..............................................................4

*United States v. Sattar*,
    314 F. Supp. 2d 279 (S.D.N.Y. 2004), *aff'd sub nom. United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009)............................................................52, 53

*United States v. Silver*,
    864 F.3d 102 (2d Cir. 2017)................................................................28

*United States v. Silver*,
    948 F.3d 538 (2d Cir. 2020)................................................................33

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008)..................................................14, 15, 16

*United States v. Tarango*,
    396 F.3d 666 (5th Cir. 2005) ..............................................................4

*United States v. Taylor*,
    464 F.2d 240 (2d Cir. 1972)............................................................3, 34

*United States v. Tomasetta*,
    No. 10-CR-1205, 2012 WL 2064978 (S.D.N.Y. June 6, 2012)................49

*United States v. Tzolov*,
    642 F.3d 314 (2d Cir. 2011)............................................................47, 48

*United States v. Urciuoli*,
    513 F.3d 290 (1st Cir. 2008)..............................................................30

*UPS Store, Inc. v. Hagan*,
    No. 14-CV-1210, 2017 WL 3309721 (S.D.N.Y. Aug. 2, 2017).........20, 21

*Villareal v. Texas*,
    No. 24-557 (2025)..................................................................................................................14

*Wheat v. United States*,
    486 U.S. 153 (1988)..............................................................................................................12

## INTRODUCTION

Nadine Menendez is entitled to a new trial due to the blatant violation of her Sixth Amendment right to counsel of her choice.  In March 2024, in an unprecedented prosecutorial move, the Government obtained a superseding indictment that included two obstruction of justice charges based in significant part on a standard attorney proffer made by Mrs. Menendez's prior counsel, David Schertler.  This, of course, rendered Mr. Schertler a fact witness and created a potential conflict between Mrs. Menendez and her counsel.

The parties identified the issue for the Court and the potential conflict quickly elevated into an actual conflict.  The Government, at a *Curcio* hearing to address the issue, informed the Court that it had "made clear [to Mr. Schertler] that we would intend to call Mr. Schertler as a witness absent the ability to reach an anonymized stipulation [regarding the details of the attorney proffer]…."  The Court set a two-week window of time for the parties to discuss the possibility of an anonymized stipulation in lieu of Mr. Schertler's testimony.  Ultimately, the parties were unable to agree on an appropriate stipulation within that window, and Mr. Schertler, an extremely well-regarded and experienced lawyer whose team been working on the matter for nearly two years, was forced to withdraw from the case due to the conflict manufactured by the Government.

Mrs. Menendez obtained new counsel, as the Court directed her to do, and her trial was then postponed due to her significant health issues.  During the time that Mrs. Menendez was undergoing medical treatment and her new counsel was attempting to get up to speed on the millions of pages of discovery and myriad complex and novel legal issues that this case presents, the Government presented itself as if it were proceeding with presenting evidence regarding the attorney proffer at trial.  The Government even included a portion of the PowerPoint utilized by Mr. Schertler during the attorney proffer, and Mrs. Menendez's engagement letter with Mr. Schertler, on its exhibit list for trial.  But then the Government did not call Mr. Schertler or offer

1

any evidence *whatsoever* regarding the attorney proffer at Mrs. Menendez's trial. It was never mentioned in any of the Government's jury addresses.

To be clear—the Government has broad discretion to choose which witnesses to call and which evidence to offer in proving its case. But the Government cannot create a conflict, forcing Mr. Schertler to be a witness against his own client and to withdraw from the case, and then secretly decide not to call Mr. Schertler or offer any evidence regarding the Government's allegations that created the conflict in the first place. Even worse, it appears that the Government did not make clear, unambiguous, and timely notification to the Court and Mrs. Menendez that it was not proceeding with proving the allegations giving rise to the conflict. If Mrs. Menendez had known that there was no longer any conflict, Mrs. Menendez would have elected to bring Mr. Schertler and his firm back into the case at any point, up until the last day of trial. Whether the Government's conduct was careless or intentional, the result is the same: Mrs. Menendez's fundamental constitutional rights were violated. This was a fundamental structural error that requires a new trial.

In addition, for all the reasons below, Mrs. Menendez moves the Court to enter a judgment of acquittal on all counts of conviction. Infecting all counts, the Government's use of so-called summary exhibits was improper and usurped the role of the jury. With regard to the various counts related to the alleged bribery schemes, the Government failed to prove beyond a reasonable doubt that any bribery occurred, or that Mrs. Menendez aided and abetted the same. The evidence was insufficient to support the jury's verdict on the obstruction of justice counts and the alleged Foreign Agents Registration Act conspiracy. Fatally, the Government failed to prove venue as to Counts One through Fifteen. Finally, as the Court already held in connection with the trial of the co-defendants, Counts One and Fifteen are multiplicitous and cannot both stand.

## LEGAL STANDARD

Faithfulness to the United States Constitution requires "that no person [ ] be convicted unless the Government has proven guilt beyond a reasonable doubt." *United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014). Consequently, courts must "take seriously [the] obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt beyond a reasonable doubt." *Id.* "[I]n our system . . . the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Jackson v. Virginia*, 443 U.S. 307, 316 n.10 (1979). The Federal Rules of Criminal Procedure 29 and 33 empower the Court to protect this bedrock constitutional principle and correct grave errors, like the conviction in this case.

Rule 29 requires the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The rule empowers the Court to vacate a jury verdict when that verdict is poisoned by reasonable doubt. Reasonable doubt exists when the evidence credibly supports a not-guilty verdict. *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (defining reasonable doubt to exist where the evidence provides "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence"). The Court must ascertain that the jury did not draw "specious inferences," *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004), or render its conclusion based upon "pure speculation or from passion, prejudice or sympathy," *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972). Courts "give no deference to impermissible speculation." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019). A verdict raises doubt when it rests on thin, equivocal, or attenuated evidence. *United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005). If a court finds that "reasonable jur[ors] must necessarily have . . . a [reasonable] doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Taylor*, 464 F.2d at 243.

As a corollary to Rule 29, Rule 33 gives the court discretion to set aside any judgment and grant a new trial if the interest of justice so requires.  Fed. R. Crim. P. 33(a); *see United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (providing that courts may set aside a verdict in the interests of justice where the evidence at trial, while "tangentially support[ing] a guilty verdict," actually "preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred") (internal quotations and citations omitted).  Indeed, the Court must be "satisfied that 'competent, satisfactory, and sufficient evidence' in the record supports the jury verdict."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  Otherwise, an unjust verdict has been rendered, and the Court must grant the Rule 33 motion.

A new trial under Rule 33 is warranted when there is a deprivation of a defendant's Sixth Amendment right to be represented by the counsel of her choice.  A district court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and [only] in 'the most extraordinary circumstances.'"  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.  *Id.*

The deprivation of a bedrock constitutional right is a structural error that works a manifest injustice.  A structural error is a class of constitutional errors that "defy analysis by 'harmless-error' standards" because they "affec[t] the framework within which the trial proceeds," and are not "simply an error in the trial process itself."  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991)).  Such an error "requires automatic reversal and is not subject to harmless error analysis because it involves a deprivation of a constitutional protection so basic that in its absence, 'a criminal trial cannot reliably serve its

function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.'" *Bentley v. Scully*, 41 F.3d 818, 823 n.1 (2d Cir. 1994) (*quoting Fulminante*, 499 U.S. at 310). The erroneous deprivation of the right to counsel of choice has "consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error." *Gonzalez-Lopez*, 548 U.S. at 150.[1] Therefore, the deprivation of a bedrock constitutional right such as the right to counsel of choice requires the grant of a new trial under Rule 33.

## ARGUMENT

### I.    THE GOVERNMENT VIOLATED MRS. MENDENDEZ'S SIXTH AMENDMENT RIGHT TO COUNSEL.

Through a remarkable series of missteps, the Government violated Mrs. Menendez's fundamental Sixth Amendment rights. The Government cannot be allowed to create an attorney conflict by adding allegations that necessarily require testimony from defense counsel to be proven, and then—once Defendant's long-time counsel is disqualified in anticipation of his expected testimony—decline to pursue the allegations that led to the conflict in the first place. It is even more problematic to do this without specific and timely notice to the Court and Mrs. Menendez that the Government-created conflict had disappeared. Courts are uniformly protective of a criminal defendant's relationship with her counsel, for very good reason. Here, the

---

[1] "Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial . . . . It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings." *Gonzalez-Lopez*, 548 U.S. at 148.

Government's actions resulted in a structural violation of Mrs. Menendez's Sixth Amendment rights, necessitating a new trial. *Gonzalez-Lopez*, 548 U.S. at 150.

### A.    Factual Background.

#### 1.    The Attorney Proffer.

In August 2023, Mr. Schertler and Mr. Onorato participated in an attorney proffer on behalf of their client, Nadine Menendez (the "August 2023 Proffer"). Two other individuals from Mr. Schertler and Mr. Onorato's law firm, Schertler Onorato Mead & Sears ("Schertler Onorato") participated in the proffer: Paola Pinto (an associate) and Grace McMahon (a paralegal). From the U.S. Attorney's side, at least eight lawyers participated, including two who were remote and members of the executive staff. There were no apparent special agents, investigators, or Government-employed paralegals present. During that proffer, Mr. Schertler and Mr. Onorato utilized a PowerPoint presentation to guide the discussion.

#### 2.    The Fourth Superseding Indictment and Obstruction Charges.

On March 5, 2024, the Government filed the Fourth Superseding Indictment, which introduced two new obstruction charges against Mrs. Menendez and Senator Menendez. *See* Dkt. 248 ("S4 Indictment" or "Indictment"). The S4 Indictment contained detailed factual allegations regarding these new obstruction charges, including an entire section entitled "Menendez and Nadine Menendez Seek to Cover Up the Bribery Scheme." S4 Indictment at 41. Within that section, the S4 Indictment alleged, in an unprecedented use of a standard attorney proffer:

> NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, caused her counsel to meet with the United States Attorney's Office for the Southern District of New York in Manhattan in or about August 2023 and—in reliance on statements made by NADINE MENENDEZ—to state, in substance and in part, that the $23,568.54 that WAEL HANA, a/k/a "Will Hana," the defendant, had caused to be made to the company holding the mortgage on NADINE MENENDEZ's house was a loan and that the payments that Jose Uribe had made on the Mercedes-Benz Convertible were a loan. In truth and in fact, and as NADINE MENENDEZ well

6

knew, both the mortgage company payment and the car payments were not loans, but bribe payments.

*Id.* ¶ 73.

The S4 Indictment charged both Senator Menendez and Mrs. Menendez with obstruction of justice, in violation of Title 18, United States Code, Sections 1503 and 2 (Count Eighteen), and conspiracy to commit obstruction of justice, in violation of Title 18, United States Code, Section 371 (Count Seventeen).  *Id.* ¶¶ 113–18.  Count Seventeen alleged a specific overt act related to the August 2023 Proffer:  "In or about August 2023, NADINE MENENDEZ caused her counsel to make false statements and misleading statements to the United States Attorney's Office for the Southern District of New York."  *Id.* ¶ 116(f).  The substantive obstruction charge contained a similar allegation regarding the August 2023 Proffer.  *See id.* ¶ 118.  Nearly identical allegations were made as to Senator Menendez, relating to a separate proffer meeting his attorney had with the Government.  *See id.* ¶ 116(e).[2]

The Government's unprecedented and aggressive tactic raised eyebrows in the legal community.  Commentators noted the chilling effect it could have on a defendant's communications with his or her attorney, as well as on a defense attorney's ability to offer critical evidence during pre-indictment negotiations.[3]  Given the high-profile nature of the case, and the intrusion upon the well-established and frequent practice of attorney proffers, one would expect

---

[2] Senator Menendez's prior counsel had already withdrawn from the case by the time of the S4 Indictment for unrelated reasons, mooting any conflict issues as to him.

[3] *See, e.g.*, "How a Last-Ditch Effort to Save Menendez From Prosecution Backfired," *N.Y. Times* (July 7, 2024), https://www.nytimes.com/2024/07/07/nyregion/robert-menendez-bribery-trial-abbe-lowell.html (quoting former chief of the Southern District's public corruption unit, Tatiana R. Martins, characterizing the obstruction charges as "unusual and aggressive" and "kind of a warning shot to the white-collar bar to weigh carefully the decision to make any factual representation to the government when they are close to indicting."); Evan T. Barr, "Prosecuted for a Proffer," *New York Law Journal* (May 1, 2024) (available at https://www.reedsmith.com/en/perspectives/2024/05/prosecuted-for-a-proffer).

that the Government gave great thought to the decision to add charges based, in significant part, on those attorney proffers.  One would further expect that the decision was vetted at the highest levels within the U.S. Attorney's Office.

   3.   The *Curcio* Hearing and Mr. Schertler's Withdrawal.

On March 17, 2024, the Government wrote to the Court to request a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), with respect to Mrs. Menendez's then-counsel, Schertler Onorato.  *See* Dkt. 253.  In that letter, the Government identified two buckets of potential conflicts that had arisen due to the Government's decision to add Counts Seventeen and Eighteen, and the related allegations, to the charges:  First, that the Government "may seek to call Mr. Schertler and/or enter into evidence materials or elicit testimony from other witnesses regarding events with which Mr. Schertler was involved"; and, second, that "Mr. Schertler (and his co-counsel) may be limited in their ability to make certain arguments to the Court or the jury at trial" because of their personal knowledge of certain relevant facts.  *Id.*  As to the first issue, the Government insisted that the Court "need not resolve the question [at that time]" but that it may present an "unsworn witness" issue.  *Id.*  It noted that the second issue was likely waivable.  *Id.*  The letter included a proposed colloquy for the *Curcio* hearing.  *See id*.  Mrs. Menendez submitted a letter in response.  *See* Dkt. 255.

On March 21, 2024, the Court held a *Curcio* hearing as to Mrs. Menendez.  At the hearing, the Government represented to the Court that the potential conflict had ripened into an actual conflict, because the Government would be calling Mr. Schertler as a witness absent a stipulation to his testimony.  *See Curcio* Hearing Tr. 5 ("And the government has had, actually, lengthy good-faith discussions with defense counsel prior to today in which we have made clear that we would intend to call Mr. Schertler as a witness absent the ability to reach an anonymized stipulation…."); *id.* at 8 ("MR. SCHERTLER:  In the government's colloquy, they have tied in to this hearing and

any waiver the prospect that if we can't reach a stipulation two weeks from now that then—and the attorneys were then required to testify at trial, obviously that would result—I think we all agree that would result in disqualification.  THE COURT:  Yes, sir.").

Unable to reach an agreed-upon stipulation, Schertler Onorato withdrew as counsel for Mrs. Menendez on April 5, 2024, just a matter of weeks before her trial was originally scheduled to begin.  *See* Dkt. 286.  Around the same time, Mrs. Menendez informed the Court about her breast cancer diagnosis and sought an adjournment of the May 6, 2024 trial date while she endured emergency surgery and treatment.  *See* Dkt. 300.  Accordingly, Mrs. Menendez was granted a separate trial with a deferred trial date.  *See* Order dated April 11, 2024, Dkt. 308.

The Court granted Mrs. Menendez time to retain new counsel.  *See* Dkt. 383.  Mrs. Menendez retained Barry Coburn of Coburn & Greenbaum PLLC on May 29, 2024, *see* Dkt. 427, and the parties appeared for a pretrial conference on June 12, 2024, *see* Order dated June 3, 2024, Dkt. 438.  Eventually, the trial was adjourned *sine die*.  *See* Order dated July 15, 2024, Dkt. 510.  On August 26, 2024, Mrs. Menendez filed a status report, attaching a sealed statement from her treating physician.  *See* Dkt. 602.

The Court set a trial date for January 21, 2025.  *See* Order dated November 19, 2024, Dkt. 633.  To avoid overlapping with Senator Menendez's sentencing, the trial was further continued to February 5, 2025.  *See* Dkt. 673, Order dated December 30, 2024.  The trial was adjourned, one final time, to March 18, 2025 in response to Mrs. Menendez's unopposed adjournment request related to her medical condition.  *See* Order dated January 24, 2025, Dkt. 716.

4.  <u>The Government's Use of Attorney Proffers at the Relevant Trials.</u>

At the trial of Senator Menendez in 2024, the Government offered evidence regarding the attorney proffer made by Senator Menendez's counsel.  Specifically, excerpts of a slide deck that Senator Menendez's former counsel provided to prosecutors during a pre-indictment proffer on

9

September 11, 2023 were admitted into evidence over objection.  *See* Dkt. 462 (letter from Senator Menendez objecting to Government exhibit 4A-3, the redacted slide deck); *see* 2024 Trial Tr. at 4273.  A non-lawyer witness from the U.S. Attorney's Office, the Special Assistant to the United States Attorney, testified about the meeting.  *Id*. at 4270–77.

Throughout the lead-up to Mrs. Menendez's trial, the Government presented that it would likewise offer evidence at her trial related to the August 2023 Proffer.  The pre-trial exhibit lists transmitted by the Government in advance of the trial—both in January and March 2025—identified as trial exhibits (1) an excerpt of the PowerPoint presentation used by Mr. Schertler during the proffer (GX 4B-1); (2) an e-mail communication between Mrs. Menendez and Mr. Schertler regarding the proffer (GX 4B-2); and (3) a copy of the engagement letter between Mrs. Menendez and Schertler Onorato (GX 4B-3).  Moreover, during the process of choosing a jury, the Government included both Mr. Schertler and Mr. Onorato on the list of "people and places" that the jury may hear about during trial.  Trial Tr. at 658–59.[4]

Then, despite the specific allegations and overt act in the S4 Indictment, the Government's uncorrected prior representations to the Court that it would be calling Mr. Schertler as a witness,

---

[4] While Mr. Schertler and Mr. Onorato were not specifically identified by name on the lists of potential witnesses the Government provided to Mr. Coburn prior to trial, those lists identified additional categories of potential witnesses, including "persons as to whom stipulations of testimony or fact have been proposed to you," and "document/records custodians as necessary, in the event that no satisfactory stipulation is reached."  These categories certainly could have encompassed the testimony from Mr. Schertler and others from his firm.

Further, absent a stipulation between the parties or testimony from the Government's own lawyers, the only way the PowerPoint could have been offered into evidence was through testimony by Mr. Schertler or one of his colleagues, due to the lack of a law enforcement or paralegal witness for the Government at the August 2023 Proffer.

and the subsequent forced withdrawal of Schertler Onorato, the Government offered no evidence at Mrs. Menendez's trial regarding the August 2023 Proffer.

**B.    The Government's Actions Amounted to Improper Government Interference with Mrs. Menendez's Right to Be Represented by Counsel of Her Choice.**

Whether inadvertent or calculated, the Government's conduct with regard to the August 2023 Proffer, in the aggregate, violated Mrs. Menendez's fundamental constitutional rights, constituting structural error. At the relevant *Curcio* hearing, the Government stated unequivocally that it was calling Mr. Schertler as a witness, absent agreement on a stipulation as to his testimony. *See Curcio* Hearing Tr. 5 ("And the government has had, actually, lengthy good-faith discussions with defense counsel prior to today in which we have made clear that we would intend to call Mr. Schertler as a witness absent the ability to reach an anonymized stipulation…."). Even giving the Government the benefit of every doubt that it did intend to prove the allegations when it created the conflict in the first place, and that it also did intend to call Mr. Schertler when it represented to the Court that it was doing so, the Government failed to properly apprise Mrs. Menendez and the Court the moment it decided not to use the evidence regarding the August 2023 Attorney Proffer. If the Government had properly done so, the Court could have allocuted Mrs. Menendez on her understanding that the conflict had resolved. She would have restored the attorneys of her choosing.

The Sixth Amendment ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez–Lopez*, 548 U.S. 140, 144 (2006).

The right to choose your own counsel is not absolute. *Wheat v. United States*, 486 U.S. 153, 159 (1988); *United States v. Locascio*, 6 F.3d 924, 935 (2d Cir. 1993) (affirming the district

11

court's disqualification of the defense attorneys). Under established Second Circuit law, an attorney who will necessarily be either a witness or an unsworn witness to the events underlying the trial faces disqualification, even over objection by the defendant. *Id*. at 931 ("Courts have also considered disqualification where the chosen counsel is implicated in the allegations against the accused and could become an unsworn witness for the accused.") (citations omitted); *see also United States v. Gotti*, 9 F. Supp. 2d 320, 324 (S.D.N.Y. 1998) (disqualifying attorney because, *inter alia*, attorney's status as house counsel for the Gambino Crime Family would likely be used to prove the existence of the enterprise under RICO).

In balancing these competing interests, courts apply a presumption in favor of the defendant's chosen counsel. *Locasio*, 6 F.3d at 931 (citing *Wheat*, 486 U.S. at 164) (other citation omitted). That is especially true when, as here, chosen counsel has been working on the case for nearly two years. In line with this, the Government must "honor" a defendant's Sixth Amendment right to counsel:

> This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance . . . . [A]t the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

*Maine v. Moulton*, 474 U.S. 159, 170–71 (1985).

The Government's actions here denied Mrs. Menendez this fundamental right. The Government created the conflict by presenting evidence to the grand jury regarding statements made by Mrs. Menendez's counsel during the August 2023 Proffer, and including specific factual allegations regarding those statements in the S4 Indictment. The conflict was profound: due to the lack of any Government non-lawyer personnel in the August 2023 Proffer, the Government

must have recognized, at the time it presented evidence regarding the August 2023 Proffer to the grand jury, that, absent a stipulation, either Mrs. Menendez's counsel or Government counsel would be necessary witnesses to prove the allegations.[5]  And then the Government specifically told the Court and the parties at the *Curcio* hearing that it would be calling Mr. Schertler absent a stipulation covering his anticipated testimony.  *Curcio* Hearing Tr. 5.

In any event, Mrs. Menendez's counsel would necessarily be either a witness or an unsworn witness to the conduct.  Indeed, the Government raised the issue in its letter to the Court shortly after the issuance of the S4 Indictment.  *See* Dkt. 253.  After the Government affirmed that it would be calling Mr. Schertler to testify, and the parties were not able to reach an agreement on a stipulation, Schertler Onorato had no option but to withdraw from the case due to the non-waivable conflict crated by the Government's actions.  *See Curcio* Hearing Tr. 5; *see also* Dkt. 286.

The law does not permit unfettered interference in the attorney-client relationship. "Unquestionably, government interference in the relationship between attorney and defendant may violate the latter's right to effective assistance of counsel."  *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985); *see also Moulton*, 474 U.S  at 176 (holding that the state violated Sixth Amendment rights of defendant, who had already been charged with crimes, when it arranged to record conversations between defendant and co-defendant, who was an undercover informant, interfering with defendant's ability to consult with counsel).

Further, the law recognizes a variety of circumstances where intrusion on the attorney-client relationship constitutes a Sixth Amendment violation.  *See, e.g.*, *Herring v. New York*, 422

---

[5] Due to the lack of any federal agent or paralegal participation in the August 2023 Proffer, the line AUSAs themselves, or other attorneys from the U.S. Attorney's Office, must have served as the hearsay source of the testimony in the grand jury proceeding regarding the 2023 Attorney Proffer.

U.S. 853, 858–59 (holding that a New York statute allowing judges in a criminal bench trial to deny counsel the opportunity to make a closing argument deprived defendant of his Sixth Amendment right to the assistance of counsel); *Geders v. United States*, 425 U.S. 80, 91 (1976) (holding that a trial court's order that defendant not consult with his attorney during an overnight recess during trial violated the Sixth Amendment).[6]

The Second Circuit emphasizes that the Sixth Amendment prohibits the government from impeding the supply of defense resources without justification. *United States v. Stein*, 541 F.3d 130, 156 (2d Cir. 2008). In *Stein*, the Court found that the government violated defendant's right to counsel when it pressured defendant's employer to change its policy regarding advancement of legal fees. As a result of the termination of fee advancements upon indictment, multiple defendants were unable to retain the counsel of their choosing. *Id.*; *see also Luis v. United States*, 578 U.S. 5, 12 (2016) (holding that the Sixth Amendment precludes pretrial restraint of a criminal defendant's legitimate, untainted assets needed to retain counsel of choice).

Courts are particularly sensitive—in our adversarial system of justice—to disqualifying an opponent's attorney based on conflicts that are created by the government's conduct. In *United States v. Morrell-Corrada*, the District Court of Puerto Rico found that the prosecution had manufactured the conflict with the defendant and rejected the government's request for disqualification. 343 F. Supp. 2d 80, 91 (D.P.R. 2004). Similarly, the court in *United States v.*

---

[6] *Villareal v. Texas*, No. 24-557 (2025), is a case pending before the United States Supreme Court considering whether a trial court abridges the defendant's Sixth Amendment right to counsel by prohibiting the defendant and his counsel from discussing the defendant's testimony during an overnight recess. While on direct examination, the defendant was barred from discussing matters with his counsel during overnight recess due to the trial court's fear that his counsel might impermissibly tell the defendant what to say on the stand. Petitioners argue that this deprived the defendant of his Sixth Amendment right to counsel, citing a split between multiple state supreme courts and several Circuits on the issue.

*Rosato* rejected disqualification of defendant's counsel because "the likelihood of 'real prejudice' to the defendant resulting from disqualification was great." No. CR-88-66E, 1989 WL 153790, at *5 (W.D.N.Y. Dec. 7, 1989). The court weighed the fact that defendant's counsel of choice had "a great and intimate appreciation of the government's longtime efforts to implicate [union] officials in racketeering and related criminal activities. Such attorneys are also exceptionally able and are recognized by this Court and others as being among the very best criminal defense counsel in this District." *Id*. On top of the expertise of the defendant's counsel of choice, the court found that "the assertion that the government has strategically sought to 'manufacture' a conflict of interest so as to avoid these attorneys' tremendous insights and abilities cannot simply be ignored." *Id.*

The course of events here is unprecedented. The Government gained a significant tactical advantage by forcing the withdrawal of Schertler Onorato, a firm retained by Mrs. Menendez since 2022 that was intimately familiar with the discovery materials and the complex issues in the case. Mrs. Menendez lost her long-standing counsel with whom she was very happy. *Curcio* Hearing Tr. 28 (Q: "Are you satisfied with your attorneys?"; A: "Yes, very much so.").[7] The infringement on Mrs. Menendez's Sixth Amendment rights was both entirely foreseeable and profound. And then, without the appropriate notice to Mrs. Menendez or the Court, which would have led to an allocution of Mrs. Menendez regarding her understanding that the conflict had been resolved, the Government determined it would not present any evidence regarding the August 2023 Proffer at Mrs. Menendez's trial.[8] These actions constituted an impermissible and improper government

---

[7] The tactical advantage gained by this was only partially alleviated by the fact that Mrs. Menendez was granted a separate trial with a deferred trial date due to her medical issues. *See* Order dated April 11, 2024, Dkt. 308.

[8] Mrs. Menendez respectfully requests that the Court hold an evidentiary hearing. Such a hearing is necessary to determine many of the underlying facts that are solely within the Government's knowledge and control.

interference in the attorney-client relationship, and a violation of Mrs. Menendez's constitutional rights, necessitating a new trial. *United States v. Stein*, 541 F.3d at 156 (finding that the Sixth Amendment violation stemming from the government's actions required dismissal of the indictment).

Sixth Amendment deprivations "are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests," such as "society's interest in the administration of criminal justice." *United States v. Morrison*, 449 U.S. 361, 364 (1981). This means that, to fashion a Sixth Amendment remedy, a court must "identify and then neutralize the [Sixth Amendment] taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *Id.* at 365. Here, due to the scope of the constitutional injury suffered and the procedural posture of the case, the only appropriate remedy is a new trial.

## II. THE GOVERNMENT'S USE OF SUMMARY EXHIBITS WAS IMPROPER, USURPED THE ROLE OF THE JURY, AND LEGITIMIZED UNWARRANTED INFERENCES REGARDING CIRCUMSTANTIAL EVIDENCE.

A summary "chart submitted by the prosecution is a very persuasive and powerful tool and must be fairly used, since, by its arrangement and use, it is an argument to the jury during the course of the trial. . . .  A chart which for any reason presents an unfair picture can be a potent weapon for harm, and permitting the jury to consider it is error." *United States v. Conlin*, 551 F.2d 534, 538–39 (2d Cir. 1977). Here, the summary charts aligned with particular counts of the S4 Indictment and were impermissibly argumentative such that their prejudice outweighed any probative value.

In Mrs. Menendez's trial, summary exhibits and testimony played an overwhelmingly predominant role in the presentation of documentary evidence, with FBI personnel uninvolved in

the investigation or collection of documents spending days primarily reading from cherry-picked documents and drawing impermissible connections between different documents based upon rank speculation (*e.g.*, to support the Indictment's bribery-related counts which constituted the majority of the counts in the Indictment). Therefore, pursuant to Federal Rule of Criminal Procedure 29, Mrs. Menendez's conviction should be set aside and a judgment of acquittal entered. Alternatively, the Court should, at a minimum, order a new trial per Federal Rule of Criminal Procedure 33 so that Mrs. Menendez may be tried without the use of improper and prejudicial summary exhibits.

The jury heard days of testimony in which multiple summary exhibits were read and interpreted by witnesses from the FBI with no knowledge of the underlying facts or investigation of the case. Mrs. Menendez's trial transcript spans 2,744 pages to reach the point when the parties rested. Of those 2,744 pages, the testimony by three witnesses—Coughlin, Graves, and Van Wie, who read and described three key summary exhibits created by the prosecutors of the case—totaled approximately 462 pages, meaning roughly 17 percent of the trial (including the portions when the jury was not present). *See* Trial Tr. 556–91, 604–800 (Coughlin); *id.* at 1189–1297, 1344–53, 2025–69 (Graves); *id.* at 2396–2458 (Van Wie). These summary chart witnesses, while dominating the testimony at trial, were not involved in the underlying investigation or gathering of documents, precluding effective cross-examination and cutting off Mrs. Menendez's ability to confront her accusers. *See United States v. Gonzalez*, No. 23-10999, 2025 WL 48071, at *3 (5th Cir. Jan. 8, 2025) (noting a witness "does not provide improper summary testimony where he testifies to facts that *were personally experienced by him* even though this testimony bolsters the government's other evidence") (emphasis added) (internal quotations omitted).

The most egregious misapplication of summary exhibits per Rule of Evidence 1006 occurred through witnesses Coughlin (as to GX 1352), Graves (as to GX 1353), and Van Wie (as

to GX 1354).[9]  Each of these summary exhibits is a chart of line entries in chronological order that are a mish-mash of texts, emails, WhatsApp and Signal communications, call log details, transcriptions of recorded voicemails, Google map screenshots, restaurant attendance logs, and photos of checks, letters, internet search history results, and other documents.  In other words, the entries compile information that the Government collected via a variety of means, via a variety of individuals—none of whom were serving as the testifying witness for the summary exhibits.

The proponents of the summary exhibits each testified that they reviewed their respective chart and its underlying documentation simply to ensure that the language in the summary chart was accurate.  Trial Tr. 556–58 (Coughlin); *id*. at 1189 (Graves); *id*. at 2395–96 (Van Wie).  The proponent played no role in deciding which "events" to include as line entries in the summary exhibits, but rather simply reviewed material that was highly curated by the prosecutors.  *See id*.  Among the summary charts:

- GX 1352 is an 83-page chart titled "December 13, 2017 – January 19, 2022" and comprises 1129 line entries.  In its closing and rebuttal, the Government specifically referred the jury to this exhibit twice regarding Count Five.  *See* Trial Tr. 2891, 2841.

- GX 1353 is a 51-page chart titled "December 16, 2016 – June 29, 2022" and comprises 1043 line entries.  In its closing and rebuttal, the Government

---

[9] While GX 1352, GX 1353, and GX 1354 are the most egregious examples of the Government's use of summary exhibits throughout trial, numerous other summary charts were admitted through the testimony of witnesses such as Coughlin and Van Wie.  *See, e.g.*, GX 1355 (a summary chart depicting phone numbers and electronic accounts identifiable to key individuals in the case); GX 1307 (a summary chart related to the organizational structure of several trucking and insurance companies); GX 1308–1327 and 1329 (a series of summary charts comprised of text message exchanges picked by the Government); GX 1337 (a chart summarizing Mr. Menendez's search history).

specifically referred the jury to this exhibit three times regarding Counts Five and Nine. *See* Trial Tr. 2878, 3029, 3037.

- GX 1354 is a 15-page chart simply titled "October 30, 2018 – May 29, 2022" and comprises 1129 line entries.

As illustrated below regarding GX 1352 and Coughlin's testimony, these exhibits were improper argumentative exhibits that allowed the prosecutors to perform precursor summations as to each count. The Government inappropriately utilized witnesses with no knowledge of the case to walk the jury through timelines of disparate evidence, suggesting inferences and weighing of the evidence that should have been solely in the domain of the jury.

### A.    The Government Turned Summary Exhibits into Early Summations.

A summary exhibit must be "based on foundation testimony connecting it with the underlying evidence summarized and must be based upon and fairly represent competent [and admissible] evidence." *U.S. Sec. & Exch. Comm'n v. Alpine Sec. Corp.*, 354 F. Supp. 3d 396, 419 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 68 (2d Cir. 2020) (citing to *Fagiola v. Nat'l Gypsum Co. AC&S*, 906 F.2d 53, 57 (2d Cir. 1990)); *see also* Fed. R. Evid. 1006. Summary exhibits should not be admitted unless a proper foundation is established. *See United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986) (requiring summary exhibits to "fairly represent and summarize the evidence upon which they are based") (internal citations omitted); *see also United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010) (quoting *Conlin*, 551 F.2d at 538). The guidance to amendments to Rule 1006 are explicit that "[i]f a summary exhibit does not accurately reflect the underlying voluminous evidence, or if it is argumentative, its probative value may be substantially outweighed by the risk of unfair prejudice or confusion." *See* Adv. Comm. Note to the 2024 amendment to Rule 1006.

The Second Circuit has "regularly affirmed the use of [summary] charts" to introduce voluminous records, such as phone records, financial records, and bank records.  *See Blackwood*, 366 F. App'x at 212 (affirming the use of a summary exhibit chart to detail over 100 telephone calls); *United States v. Gentile*, No. 21-CR-54, 2024 WL 3046193, at *1–2 (E.D.N.Y. June 18, 2024) (upholding a summary exhibit chart detailing relevant financial records); *Fagiola*, 906 F.2d at 57–59  (affirming a summary chart that detailed voluminous financial records and calculations). The party seeking to admit summary evidence must "establish that the summary is accurate and nonprejudicial."  *UPS Store, Inc. v. Hagan*, No. 14-CV-1210, 2017 WL 3309721, at *5 (S.D.N.Y. Aug. 2, 2017) (internal quotations omitted).  "[G]reat care must be taken to ensure that the proposed summary contains no annotation or suggestion, even inferential, that may be considered argumentative."  *Id.* (internal citations omitted).  Such care is even more heightened when the government is combining different source materials into one overarching summary of a particular theory of its case, as was the case here.

Here, the Government overextended the reach of Rule 1006 and the standard use of summary charts in this district, veering strongly into argument and advocacy.  The Government used the summary charts to preview its summation.  In essence, the Government's summary exhibits were its summation slide deck in sheep's clothing.  By compiling a variety of sources of information, the summary exhibits in this trial became improperly argumentative, as they were rife with the Government's judgment determinations and conclusions about the weight of the evidence. What is more, GX 1352, 1353, and 1354 are inherently argumentative because the line entries from a variety of sources (albeit individuals and means of communication) are compiled together based upon the judgment that all those different activities are related to the same course of conduct, or scheme as the Government would characterize it.  Connecting actions into a course of conduct,

such as a conspiracy, is the role of the factfinder, and the Government's summary exhibits usurped that role with GX 1352, 1353, and 1354 and the corresponding witness testimony.

The effects of this improper argument via summary exhibit were exacerbated because the prosecutors did not elicit testimony regarding the entirety or near entirety of the summary charts, but instead selectively chose entries to raise with the witness who lacked personal knowledge. *See* Trial Tr. 595:15–20 (defense counsel objecting to prosecution "us[ing] this witness to cherry-pick particular portions of the record that the government has decided are inculpatory and, in open court, hav[ing] this witness, with no personal knowledge, read those cherry-picked, you know, plainly advocacy-related portions to the jury one at a time at the government's prodding"); *see also United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) (noting that information in a summary exhibit cannot be "embellished by or annotated with the conclusions of or inferences drawn by the proponent").

While the Government is certainly entitled to highlight evidence, suggest connections among evidence, and comment upon credibility *in its summation and rebuttal*, it is an entirely different situation to allow as a trial exhibit (and for use during jury deliberations) what is essentially an outline to the Government's theory of the case. The Government emphasized these exhibits in summation, recognizing that they were amalgams of a significant portion of the proffered evidence in the case:

> The exhibits in this chart are all you need to prove the corrupt *quid pro quo*. You've heard the evidence; but if you want to see it again, you can write down the number of this chart and look at every exhibit in it that you want, Government Exhibit 1352. *Just based on the evidence in this timeline alone, even if there were nothing more than what we've been through, we would be done with this entire count.*

*See* Trial Tr. 2841:20–42:2 (emphasis added).

The incentive to simply look at the summary exhibits is reinforced by the repeated references in the Government's summation and rebuttal to the summary exhibits: two times to GX

1352 and three times to GX 1353.  With a simplified timeline of certain arguably related conduct all in one place, jurors are then less likely to actually assess the underlying evidence and/or analyze evidence that was admitted but not included within the summary exhibit.  At most, summary exhibits such as these, which contain evidence from a vast array of sources, should have been illustrative aids not used in jury deliberations.  *See* Fed. R. Evid. 107 ("An illustrative aid is not evidence and must not be provided to the jury during deliberations," with some exceptions).  It is well settled that slide decks or visuals generated for closings are illustrative and not evidence to be provided to the jury for use during deliberations, but the Government was allowed to misapply Rule 1006 and provide the jury with an outline of its arguments.

When further objections to the summary exhibits were raised during trial (*see* Trial Tr. 591), the Government relied upon *United States v. Ho*, 984 F.3d 191 (2d Cir. 2020), as support for admission of the summary exhibits pursuant to Rule 1006.  The summary exhibits went far beyond those in *Ho*.  Among other things, in *Ho*, the summary exhibits were read into the record in their entirety or virtually in their entirety.  Trial Tr. 596:13–15.  The summary exhibits in *Ho* were also significantly less voluminous.  *See* 984 F.3d at 209 (addressing two summary charts reflecting 71 documents and 62 documents).

### B.    The Government Witnesses' Testimony Prejudicially Skewed the Jury's Understanding and Analysis of the Evidence.

The argumentative and prejudicial nature of the summary exhibits, as discussed above, was further exacerbated by the corresponding testimony.  "While [ ] witnesses may be appropriate for summarizing voluminous records, as contemplated by [Federal Rule of Evidence] 1006, summary witnesses cannot organize the case for the jury, substitute for closing argument, . . . or introduce evidence the jury has not previously heard."  *Gonzalez*, 2025 WL 48071, at *3 (internal quotations and citations omitted).  In Mrs. Menendez's trial, the Government had personnel from the FBI

22

serve as witnesses for the summary exhibits, despite having no personal knowledge of the facts of the case. As such, the Government significantly curtailed the potential cross-examination of these witnesses regarding the underlying documentation and documentation that was purposefully left out of the summary exhibits prepared by the U.S. Attorney's Office—all the while bolstering the credibility of the witnesses by using law enforcement for testimony characterized by the prosecution as a simple exercise of reading comprehension.

A critical problem with the summary exhibits and corresponding testimony was, however, inferences made by these witnesses with no personal knowledge. For instance, Coughlin was permitted to draw connections and testify as to interpretations without any personal knowledge of the investigation. Yet he was in no better position to interpret the text than a juror—and allowing him, as a law enforcement witness, to do so gave undue weight and credibility to the connections and inferences the prosecution was advancing in its interpretation of the case. For instance, when properly stopped from speculative interpretations of the language of an underlying document, the Government still drew out testimony to make the same improper connection:

Q. All right. Special Agent Coughlin, where the third

sentence says, "We succeeded in monitoring and destroying about

1,300 armed SUVs," as you read that paragraph, who does the

"we" refer to?

MR. COBURN: Objection. No personal knowledge.

THE COURT: Sustained.

Q. What is the entity that is listed in the first sentence as

bearing the burden of securing its western border?

MR. COBURN: Objection. No personal knowledge.

THE COURT: He's just reading it.

23

Go ahead, sir.

    A.  The Egyptian state.

Trial Tr. 631:15–32:1. In another instance, the Government used its questioning as to GX 1352 to suggest how to interpret a text by Mrs. Menendez in March 2019 about "a year of broken promises by Will to me." *See id.* at 677:11. Coughlin confirms the date of that text (which is line 461 of GX 1352), then is referred to line 76 and the underlying document, which are dated March 2018. The prosecutor then asks, "About how long was that before the defendant texted about broken promises?," and Coughlin responds, "A little over a year." *Id.* at 677:13–25. Similar tactics were used in Graves' testimony. *See, e.g.*, *id*. at 1242:4–15; *id*. at 1256:1–17. Making such connections is for the jury to do after the prosecutor argues for them in closing; here, however, the prosecutor is making that argument through the witness on the stand under the guise of helping the jury process a voluminous documentary record. This approach to summary exhibits and corresponding testimony violated the language and spirit of Rule 1006 by creating arguments and inferences for the jury outside of the context of summation or rebuttal.

    For all these reasons, the impermissible use of expansive summary charts requires an entry of acquittal pursuant to Rule 29 or a new trial pursuant to Rule 33.

## III.    THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT ANY BRIBERY OCCURRED.

    At trial, the Government fell far short of proving essential elements of each bribery count— including the extortion and honest services wire fraud counts—throwing a fatal blow to eleven counts on which Mrs. Menendez was convicted. As a threshold matter, the Government failed to prove beyond a reasonable doubt that Senator Menendez engaged in a single official act—leaving out the necessary *quo* in the alleged *quid pro quo*. Secondarily, the Government also failed to offer sufficient proof that the Senator and Mrs. Menendez agreed to perform an official act *in exchange*

*for* anything of value with corrupt intent.  Thus, the necessary proof of a *quid pro quo*, or that the Menendezes traded official conduct in exchange for bribes, is lacking.  Consequently, the convictions on Counts One, Two, Three, Five, Seven, Eight, Nine, Ten, Eleven, Thirteen, and Fourteen must be vacated.[10]

### A.    Mrs. Menendez Did Not Aid or Participate in Any Bribery Because No Official Acts Were Performed.

The Supreme Court has clearly established the stringent standards for what constitutes official action.  An official act must involve a "formal exercise of governmental power" of a "focused and concrete" nature that is pending either before the public official who is performing the official act or before another public official.  *See McDonnell v. United States*, 579 U.S. 550, 571–74 (2016).  Any lower standard, the Supreme Court warned, would cast a shadow over commonplace political interactions between constituents and their elected officials.  *Id.* at 575–56.  Consequently, the federal bribery statute, 18 U.S.C. § 201(a)(3), defines official act as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."  Moreover, a public official "must make a decision or take an action *on* that question or matter, or agree to do so."  *McDonnell*, 579 U.S. at 572.  The Supreme Court cautioned against minor conduct that can never rise to the level of an official act, alone, such as setting up a meeting, talking to another official, or organizing an event (or agreeing to do so).  *Id.* at 567.  Despite *McDonnell*'s stringent requirements, the

---

[10] Because the substantive counts for federal bribery under 18 U.S.C. § 201, honest services wire fraud, and extortion under color of official right fail, so do their related conspiracy counts.

Government in this case mischaracterized several lawful acts as criminal official conduct based on complete and improper conjecture.

        1.   <u>The Hana-Egypt Bribery (Counts Five, Seven, and Eight).</u>

At trial, the Government mistakenly painted a three-to-four-minute call to Undersecretary Ted McKinney, and specifically the Senator's alleged statement—"stop interfering with my constituent"—as official conduct. *See* Trial Tr. 2838:3–6 ("But this one incident, the McKinney call and the bribes that surround it, is all you need to convict the defendant on the Egypt-related bribery counts."); *id* at 1059:6. Yet the only plausible official act was not performed by the Senator, or even Undersecretary McKinney, or *any other U.S. official*, at all. Rather, Egypt was the only actor with any formal decision-making authority with respect to the halal certification grant. *See id.* at 1095:9–12 (testimony of Undersecretary McKinney: Q: "If the government of the country of Egypt makes a decision about halal certification, no one at the USDA has the power to overrule that. Is that fair to say?" A: "That's correct.").

Moreover, the Government offered no evidence whatsoever that Senator Menendez attempted to pressure the Undersecretary's position on the certification matter. *C.f. McDonnell*, 579 U.S. at 572 ("A public official may also make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy' by using his official position to exert pressure on *another* official to perform an 'official act.'"). Indeed, there was no evidence offered that demonstrated this kind of pressure. For instance, Undersecretary McKinney testified that the call did not alter his position, or even his thinking on that position, on the certification issue. Trial Tr. 1113:11–13 ("We don't like monopolies. So that was clearly my position, and that was what I reflected in letters and communications[.]"). Moreover, Undersecretary McKinney testified that Senator Menendez did not threaten him, and the Senator was not angry during the call. *See id.* at 1062:25–25, 1111:17–19. Thus, the evidence supports that a conversation occurred but not that

there was undue influence or pressure by Senator Menendez towards Undersecretary McKinney. All the more telling, the Government solicited no testimony that the Senator even offered Undersecretary McKinney advice on his position regarding certification.

The Senator's call, at most, fell under the purview of his lawful duties as a member of Congress—providing services for one of his constituents. *McDonnell*, 579 U.S. at 574 ("[Not] every decision or action customarily performed by a public official—such as the myriad decisions to refer a constituent to another official—counts as 'an "official act."'"); *see also id.* at 573 (noting that "calling an official (or agreeing to do so) merely to talk about a research study or to gather additional information" does not constitute an official act).

Moreover, the Government incredulously and ambiguously contended that several additional innocuous acts constituted official acts and grouped them together as benefitting the country of Egypt. *See, e.g.*, Trial Tr. 2813:21–14:7; 2829:5–13; 2831:3–15 (*e.g.*, a promise of approval of military aid to Egypt; the promise to provide information to Egypt about Americans stationed abroad; and the promise to help change the official position of the U.S. on a matter related to U.S. foreign policy). But none of these acts involved formal exercises of governmental power on the part of any American official, let alone Senator Menendez. For example, providing information about the number of employees at the Cairo embassy and providing comments on a draft letter hardly constituted official acts. *See, e.g.*, *See United States v. Silver*, 864 F.3d 102, 122 (2d Cir. 2017) (noting that the defendant's opposition via a draft letter, where he took no separate, formal action exercising his governmental power was not an official act). Indeed, regarding the Senator's edits to a draft letter, the Government conceded that the act itself was not an official act, and instead characterized it as the "promise of one." Trial Tr. 2832:10–13. That argument is a red herring. It requires the impermissible leap that at some point in time—without evidence of when

27

specifically, or even in what context or medium—the Senator would address the topics raised in the letter in a formal way.  The Government offered no evidence of any "concrete" or "focused" matter for which there would be a "formal exercise of governmental power."  *McDonnell*, 579 U.S. at 571–74.  Neither was the Senator's communication regarding the $99 million tank sale a promise of some future conduct because it was nothing more than a communication from the Senator about a decision he had already decided to make.

The Government's theory of official acts, in aid of either Hana's "monopoly" or military aid to the country of Egypt, as a whole boiled down to pure speculation—the kind that stretched inference upon inference so that the jury would render an unsupported verdict in violation of Rules 29 and 33.  The absurd so-called bribery scheme relying on Hana's certification business required the premise that somehow Hana, Senator Menendez, Mrs. Menendez, several other actors, including *within* the Egyptian government involved in approving the certification rights—and by extension the nation of Egypt—somehow all agreed to this *quid pro quo*.  The fantasy is no less incredulous than the purported "acts in aid" of Egypt.  Both categories of "official conduct" more plausibly constituted action completely within the lawful confines of Senator Menendez's role in U.S. foreign relations.

## 2.   The Uribe Bribery (Counts Nine and Ten).

Similarly, the Government failed to prove an official act with respect to certain New Jersey state prosecutions and investigations.  The Government improperly attempts to paint two short discussions with the New Jersey Attorney General in response to a constituent's concerns as official acts for purposes of criminal liability under the federal bribery laws.  But the evidence at trial, at best, showed that Senator Menendez was relaying a concern to then-New Jersey Attorney General Gurbir Grewal regarding potential selective prosecution of Hispanic defendants.  *See* Trial Tr. 1738:7–23.  Critically, in these discussions, he never asked anything of the Attorney General.

28

*Id.* at 1407:15 (Grewal testifying that the Senator "did not ask me to do anything"). Nor did he even mention the case name, the criminal defendant, or any individual target of investigation by the Attorney General. *See id.* at 1422:5–13.

*McDonnell* made clear that calls or meetings, without more, do not constitute official acts. *See* 579 U.S. at 567 ("[S]etting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'"). Yet the Government improperly attempted to stretch the Senator's conduct beyond this permitted scope—painting it as potential pressure on the Attorney General. But that theory was belied by the Attorney General's own testimony that the Senator remained calm and collegial during his meetings with the Senator, debunking any misconception that the Senator may have attempted to influence the Attorney General's office through his official position. *See* Trial Tr. 1391–1415. Nor could the Senator's conduct be determinative of the Attorney General's prosecutorial or investigative functions because the Senator had no power over prosecutorial decisions within the purview of the Attorney General's Office. Indeed, the Government failed to proffer sufficient evidence at trial that the New Jersey Attorney General could be influenced by the Senator in these matters. *See generally id*. Consequently, there was no matter or controversy on which Senator Menendez promised to make a decision or take action, which is fatal to the bribery counts related to Uribe and his associates. *See, e.g.*, *United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008) (finding no criminal activity based on state legislator's lobbying where he never "invoked any purported oversight authority or threatened to use official powers in support of his advocacy").

### 3. The Daibes Bribery (Counts Eleven, Thirteen, and Fourteen).

As with the other alleged schemes, the Government failed to meet its evidentiary burden that Senator Menendez took any official act in support of Counts Eleven, Thirteen, and Fourteen. The Government again relied on misplaced theories that the Senator engaged in two official acts.

The first purportedly involved a recommendation that Philip Sellinger be nominated as New Jersey's United States Attorney, with the hope that Sellinger could influence a prosecution brought against Daibes by that office. The second involved a phone call from Senator Menendez to the First U.S. Attorney for New Jersey, Vikas Khanna, on the same case. But neither of these theories comports with *McDonnell* and subsequent case law.

As to the first purported official act, Senator Menendez did not have the power to nominate the U.S. Attorney. *See* Trial Tr. 2383:9–14 (Soliman testifying that Senator had no power to nominate U.S. Attorney); *id.* at 2260:1–9 (Sellinger testifying that only President has power to nominate U.S. Attorney for consent of Senate). Moreover, the evidence does not support that the Senator intended for Sellinger to influence the Daibes prosecution. In no meetings with Sellinger or Soliman did the Senator state Sellinger must take specific action in favor of Daibes. *See, e.g.*, Trial Tr. 2217:22–18:12 ("Senator Menendez hoped that if I became United States Attorney," Sellinger would look into whether Daibes was being treated fairly; Sellinger testified he told the Senator that he would do that for every case before him); *id.* at 2250:19–22 (Sellinger testifying that, at a meeting, the Senator did not ask him to do anything in his official capacity). The Senator also knew it was a possibility that Sellinger could be recused before he ultimately recommended Sellinger for the nomination. *See id.* at 2226:17–27:9 (describing that Sellinger told Senator Menendez that he may need to be recused from the Daibes case *before* the Senator re-considered Sellinger); *id.* at 2234:12–35:4 (Sellinger told Soliman in spring 2021 that an official at Main Justice would need to make the ultimate decision on Sellinger's recusal). Further, the back-and-forth on Senator Menendez's part regarding who to recommend for the nomination was not evidence of an official act either; rather, such conduct was commonplace (and lawful) when considering nominations to the post.

30

Instead, the Government improperly sought to condemn, by way of a federal conviction, the long-standing friendship between Senator Menendez and Daibes. No law proscribes such friendships themselves; nor does any law criminalize a U.S. Senator merely contemplating a friend's interests when making his choice of recommendation, or when engaging with the office of a U.S. Attorney. Even Soliman, the Government's witness, testified that the Senator only requested Soliman remind Sellinger to "give the Daibes case . . . all due process." Trial Tr. 2358:4–8. The comment was ordinary, as all criminal cases require due process, and did not reflect a request for any specific outcome or even favorable treatment by the U.S. Attorney's Office.

The Government—in very short breath—also argued at summation that the Senator made calls to First U.S. Attorney Khanna on the case. But such conduct did not constitute an official act. Notably, the Government proffered zero proof of the contents of the calls, and even conceded to that fact in summation. *See id.* at 2914:17–15:11. Tellingly, it did not call Khanna as a witness in Mrs. Menendez's trial, despite calling Khanna to testify in the Senator's trial proceedings. The silence speaks volumes. At the Senator's trial, Khanna explained he never once was directed to take any specific action, and there was no discussion of any specific case between Khanna and the Senator. *See* 2024 Trial Tr. 5029:5–30:21. Moreover, as a matter of law, *McDonnell* already rejected this theory of official conduct: a call itself is an inadequate showing of such conduct. *See* 579 U.S. at 573–74 (official action, without more, does not involve talking to another official). Further, the Government proffered insufficient proof that the Senator somehow caused, through advice or pressure, conduct by anyone in the U.S. Attorney's Office, including Sellinger himself. There simply was no proof to substantiate a single official act. For these reasons, the Government failed to prove beyond a reasonable doubt unlawful bribery with respect to Counts Eleven, Thirteen, and Fourteen.

**B.**    **Mrs. Menendez Could Not Have Aided or Participated in Any Bribery Because Neither She Nor Senator Menendez Agreed to a *Quid Pro Quo*.**

The lack of any official conduct to substantiate any of the substantive and conspiracy bribery counts is justification alone to vacate Mrs. Menendez's convictions on those counts.  But the Government also failed to offer sufficient proof that the Senator and Mrs. Menendez agreed to perform an official act *in exchange for* anything of value with corrupt intent.  As the Court previously instructed:  "In addition to an official act, the government must prove a *quid pro quo*, or an 'understanding that the payments were made in return for official action.'"  *United States v. Menendez*, 759 F. Supp. 3d 460, 477 (S.D.N.Y.  2024) (quoting *United States v. Silver*, 948 F.3d 538, 551 (2d Cir. 2020)).  Moreover, "the *quid pro quo* must be clear and unambiguous."  *Id.*  "The inducement from the official is criminal if it is express or if it is implied from his words or actions, so long as he intends it to be so and the payor so interprets it."  *Id.*  Furthermore, the public official must have "agreed[d] to perform an 'official act' at the time of the alleged *quid pro quo*."  *Id.* at 478 (citing *McDonnell*, 579 U.S. at 572–73).

1.    The Hana-Egypt Bribery (Counts Five, Seven, and Eight).

The Government failed to prove that Mrs. Menendez and the Senator promised that the Senator would help maintain IS EG Halal's monopoly or perform any actions to benefit Egypt in exchange for bribes.  For instance, the Government wrongfully argued that the Senator must have promised to provide aid to Egypt, relying upon a series of actions that required baseless leaps.  It highlighted, in part, a meeting on March 13, 2018, involving Senator Menendez, Mrs. Menendez (then Nadine Arslanian), Hana, General Khaled Shawky, the Egyptian attaché, and Andy Aslanian.  *See* GX 1352 (line 75).  It also pointed to a dinner at Mr. Chow in June 2018 among Hana, Mrs. Menendez, and Senator Menendez, when Hana texted General Shawky.  *Id.* (line 244).  In July 2018, Senator Menendez purportedly met with General Shawky again at a dinner that the general

hosted, and the day after, the Senator allegedly informed Mrs. Menendez that he would approve of a sale of ammunition and that she should inform Hana. *Id.* (line 306). Simply put, the Government implied causation, even a connection, between these events where there was none whatsoever. The Government improperly argued the events demonstrated that, at some unidentified point in time, Senator Menendez must have agreed to provide Egypt with assistance in ammunition sales in exchange for bribes. But the Government, not once, proffered evidence of what was actually said at these meetings. Instead, it relied on the mere fact that meetings occurred to incredulously contend that a corrupt bargain must have occurred. Those speculative inferences were not reasonably grounded in the evidence at trial and, therefore, violated Rules 29 and 33. *See, e.g.*, *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004); *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972).

Moreover, the "*quid*" asserted by the Government was not provided in exchange for any "*quo*." The Government argued, for instance, that the Menendezes received gold, mortgage payments, checks for a "sham" job performed by Mrs. Menendez, and other miscellaneous gifts like an elliptical in exchange for a corrupt act. But these were not bribes at all. For example, the Government never offered adequate evidence regarding when the gold was received by the Menendezes, only conclusory speculation. *See, e.g.*, Trial Tr. 2824:15–21 ("And as for Daibes, when the defendant and Menendez come back from a trip from Egypt, Daibes gives them one of the kilo gold bars. Daibes stops by with doughnuts the day after they land when both the defendant and Menendez are home, and right after he's left, Menendez googles the price of a kilo of gold for the first time in his whole search history[.]"). Moreover, the evidence offered by the Government to claim her job a sham was dubious and thin. For example, Jamela Maali testified that she was unaware of the work that Mrs. Menendez may have performed for IS EG Halal, but that

individual's lack of awareness does not prove that Mrs. Menendez did not provide substantive work. Maali was a member of the company's administrative staff and reasonably may not have participated in any discussions around, or otherwise understood, Mrs. Menendez's work. *See id.* at 1143:4–17, 1148:1–13.

Moreover, there was evidence that the mortgage payments made on behalf of Mrs. Menendez were always understood by Mrs. Menendez to be a loan she had every intention of paying back. *See id.* at 481:10–24 (John Moldovan testimony regarding Mrs. Menendez's receipt of his text that he was authorized to send a personal loan with no interest). The evidence at trial also supported that other items and financial assistance Mrs. Menendez received were not the result of bribes but gifts offered by friends. The Government's innuendo of corruption is a conjuring of the Government's own making and not supported by adequate evidence that the things of value constituted bribes.

The timing of the so-called "bribes" further undermines the Government's theory. The Government identified April 2018 as the start of the purported plot to provide aid to Hana's company and the country of Egypt. *See id.* at 2819:2–4 ("As far back as April [6,] 2018, [Mrs. Menendez allegedly] told Hana that she was going to ask Menendez about the two deals."). Without naming which two deals, the Government then incorrectly asserted that Mrs. Menendez and the Senator received several forms of payment in furtherance of a corrupt exchange. But the timing of these alleged payments is off.

- The mortgage payment was provided on July 19, 2019, two months after the Senator's call to Undersecretary McKinney, and an *entire year and three months* after the alleged beginning of the scheme. *See* GX 1352 (line 894).

- Mrs. Menendez's first wages for her consulting job were paid starting in August 2019, a year and four months after the alleged start. *Id.* (line 919).

- The Senator was unaware of any mortgage delinquency until *after* the call with the undersecretary. Trial Tr. 2822–23.

The attenuated timing of these payments undermines the notion that any corrupt bargain was struck prior to the call to the undersecretary. Case law in the Second Circuit supports that finding. *See United States v. Bongiovanni,* No. 19-CR-227, 2024 WL 3487914, at *6 (W.D.N.Y. July 19, 2024) (distinguishing gratuities, which are "payments made to an official after an official act as a token of appreciation," and bribes, which are "payments made or agreed to before an official act in order to influence the official with respect to that future official act") (quoting *Snyder v. United States*, 144 S. Ct. 1947, 1951 (2024)). At most, the evidence offered may have suggested a gratuity was paid (although Mrs. Menendez does not concede to such a gratuity), but the Government did not charge Mrs. Menendez on that theory. Thus, the Government offered insufficient proof that either Mrs. Menendez or the Senator agreed prior to some purported official act to perform that act in exchange for bribes.

### 2. The Uribe Bribery (Counts Nine and Ten).

Similarly, the Government failed to offer sufficient evidence that a *quid pro quo* occurred with respect to the conduct underlying Counts Nine and Ten. There was no agreement by Mrs. Menendez or Senator Menendez to "stop and kill" the investigation in exchange for things of value. Trial Tr. 2983; *id.* at 1736:4–7. Most damningly, there was not a single shred of evidence presented at trial that the Senator knew that payments were being made for the Mercedes Benz in exchange for intervention in the New Jersey state cases. Thus, there could have been no bribery agreement. *See, e.g.*, *id.* at 1624:6–24 (Uribe testifying that he had no discussion with Senator at all, ever,

about Mercedez Benz payments).  Moreover, in meetings between Uribe, Hana, the Senator and Mrs. Menendez, for example at Il Villagio in 2018, Uribe testified to never raising the intervention he sought.  *Id.* at 1512:1–7.  At trial, the Government used at least 13 summary charts, involving purported communications between Mrs. Menendez and Uribe from March 2019 to August 2020.  But not a single piece of communication reflected a request for an official act, or anything remotely resembling an official act.  *Id.* at 1735:9–20 (Cross examination of Uribe:  Q: "[D]id any of the text messages between yourself and the defendant on those charts refer to something that Senator Menendez was going to do?"; A: "Best of my reflection sitting here . . . But ones come to mind where he says something to the extent that he might be busy and he's not home yet or so, but I make up and phone calls go out, when referring that when she talks to the [S]enator or get ahold of the [S]enator is the best of my recollection sitting here right now.").

Moreover, the timing of the payments again undermined the notion that any bribe agreement was struck.  Notably, discussions between Uribe and Mrs. Menendez about purchasing a Mercedez Benz first occurred in 2019.  The actual payments themselves started in March 2019.  *Id.* at 1552:16–18 (Uribe testifying regarding payment of $15,000).  But Uribe testified to requesting that Hana discuss the New Jersey state prosecution and investigation with the Senator in October 2018.  *See* GX 1309; *see also Bongiovanni*, 2024 WL 3487914, at *7 ("[T]he remoteness of the events loosens the connection between the payments and Bongiovanni's future intervention on behalf of Gerace.").

On these counts, the Government's misguided theory stemmed, then, not from sufficient evidence of a *quid pro quo* but something else entirely.  The Government sought to attach criminal liability to Mrs. Menendez, not because she actually ever agreed with Uribe to influence the Senator to intervene in certain New Jersey state matters.  Rather, the evidence only ever plausibly

supported that an agreement was struck between *Hana* and Uribe.  *See* Trial Tr. 1484 (Uribe testifying that Hana overheard a discussion between Uribe and Andy Aslanian about the state cases; Hana offered that for $200,000 to $250,000, Hana could make the investigations "go away").  The Government never proved the kind of "clear and unambiguous" *quid pro quo* required by the Second Circuit that involved Mrs. Menendez.  *See United States v. Benjamin*, 95 F.4th 60, 68 (2d Cir. 2024).  For this reason, the Court should vacate the jury verdict on these counts.

### 3.   The Daibes Bribery (Counts Eleven, Thirteen, and Fourteen).

Finally, the Government failed to prove beyond a reasonable doubt a *quid pro quo* related to any attempt to intervene in Daibes's criminal prosecution brought by the New Jersey U.S. Attorney's Office.  Trial Tr. 2814:3–7.  The Government failed to meet its evidentiary burden on the requisite nexus between the things of value and the purported official acts.  The Government, for example, relied on cash and gold as purported bribes.  But it never provided adequate information as to when or why the cash or gold was provided, outside of improper speculation. One repeated pained theory involved the Senator's receipt of kilos of gold—the same theory the Government implausibly used regarding the Hana-Egypt conduct.  The Government improperly asserted the Menendezes received that gold on October 18, 2021 because that was the same date that the Senator (but not Mrs. Menendez) googled the price of a kilo of gold.  *See, e.g.*, *id.* at 2907:19–24, 2915:2–6.  Even if that were true (which it was not), Senator Menendez had already begun the process of considering Philip Sellinger for the U.S. Attorney position in August 2020. *See* GX 1354 (lines 2, 3).  Consequently, *more than a year had passed* between the Senator's consideration of Sellinger and the Senator's alleged receipt of the these kilos of gold.  Per the Government's theory, this necessarily meant that the Senator *agreed* to wait one year and two months to receive a gold payment in exchange for his efforts in favor of Sellinger (which involved a back-and-forth regarding multiple potential nominees and numerous discussions and research

regarding those candidates).  The theory is simply implausible and defies common sense.  It also further undermines the Government's theory that a bribery even occurred.  Instead, the Government completely ignored the more credible, innocuous reasons for googling the price of gold—like wanting to know the value of his wife's family gold.  *See United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005) (noting that a verdict raises doubt when it rests on thin, equivocal, or attenuated evidence).  The purported ride from JFK to the Menendez residence, and the apparent cash the couple received, suffered from the same defect.  The ride home purportedly occurred on October 17, 2021, *see* GX 1352, over a year after the Senator started contemplating Sellinger's recommendation.  With respect to the cash, the Government provided ambiguous estimates.  *Compare* Trial Tr. 2904 (Daibes cash "had to be put in" between October 5, 2021 and June 16, 2022) *with id.* at 2906 (describing undated cash in safety deposit bank).  The Government utterly failed to prove that these other alleged "things of value" were bribes to either Mrs. Menendez or the Senator.

Instead of offering sufficient proof to substantiate any of its bribery or related conspiracy charges, the Government impermissibly swayed the jury to convict Mrs. Menendez based solely on foul speculation.  For this reason, the Court should remedy the grave injustice and grant Mrs. Menendez's post-trial motions pursuant to Rules 29 and/or 33 on the bribery counts.[11]

---

[11] The Government's failure to proffer sufficient evidence of any *quid pro quo* necessarily damns its ability to prove beyond a reasonable doubt that Mrs. Menendez possessed the requisite *mens rea* to support the bribery convictions.

IV.    **THE EVIDENCE WAS INSUFFICIENT TO CONVICT MRS. MENENDEZ ON THE OBSTRUCTION OF JUSTICE COUNTS.**

A.    **The Evidence Regarding Counts Seventeen and Eighteen Was Insufficient to Support the Jury's Verdict.**

The Government's evidence on Counts Seventeen and Eighteen was astonishingly thin, consisting of a few checks: two checks provided by Senator Menendez to Mrs. Menendez, a check from Mrs. Menendez to Jose Uribe, and a check from Mrs. Menendez to Wael Hana. GX 3B-1-EM. This is not enough to support criminal liability. The record is devoid of any evidence that Mrs. Menendez acted with the necessary wrongful intent to obstruct a judicial or grand jury proceeding. To the contrary, Mrs. Menendez did what she was supposed to do when receiving a grand jury subpoena: she turned over the responsive documents requested by the subpoena.

The omnibus clause of Section 1503 makes it a crime to "corruptly or by threats or force, or by any threatening letter or communication, influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a). In *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006), the Second Circuit stated:

> In order to convict for obstruction of justice under the omnibus clause of section 1503, the government must establish (1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so—that is, 'that the defendant corruptly intended to impede the administration of that judicial proceeding.'

*Id*. at 170 (quoting *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003)). It is the government's burden to prove that the defendant's conduct had the "natural and probable effect of interfering" with a judicial or grand jury proceeding. *United States v. Aguilar*, 515 U.S. 593, 599 (1995) (internal quotations omitted). The government must show that the defendant knew that his or her actions were likely to affect the judicial proceeding to prove that the defendant acted with

the necessary wrongful intent or improper purpose required under Section 1503. *Id.* The defendant "lacks the requisite intent to obstruct" absent the defendant's knowledge that his or her actions were likely to affect the judicial proceeding. *Id.*

The Government's theory of liability rests on the argument that the checks were written, and subsequently provided to the Government as requested by the relevant subpoena, to "create a fake paper trail." Trial Tr. 2949.[12] This theory is not supported by the evidence, necessitating an acquittal on Counts Seventeen and Eighteen.

There is nothing "fake" or "false" about the checks. There is no dispute that the checks themselves were authentic—the Government's only cooperating witness, Jose Uribe, testified that he deposited the check made out to him. Trial Tr. 1681. Thus, the Government's argument that the checks constituted a "fake paper trail" hinges on the improper notion that the memo lines of the checks made out to Wael Hana and Jose Uribe were inaccurate. But this is a quintessential red herring. The memo line simply assists the person writing a check in her own record-keeping and does not render a check "true" or "false" or "full of lies," as the Government argued. Imagine a scenario where a friend belatedly writes a check to another friend for his birthday, with a memo line reading "Happy Birthday." The check is not "false" simply because the birthday has already passed, and the check is a month or two late.

Indeed, there was ample evidence in the record showing that the funds Mrs. Menendez received from Hana and Uribe could be considered loans from Mrs. Menendez's perspective, undercutting the necessary *mens rea*. *See, e.g.*, Trial Tr. 481 (John Moldovan testimony: Q: "On

---

[12] In their opening statement, the Government made this same unproven and illogical point, arguing that Mrs. Menendez committed obstruction when "she produced those checks full of lies to that federal grand jury." Trial Tr. 91.

July 19, 2019, you texted Ms. Menendez that you were authorized to send roughly $23,000 as a personal loan with no interest.  That's correct?"  A:  "Yes."); GX D207-A; Trial Tr. 459 (memo line of cashier's check reads, "LOAN AUTH W.HANA/IS EG TO N.A."); *id*. at 1677 (Jose Uribe explaining to Mrs. Menendez that he would tell the FBI that the car payments were an effort to help a friend that was in financial distress, and that the friend was going to pay him back).

The timing here also undercuts the Government's theory of criminal liability.  According to the evidence presented at trial, Mrs. Menendez first became aware of the Government's investigation in June 2022, when her home was searched and she was provided with the first subpoena.  Trial Tr. 109; *id.* at 1427–38; GX 11B-1.  The checks at issue were written in December 2022.  GX 3B-1-EM.  And then Mrs. Menendez produced the checks promptly when required to do so pursuant to a subpoena issued in June 2023.  GX 2499.  The record is devoid of any evidence that Mrs. Menendez acted with the necessary wrongful or corrupt intent to obstruct a judicial or grand jury proceeding through the issuance of the two checks in December 2022, and the provision of those checks pursuant to a subpoena six months later.  GX 3B-1-EM; Trial Tr. 1835–38.  This necessitates the dismissal of Counts Seventeen and Eighteen.

## B.    The Evidence Regarding Count Four Was Insufficient to Support the Jury's Verdict.

The evidence in support of Count Four was also deficient, requiring the dismissal of that count.  There was no evidence that Senator Menendez attempted to obstruct the prosecution of Fred Daibes, and thus Mrs. Menendez cannot be found guilty of conspiracy to do the same.  There was nothing even improper, and certainly not criminal, with regard to Senator Menendez's interactions with Phillip Sellinger.  *See* Section III, *infra*.

It is the President of the United States, not a Senator, who has the ultimate power to nominate a United States Attorney.  *See* Trial Tr. 2206, 2260.  It is typical practice for Senators to

vet candidates for United States Attorney and make recommendations to the President for the President's nomination.  *Id.* at 2206, 2287–88.  In making such recommendations, it is axiomatic that a particular Senator takes into account innumerable factors.

Even assuming that Senator Menendez was interested in how the person he recommended would view the pending case against Mr. Daibes, that is not obstruction of justice; that is simply one data point among many that the Senator was certainly allowed to consider in making his decisions about who he thought was best suited to serve as United States Attorney.  Likewise, Senator Menendez's request to Soliman, a political consultant, that Mr. Soliman ask Phillip Sellinger, once he became U.S. Attorney, to give the Daibes case "all due process" (a request that was not even passed along) is not obstruction of justice.  *Id.* at 2358.

Crucially, in no meetings or communications with Sellinger did Senator Menendez, or his strategic consultant, Soliman, direct or even ask Sellinger to take specific action in favor of Daibes. *Id.* at 2218–50.  Accordingly, the evidence simply does not allow for an obstruction conviction under the relevant law.  Like in *Aguilar*, the conduct here "cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice."  *Aguilar*, 515 U.S. at 599. There are boundaries to the use of the obstruction statutes, as the Supreme Court recently made clear in *Fischer v. United States*, 603 U.S. 480 (2024), and Count Four goes well past those boundaries.

## V.    THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION FOR THE FARA CONSPIRACY.

The Government employed the Foreign Agents Registration Act, 22 U.S.C. § 611 ("FARA"), in a wholly unprecedented manner to charge Mrs. Menendez with conspiracy to have Senator Menendez act as an agent of a foreign principal.  Setting aside the absurdity of bringing FARA charges against a U.S. Senator—who occupied multiple leadership positions on the Foreign

Relations Committee and represented a substantial Egyptian diasporic population—the Government failed to allege sufficient evidence to prove that Mrs. Menendez or any other defendant agreed to have the Senator act as a foreign agent. Accordingly, Count Fifteen must be vacated.

Principally, the Government failed to show an agreement because the Government proffered not even a scintilla of evidence that demonstrated Senator Menendez acted on the request of Egypt.[13] The Government improperly attempted to spin routine tasks within the lawful confines of the Senator's political posts into a foreign conspiracy. But the effort failed. For example, in its closing, the Government highlighted the letter Senator Menendez edited at Mrs. Menendez's request. *See* Trial Tr. 2937; GX A403; GX C406. But at trial the Government provided only communications between Mrs. Menendez and Hana, offering no evidence that the letter was at all solicited by the government of Egypt. The Government wrongly described this letter as an example of Mrs. Menendez passing on certain information to assist Egypt in responding to human rights concerns. Trial Tr. 2937. But the evidence, at most, showed only that Mrs. Menendez sent the letter to Hana, and that, several months later, Helmy and Hana exchanged a copy of a similar

---

[13] The Court informed the jury of the substantive FARA charge, noting that "[a] person can act as an agent of a foreign principal if he acts under the order, direction, or control of a foreign principal or at the request of a foreign principal," and that "request" has a particular meaning in the FARA context. Trial Tr. 3143. As the Court instructed, the request "must be something more than an ordinary solicitation, although it can be less that an order or command." *Id.* In other words, "the foreign principal making the ask must have some degree of authority over the agent." *Id.* at 3144. Ultimately, "[w]hether a person is acting as an agent of a foreign principal turns on whether he or she is acting based on his own volition or views or whether he is instead taking directions or acting at the order, under the control, or in response to a request." *Id.*

letter addressed to the Senate Foreign Relations Committee. *See* GX 1352 (lines 190, 274).[14] Based on this evidence, a reasonable factfinder could not have concluded that the letter was the result of a request by Egypt, let alone support the inference that Mrs. Menendez agreed to have the Senator act on behalf of the country of Egypt.

The Government also incredulously claimed that the call Senator Menendez made to Undersecretary McKinney regarding the halal certifier decision somehow "represented the interests of" Egypt. *See* Trial Tr. 2939. This theory is implausible. One the one hand, in support of its purported bribery counts, *see* Section III, *supra*, the Government contended that the call to the Undersecretary was an attempt to alter his official conduct—that is, as an American official. But in pursuit of proving Count Fifteen, the Government changed course entirely and argued instead that the call somehow was now made in support of the government of Egypt. Notwithstanding this clear about-face, the Government again failed to produce any proof that this call was made at the direction of the government of Egypt, or even that Mrs. Menendez or Senator Menendez knew that making a call on behalf of a constituent implicated the government of Egypt.

Finally, the Government suggested that Senator Menendez acted as a political consultant by informing Hana and Mrs. Menendez that the ban on small arms sales to Egypt was lifted, and by telling Mrs. Menendez the number of staff at the U.S. Embassy in Cairo. *See* Trial Tr. 2938. But, again, the Government did not provide any evidence to prove that these communications were made at the request of the Egyptian government or as part of any agreement involving the Egyptian government whatsoever. Even Sarah Arkin, the Government's witness, testified that the conduct

---

[14] This transmission—like all of the evidence implicating Mrs. Menendez in the foreign agent charge—is shown only through the Government's summary charts, which, as detailed in Section II, *supra*, were used improperly at trial.

was entirely commonplace and a key part of Senator Menendez's duties to meet his constituents about their concerns, including Hana who was a member of the Egyptian diasporic community in New Jersey and who rightfully might have had personal interests in understanding information about Egypt. *See* Trial Tr. 1855 ("[A] constituent would always get a meeting with a representative from the senator's office."); *id.* 1870–71 ("[G]iven New Jerseys huge diaspora population, [Senator Menendez had] staff that specifically worked on—who worked with diaspora communities as related to matters of foreign policy.").

Further, it is undisputed that neither Mrs. Menendez, Hana, nor IS EG can be foreign principals under FARA. *See* 22 U.S.C. § 611(b)(2) ("foreign principal" cannot include a person that is a citizen and domiciled within, or organized under the laws of, the United States). Count Fifteen therefore rested on the inaccurate proposition that Mrs. Menendez agreed that the Senator would act at the requests of Egypt as Egypt's agent. But the theory was preposterous and the evidence instead supported, at most, that the challenged activities were entirely routine and made at the volition of Senator Menendez in connection with his lawful duties as a political official. Consequently, the Government failed to meet its burden on Count Fifteen and the corresponding verdict must be vacated.

## VI.    THE GOVERNMENT FAILED TO PROVE VENUE AS TO COUNTS ONE THROUGH FIFTEEN.

The Government brought nearly all of its charges in a district of improper venue. It relied on flimsy evidence of any and all acts that occurred—or potentially occurred—in the Southern District of New York without regard to whether those acts indeed formed the basis of any of the alleged offenses. The result of the Government's patchwork venue theories was a slew of faulty convictions that violated fundamental constitutional rights. Venue as to the counts outlined below cannot be sustained on the evidence presented, and the convictions must be vacated.

A.    **The Constitution Twice Guarantees Mrs. Menendez's Right to Be Tried in a District of Proper Venue.**

Both Article III of the Constitution and the Sixth Amendment require that the accused must be tried in the district where the alleged crime was "committed."  U.S. Const. art. iii, § 2, cl. 3; U.S. Const. amend. VI; *see also* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.").  Although not technically an element of a charged crime, venue is an essential component of the government's burden of proof at trial.  Thus, the government must show by a preponderance of the evidence that venue is proper as to each and every count.  *See United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011); *United States v. Ramirez*, 420 F.3d 134, 139–40 (2d Cir. 2005).

"Venue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place."  *Tzolov*, 642 F.3d at 318 (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999)).  As a corollary, mere "preparatory acts" that occur in the district cannot support venue.  *Id.* at 319; *see also United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989) ("Whether the crime be continuing or noncontinuing, venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense.").

Furthermore, the Government must show that an act's occurrence in the prosecuting district was "reasonably foreseeable" to the defendant.  *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012) ("[T]here must be some sense of venue having been freely chosen by the defendant."); *see also United States v. Bezmalinovic*, 962 F. Supp. 435, 441 (S.D.N.Y. 1997) (venue for bank-fraud charge was improper because "Defendant did not intend and could not have foreseen that any acts

46

would occur in the Southern District, and no decisions were made by the target of the fraud in the Southern District.").

Finally, "[t]o comport with constitutional safeguards," the Second Circuit requires "more than some activity in the situs district." *Davis*, 689 F.3d at 186. Instead, there must be "substantial contacts," considering "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." *Id.* (quoting *United States v. Reed*, 773 F.2d 477, 481 (2d Cir.1985)).

### B. The Evidence at Trial Did Not Support Venue in the Southern District of New York for Counts One Through Fifteen.

#### 1. Hana-Egypt Substantive Bribery (Counts Five, Seven, and Eight).

The Government advanced several arguments for venue as to the Hana-Egypt bribery counts in summation. First, the Government pointed to the June 2018 dinner at Mr. Chow in Manhattan with Mrs. Menendez, Senator Menendez, and Hana, at which Hana allegedly paid through his associate, Andy Aslanian. *See* Trial Tr. 2861:10–18; GX 7B-1; GX 5E-101A. But the Government offered no evidence to show that this dinner was part and parcel of an underlying bribery scheme, such as what was discussed at the dinner or the occasion for the dinner. The Government provided only vague, innocuous context surrounding the dinner. *See, e.g.*, GX 1352 (line 243) (text message from Mrs. Menendez inviting Hana to dinner).

Second, the Government pointed to the same Mr. Chow dinner, during which Hana sent a WhatsApp message to Major General Shawky scheduling meetings that would lead to the tank ammunition promise. Trial Tr. 2861:10–18; GX 1352 (lines 245–46). But for the same reasons stated above, the Government has not met its burden of showing that the dinner formed any part of the essential conduct of the offense, beyond the fact that this dinner occurred before the July 25, 2018 meeting between Senator Menendez and the Egyptian delegation.

Regardless, even if the Government had sufficiently demonstrated that the Mr. Chow dinner was connected to the later meeting (which it did not), the dinner would nonetheless constitute a preparatory act. Simply because "preparatory acts [may] happen close in time to a crime or under dubious circumstances," that does not mean they can suffice for satisfying the venue requirement. *United States v. Eisenberg*, No. 23-CR-10, 2025 WL 1489248, at *5, 27 (S.D.N.Y. May 23, 2025); *see also United States v. Tomasetta*, No. 10-CR-1205, 2012 WL 2064978, at *4 (S.D.N.Y. June 6, 2012) (granting Rule 29 motion because meetings in the district that fostered relationship between defendants could not sustain venue for charges of subsequent fraudulent disclosures, even if the meeting "set in motion a chain of events ultimately leading to" defendants' fraud).

Lastly, the Government attempts to support venue based on Vasken Khorozian's gold sales in New York. Trial Tr. 2865:22–66:5. But, once again, the sales do not form the essential conduct of the scheme. Mrs. Menendez's later efforts to monetize the gold are independent of and unrelated to the alleged scheme to acquire the gold in the first place. The Government has utterly failed to prove that any essential conduct occurred in the Southern District of New York as to Counts Five, Seven, and Eight.[15]

## 2. Uribe Substantive Bribery (Counts Nine and Ten).

In summation, the Government argued that the car payments Fernando Barruos made while he was in the Bronx supported venue. Trial Tr. 2900–01. But the Government supplied no evidence that Mrs. Menendez could foresee that this payment would be made from New York, or that Uribe would have called him about the payments in New York. Rather, all the evidence points

---

[15] The Government advanced the same arguments for venue as to Count 15 as it did for the Hana-Egypt bribery counts. Therefore, venue is also improper as to Count 15.

to these acts foreseeably occurring in New Jersey, where Mrs. Menendez and Uribe reside and where the account was located.

Additionally, the Government impermissibly speculated that Mrs. Menendez drove over the waters of the Southern District of New York *en route* to deposit money in Long Island. Trial Tr. 2901:20–25. But the Government failed to prove that this act formed any essential conduct of the scheme, as there was no evidence that the money to be deposited was related to bribe payments as opposed to any other cash. And, regardless, the Government failed to supply even the slightest evidence to support the inference that Mrs. Menendez actually traveled through the district.

3.   Daibes Substantive Bribery (Counts Eleven, Thirteen, and Fourteen).

In addition to several of the arguments already addressed, the Government attempted to sustain venue as to the Daibes bribery counts based on the ride given by John Pilot from JFK back to New Jersey. Trial Tr. 2929:14–18. Again, the Government offered no evidence that the ride constituted essential conduct of the bribery scheme. There is no evidence that any of the charged offenses occurred during that ride nor evidence to support an inference that the ride itself was a thing of value that was exchanged for any actions on the part of any defendants.

Finally, as to all the substantive bribery counts, venue cannot otherwise be established by virtue of the Government's aiding and abetting theory, because for all the same reasons that venue is improper as to Mrs. Menendez, it is improper as to Senator Menendez and the remaining defendants as well.

4.   Bribery Conspiracy (Counts One, Two, and Three).

Insofar as the bases the Government provided fail to support venue for the substantive bribery charges, they necessarily fail to support the conspiracy charges as well. In summation, the Government pointed to other "overt acts" that occurred in Manhattan, including phone calls, text messages, and meetings. Trial Tr. 2935:12–17. The Government was referencing evidence of calls

and texts by Mrs. Menendez that were transmitted using cell towers located in New York. Even assuming the communications were in furtherance of any of the charged conspiracies (and they were not), the Government offered no evidence from which to surmise that Mrs. Menendez could reasonably foresee that they would run through cell towers in the Southern District of New York.

### 5. Daibes Obstruction of Justice Conspiracy (Count Four).

In summation, the Government offered the same purported grounds for venue as to Count Four as it did for the substantive bribery offenses. *See* Trial Tr. 2953:18–22 ("So just like with the bribery offense, the sales of gold in New York, Khorozian's call into New York to sell the gold, and Daibes instructing John Pilot to give the defendant and Menendez a free ride through Manhattan, all grounds for venue."). For all the reasons stated above, the Government has failed to establish that these acts in the district were in furtherance of any of any of the bribery schemes and, likewise, cannot support venue for conspiracy to obstruct justice in an out-of-district proceeding.

## VII.    COUNTS ONE AND FIFTEEN ARE MULTIPLICITOUS AND CANNOT BOTH STAND.

The conclusion of trial has made resoundingly clear that the Government premised two separate conspiracy charges on the same underlying alleged conspiracy. Sustaining both convictions would violate Mrs. Menendez's Fifth Amendment rights under the Double Jeopardy Clause. Should the Court deny Mrs. Menendez's motion for acquittal on Counts One and Fifteen, the Court must enter judgment on only one of the conspiracy counts.

Following the co-defendants' trial, Hana argued in his Rule 29 motion that Counts One and Fifteen of the S4 Indictment were multiplicitous because they alleged at most a single conspiracy. *See* Dkt. 600 at 159–69. This Court denied Hana's motions for acquittal on those counts but agreed that they were multiplicitous and imposed judgment on only one count as to

50

both Hana and Senator Menendez.  *See* Order dated December 13, 2024, Dkt. 654, at 75–78.  The Government has provided no evidence in Mrs. Menendez's trial that would command a different outcome.

## A.    Legal Standard

Multiplicitous indictments violate the Double Jeopardy Clause because they "[subject] a person to punishment for the same crime more than once."  *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).  "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed."  *Id.*  When the charged offenses are for conspiracy, the inquiry becomes whether the government has proven one or multiple agreements.  *See United States v. Sattar*, 314 F. Supp. 2d 279, 307 (S.D.N.Y. 2004), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).  "A single agreement to commit several crimes constitutes one conspiracy," while "multiple agreements to commit separate crimes constitute multiple conspiracies."  *Id.*  "A defendant may be convicted of separate counts for 'overlapping conspiracies,' but not 'where a smaller conspiracy is wholly contained within a larger one.'"  *United States v. Fishman*, No. 20-CR-160, 2022 WL 1744698, at *3 (S.D.N.Y. May 31, 2022) (quoting *United States v. Gaskin*, 364 F.3d 438, 454 (2d Cir. 2004)).

In determining whether the Government has proven a single agreement or multiple agreements, the Court is guided by the factors set forth in *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985).  These factors include:

> (1) the criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.

*Id.*  "[N]o single *Korfant* factor is dominant or dispositive."  *United States v. Maxwell*, No. 20-CR-330, 2022 WL 1294433, at *4 (S.D.N.Y. Apr. 29, 2022), *aff'd*, 118 F.4th 256 (2d Cir. 2024).

**B.      The Government Proved, At Most, Only One Conspiracy.**

The Government brought both Counts One and Fifteen pursuant to 18 U.S.C. § 371.  Both charges alleged a single scheme related to bribes given to Senator and Mrs. Menendez in exchange for certain actions benefitting Hana and Egypt.  Review of the *Korfant* factors confirms that at the core of the two charges lies a single conspiracy, with Count Fifteen being a subset of Count One.

First, the charged offenses are entirely similar in operation and share common objectives.  Both charged schemes were supported by evidence of the ghostwritten letter, the call to Undersecretary McKinney, and the information regarding the embassy staff and the arms ban lift.  Further, both schemes were alleged to further the interests of Hana and, by extension at times, the government of Egypt.  And Mrs. Menendez's purported role in either one was indistinguishable, often conveying communications between Senator Menendez and Hana or arranging meetings.

Additionally, the two charges were highly interdependent and, indeed, Count Fifteen rose and fell with Count One.  The Government amply illustrated this overlap when it argued in summation that the jury could surmise the Senator did not act independently "because he was getting paid."  Trial Tr. 2940.  In other words, the conclusion that Senator Menendez was an agent of the Egyptian government, required to prove Count 15, depended entirely on the existence of the same bribery scheme underlying Count One.

Further, the Government relied on the same overt acts for both charges.  *See* Trial Tr. 2933 (listing overt acts supporting Count One as acts purportedly benefitting Egypt and Hana's monopoly like "Daibes handing over a bar of gold, the defendant selling it."); *id.* at 2947 ("[J]ust like with the bribery conspiracy," the overt acts include "[s]ending the embassy information; asking Menendez to write the ghostwritten letter; the meeting with Hana at Mr. Chow; selling the gold they got from the scheme in Manhattan; so many more.").

At a more rudimentary level, the conspiracies have nearly identical participants, time periods, and geographic scope. All of the participants alleged in Count Fifteen—Senator Menendez, Mrs. Menendez, and Hana—were also alleged to be part of the conspiracy in Count One (only Daibes was excluded). Likewise, the time period of Count Fifteen runs from 2018 to 2022, which is wholly subsumed within the time period for Count One, which extends into 2023. And the geographic scope entirely overlaps, with the relevant actions taking place in New York, New Jersey, and Washington D.C. For these reasons, the Court, at the very least, may not enter judgment as to both Counts One and Fifteen.

**CONCLUSION**

For the foregoing reasons, Mrs. Menendez respectfully requests that the Court grant a judgment of acquittal or, in the alternative, a new trial.  The Government's violation of Mrs. Menendez's Sixth Amendment right to counsel of choice through a manufactured conflict of interest, its improper reliance on summary exhibits, and its failure to prove key elements of the bribery and obstruction of justice charges beyond a reasonable doubt deprived Mrs. Menendez of a fair trial.  Moreover, the multiplicitous conspiracy counts violate Mrs. Menendez's Fifth Amendment right against double jeopardy.  In addition, Mrs. Menendez adopts all relevant arguments from her co-defendants.  Accordingly, relief is warranted to preserve Mrs. Menendez's constitutional rights and the fundamental fairness of the judicial process.

Dated: June 6, 2025                              Respectfully submitted,

                                                 By: */s/ Sarah Krissoff*

                                                 Sarah R. Krissoff, Esq.
                                                 Andrew Vazquez, Esq.
                                                 COZEN O'CONNOR
                                                 3 WTC
                                                 175 Greenwich St.
                                                 New York, N.Y. 10007
                                                 (212) 908-1388 / (212) 453-3886

                                                 *Attorneys for Defendant Nadine Menendez*