

August 14, 2025

**Sarah Krissoff**
**Catherine Yun**
**Andrew Vazquez**
Direct Phone   212-908-1388
Direct Fax        646-225-5128
skrissoff@cozen.com

The Honorable Sidney H. Stein
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

**Re:**    ***United States v. Nadine Menendez*, 23 Cr. 490 (SHS)**

Dear Judge Stein:

Nadine Menendez will stand before the Court for sentencing on September 11, 2025. For all of the reasons set forth below, Mrs. Menendez respectfully requests that the Court sentence her to 12 months and 1 day of imprisonment.

We recognize that the sentencing of criminal defendants is among the most difficult tasks the Court faces in a day of difficult tasks. The Court must weigh myriad factors and ultimately arrive at a sentence that is fair and just. Here, where the Court has adjudicated countless motions and presided over two trials, the task is even more immense. Despite the Government's "one size fits all" approach in this case, we are confident that the Court understands the need to assess each defendant individually. Nadine Menendez is not her co-defendants.

The Government has told its story. But Nadine has never had the opportunity to tell her story. And Nadine's story is profound: raised in wartime in Lebanon, taught to dutifully obey and serve the men around her, and repeatedly abused over the course of years, both physically and emotionally, by the very people she thought she could trust. A lifetime of trauma left its mark.

That trauma, and the effects of that trauma, are detailed in the Presentence Investigation Report, dated July 25, 2025 ("PSR" or "Presentence Report"). The August 13, 2025 report of Dr. Bardey, which is attached as Exhibit A ("Bardey Report") provides additional, critical information.[1] As described in the PSR, the Bardey Report, and the letters and myriad records that have been submitted to the Probation Department and the Court on Nadine's behalf throughout the sentencing process, Nadine has endured too much. While she has not suffered

---

[1] Dr. Bardey's work was not incorporated into the PSR, as it was not completed before the final PSR was issued. We are confident that if the Probation Department had the benefit of Dr. Bardey's report before it issued its final report, it would have recommended a lower below-Guidelines sentence.

from financial want, the trauma she has lived through ████████████████████████
████████████████████████████████████ Nadine spent her formative years in a war zone, experiencing and witnessing human suffering, deprivation, and violence. She saw and endured unspeakable things and spent a significant amount of time huddled in a bomb shelter. Nadine and her family were eventually able to escape Lebanon, securing placement on an American Sixth Fleet ship bound first for Athens, Greece and then London. Ultimately, when Nadine was approximately 11 years old, the family entered the United States, residing with family in California.

Unfortunately, the trauma did not end there. Nadine was objectified since she was a teenager, and, before her marriage to Senator Menendez, was involved in a series of romantic relationships since a young age where she was emotionally and, tragically, physically abused. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████

Nadine has long-centered the men in her life. She was raised to do this from a very young age. She was taught, as so many women of her generation were taught, that her worth is dependent on her physical appearance and her value to men. She has always relied on others, particularly her romantic partners, for what she perceived to be safety, stability, and guidance. ██
████████████████████████████████████ Whatever the name, the result is the same, and devastating. As Dr. Bardey explains in great detail, ████████████████████
████████████████████████████████████████████████████
████████████████████████

Nadine remains, despite the challenges detailed in the PSR and Dr. Bardey's report, a remarkably kind, warm, and curious person. She is a loving mother, wife, daughter, aunt, and friend. Nadine is not the caricature the Government and the press make her out to be. She has served as a convenient scapegoat for her co-defendants, particularly since her trial was severed from theirs due to her cancer.

For the Court, the starting point at sentencing is the advisory Sentencing Guidelines. In a continuation of their "piling on" investigatory and trial strategy, the Government now strains to increase the Sentencing Guidelines. As set forth herein, the Guidelines range calculated by the Probation Department is incorrect. Due to the expected appeal, we do not intend to engage, in this submission, with the factual and legal defenses to the charged conduct. This is not the appropriate forum to do so. But we will, of course, address Nadine's conduct as relevant to the disputed Guidelines issues and the 3553(a) factors. Indeed, the entire Sentencing Guidelines regime for this type of crime is up in the air. Just days ago, on August 6, the U.S. Sentencing

Commission published its priorities for amending the Sentencing Guidelines in 2025-2026—among which were a revision of the loss table of § 2B1.1.[2]

But even a sentence within the current Guidelines is far greater than is appropriate in this case. The Government will, undoubtedly, stand before this Court and argue for a long custodial sentence. That is what the Government does, and what it did with each of Nadine's co-defendants. But such a sentence would not properly reflect the 3553(a) factors and is not appropriate in this case. Second Circuit precedent requires the Court to impose an individualized sentence. And an individualized sentence here requires leniency.

On top of everything else, Nadine has been battling breast cancer. The entire world knows this.



These issues require extensive surgeries to correct. See Ex. F, May 3, 2025 ; Ex. G, May 19, 2025 .

Specifically, the surgery "requires prolonged recovery, of three to six months" and that "[t]he patient is expected to be totally disabled for three to six months and partially disabled for at least a year. She will require extensive rehabilitation, physical therapy, pain management, as well as frequent visits to her doctors in the postoperative period." *Id.* Additionally, the surgeons at Lenox Hill note that "[t]here is a high complication rate of approximately 20% that may require additional operations." *Id.* In addition to the surgeries, Nadine will require frequent and intensive visits with the oncologists and testing to monitor for any return of the cancer. Ex. I, August 14, 2025 letter. A lengthy period of incarceration will obliterate any possibility that Nadine receives the proper medical care for her breast cancer.

There can be no dispute that the Bureau of Prisons ("BOP") is particularly ill-equipped to provide this type of cancer care, particularly to women. This is detailed in the August 12, 2025 report of Dr. Howard ("Howard Report"), who served as a doctor in the Bureau of Prisons for over 20 years. As Dr. Howard explains in his report, which is attached as Exhibit B, the Bureau of Prisons will not be able to adequately provide the surgical, medical, and mental health care that Nadine needs. The Probation Department itself has recommended that the Court vary downward from the Guidelines, citing to Mrs. Menendez's significant health concerns, along with her lack of criminal history, difficult upbringing and history of abuse, and age as mitigating factors warranting a non-Guidelines sentence. PSR, at 76. But even a sentence anywhere near

---

[2] U.S. SENT'G COMM'N, *Federal Register Notice of Final 2025-2026 Priorities*, https://www.ussc.gov/policymaking/federal-register-notices/federal-register-notice-final-2025-2026-priorities (last visited Aug 10, 2025).

The Honorable Sidney H. Stein
August 14, 2025
Page 4

_____

the 96-month sentence recommended by the Probation Department will ensure that Nadine
Menendez dies in prison.

That cannot be the result of this case. While it is much too late, Senator Menendez has
now explained to the Court that, "Nadine is not the person who Prosecutors, or for that fact, what
the Defense Attorneys made her out to be." Ex. C-11, Aug. 4, 2025 Letter from Robert
Menendez. Similarly, Wael Hana, in connection with his sentencing, explained to the Court his
understanding of his relationship and interactions with Nadine, providing a picture of Nadine that
is very different than the one painted by the Government. *See* Dkt. 687 (Sentencing
Memorandum of Wael Hana). The letters provided by Nadine's friends and family confirm that
she is a kind-hearted and compassionate person whose identity is defined by her romantic
partner. In his remarkable letter, Nadine's adult son, █████████, explained to the Court,
"My whole life I watched as her friends and boyfriends would take advantage of her and abuse
her. I can't even describe the frustration I have that she continues to spend time around the
wrong people." Ex. C-2, Letter from ████████.

Many people have failed Nadine. Despite that, she remains a fiercely loyal, loving, and
open-hearted person, doing everything she can to take care of her children, her husband, and her
96-year-old father. There is never an excuse for criminal conduct. But there is **context**. Nadine
is a 58-year old first-time offender. Like many victims of gender-based trauma, she has spent
her entire life centering and obeying the men around her, and has suffered greatly as a result. A
below-Guidelines sentence, of 12 months and 1 day of imprisonment, would properly reflect the
factors set forth in Title 18, United States Code, Section 3553(a), and would constitute a sentence
that is sufficient, but no greater than necessary.

## I.      The Offense Conduct and Applicable Guidelines

The PSR calculates an advisory Guidelines range of 210 to 262 months based on a total
offense level of 37 and a criminal history category of I. PSR ¶¶ 154, 158, 216. For the reasons
that follow, Nadine submits that, under the current Guidelines regime, the proper advisory
Guidelines range is 121 to 151 months, which correlates to an offense level of 32. First, the total
offense level calculated by Probation is based, in part, on speculative and unsubstantiated
assertions of bribery payments. The total value of the bribes is significantly less than the
Government contends, reducing the offense level by two points. Second, the proposed
manager/supervisor role enhancement under U.S.S.G. § 3B1.1 is inapplicable to Nadine. The
Court should reject the proposed role enhancement, resulting in an additional reduction of three
points to the total offense level.

### i.      The Total Value of the Bribes Is Grossly Overvalued.

Pursuant to U.S.S.G. § 2C1.1(b)(2), the relevant bribery benefit amount is governed by
the loss table in Section 2B1.1. Section 2B1.1, in turn, prescribes that loss is the greater of actual
or intended loss. *See* U.S.S.G. § 2B1.1, cmt. n. 2B1.1(b)(1)(A). The Guidelines define actual
loss as "reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, cmt. n.

The Honorable Sidney H. Stein
August 14, 2025
Page 5

---

2B1.1(b)(1)(C). Thus, foreseeability is the lynchpin of actual loss. *Id.* Intended loss in turn is the "the pecuniary harm that the defendant purposely sought to inflict[.]" *Id.*[3]

The Government bears the burden of proof in demonstrating loss at sentencing. *See United States v. Williams*, 247 F.3d 353, 358 n.7 (2d Cir. 2001); *United States v. Cuti*, No. 08-CR-972, 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011). When proving loss, mere speculation will not suffice, and a "district court's findings must be grounded in the evidence." *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012). Moreover, "in order to hold a defendant accountable for the acts of others, a district court must make two findings: 1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the defendant." *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995); *see also* U.S.S.G. § 1B1.3.

The evidence only supports a loss calculation of $399,995.39, not the exaggerated $884,778.39 pushed by the Government.

### a. The loss calculation should only be $30,000 for Mrs. Menendez's salary.

The Government erroneously contends that the loss amount includes a $120,000 annual salary "promised" by Hana to Nadine for her work as a consultant for IS EG Halal. *See* July 23, 2025 Gov't Ltr. to Probation, p. 6; *see also* PSR ¶ 124(b). But the trial record does not support this contention and instead paints a starkly different picture. First, Nadine never anticipated that salary. At trial, the Government introduced two versions of the consulting agreement Nadine's business, Strategic International Business Consultants, had with IS EG Halal. *See* GX 4C1-O; GX 3C-9. Notably, neither agreement is a fully executed agreement. Moreover, GX 4C1-O, an earlier version of the draft agreement, did not contain an annual term of employment. GX 3C-9 contemplated a ***three-month term*** for which Nadine would receive a monthly payment of $10,000. *See* GX 3C-9.

Other record evidence supports Nadine's understanding that her consulting position would end in three months. John Moldovan, who drafted the document, testified that the draft consulting agreement embodied in GX 3C-9 included a three-month term of employment because the practice was typical of IS EG Halal, to place new employees on a probationary period. Trial Tr. 467 ("So, generally speaking, when hiring an employee for IS EG Halal on previous occasions, we had discussed the three-month probation term to see and assess whether

---

[3]     The use of intended loss instead of actual loss when conducting loss calculations is the subject of an ongoing Circuit split. *Compare United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022), *with United States v. Rainford*, 110 F.4th 455, 475 n. 5 (2d Cir. 2024). Nadine reserves her right to challenge the use of intended loss as a proper measure of loss at sentencing. Moreover, Nadine adopts the arguments from her co-defendants, including from Section I.E of Senator Menendez's Sentencing Submission regarding the use of "Shadow Guidelines" instead of the "Loss Amount" calculation in U.S.S.G. § 2B1.1 *See* Dkt. 677, Sentencing Memorandum of Robert Menendez (arguing that the Court should apply the "Shadow Guidelines" developed by the ABA for avoiding unduly harsh sentencing recommendations in economic crime cases).

The Honorable Sidney H. Stein
August 14, 2025
Page 6

_____

or not the person was a good fit for the company, and that's what that term is essentially there for."). This is consistent with what Hana told the Court about Nadine's employment with him:

> Mr. Hana originally offered Nadine Arslanian a job working in his office in New Jersey when it opened, but she had started dating Senator Menendez and traveled with him frequently. Therefore, Nadine did not want a traditional administrative position that would require her to report to the office eight hours per day. But Nadine continued to communicate to Mr. Hana that she was having financial trouble, so he offered her a consulting role several months later and anticipated that she would assist him setting up international offices as IS EG Halal expanded from the United States and Latin America to India, Australia, Germany, and beyond. Mr. Hana and Nadine negotiated a formal agreement, to be re-evaluated, in light of her performance, after three months. Unfortunately, Nadine's performance was not satisfactory and so, beginning in the fall of 2019, Mr. Hana put someone else on the job and decided not to renew her contract.

Dkt. 687, at 19.

To the extent that the Government is relying upon single text from Hana to "HH HH" on May 28, 2019 stating: "Nadine Arslan 120 k" as purported evidence that Mrs. Menendez intended to receive that annual salary for her work performed, that reliance is misplaced. GX 1352, No. 675. That text was not to Nadine and does not speak to what *Nadine* expected.

Thus, the bribery benefit amount of an annual salary of $120,000 is completely unsupported by any evidence. The amount set forth in Paragraph 124(b) of the PSR should be $30,000 instead, reflecting the sum of the three monthly checks Nadine actually received for her consulting work. *See generally* U.S.S.G. § 2C1.1, cmt. n.3 (requiring the value of the benefit be calculated as net value).

### b. The loss calculation in the PSR contains other amounts that should not be included.

The calculation in the PSR of the bribery benefit also incorrectly includes two bags that contained $95,000 and $100,000 in cash, respectively, that were found in the basement storage room of the Menendez's home. PSR ¶ 124(i), (j). We objected to the inclusion of these two bags of cash in the total loss amount, arguing that the Government "appears to be relying on mere physical proximity to other evidence in the case to suggest that the United States dollars…were part of the alleged bribery scheme." PSR, at 70. The Government's counter to this point is unavailing. *See* July 23, 2025 Gov't Ltr. to Probation, p. 7 ("[T]he bags with $95,000 and $100,000 in cash that were found in the basement storage area were not included in the list of items of value received by the defendant and Robert Menendez based merely on proximity, but also because of the highly damning facts regarding the placement, packaging, and amounts of the cash[.]") Essentially, the Government is arguing that because the money was in proximity to *other* items of value with co-conspirator prints and came from a bank at which

The Honorable Sidney H. Stein
August 14, 2025
Page 7

_____

neither Nadine or her husband had accounts, it must have been bribe money.  *Id.*; PSR, at 71.
The Government's position, despite their rhetoric, is without merit.

It is the Government's burden to prove that the bags with cash were bribe payments
attributable to the relevant schemes.  The United States Sentencing Guidelines require that a
defendant's total offense level be based on the defendant's "relevant conduct."  *United States v.
Helm*, 58 F.4th 75, 88 (2d Cir. 2023); *United States v. Shonubi*, 103 F.3d 1085, 1088 (2d Cir.
1997); *see also* U.S.S.G. § 1B1.3(a)(1)(A).  Relevant conduct can include the acts of others
related to a jointly undertaken criminal offense, when those acts of others are reasonably
foreseeable to the defendant.  *See* U.S.S.G. § 1B1.3(a)(1)(B).  But the Government has presented
no evidence, at trial or otherwise, that the cash constituted bribe payments.  The evidence at trial
was simply that the cash was found in the basement storage room.  Special Agent Aristotelis
Kougemitros testified at trial regarding the specified cash found during the search of the home.
Trial Tr. 249-50 (testifying regarding the brown bag of $100,000 cash); *id.* at 251-55 (testifying
about a yellow bag full of cash in the amount of $95,000).

The fact that the cash was found in bags near other items that the Government has tied to
the scheme tells us absolutely nothing about the source or ownership of money.  The fact that an
individual has 10 dollars from her father in her right pocket says nothing about the 10 dollars in
her left pocket.  The Government has also failed to tie the money to any of the alleged schemes
outlined at trial.  The cash is not bribe money simply because the Government says it is so, as
much as they would like that to be the case.  The evidence is not "highly damning"– to the
contrary, it is non-existent.

The inclusion of this money in the bribe amounts is precisely the type of impermissible
speculation that is forbidden in this Circuit.  *United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir.
1993) (finding that the district court engaged in impermissible speculation under the Guidelines).
As the Government has failed to offer sufficient evidence to meet its evidentiary burden on this
issue, the Court should exclude the full amount of $195,000 that is the sum of both bags of cash
from the Guidelines calculations.[4]  *See United States v. Moran*, No. 14-CR-348, 2024 WL
2577970, at *7 (E.D.N.Y. May 24, 2024) (rejecting the Government's loss assertion of over $1
million and zeroing the loss because the Government failed to prove loss attributable to the bank
fraud scheme); *United States v. Sweitzer*, No. CR-03-9-87-01, 2005 WL 3806056, at *14 (M.D.
Pa. Apr. 22, 2005) (rejecting, in part, Government's fraud loss claims because defense offered

_____

[4]      The Government apparently contends that because the Court already concluded these bags were
proceeds of the scheme forfeited by Robert Menendez, the Court should incorporate them as part of the
bribery benefits for purposes of Nadine's loss calculation.  July 23, 2025 Gov't Ltr. to Probation, p. 7.
This argument also fails.  The critical issue, for purposes of the Guidelines calculation in *this* matter, is
what bribery payments are attributable to the criminal scheme, not what amounts were forfeited in the
Senator's case where the Senator did not even dispute the at-issue cash for purposes of Section 2C1.1.
*See* Sentencing Memorandum on Behalf of Robert Menendez, at 16-20.  For the reasons already noted,
the Government has failed to meet its burden on the cash amounting to $195,000.

The Honorable Sidney H. Stein
August 14, 2025
Page 8

_____

convincing rebuttal evidence and showed unreliability of alleged loss proof); *United States v. Siciliano*, 601 F. Supp. 2d 623, 633-34 (E.D. Pa. 2009) (same).

The bribery benefit must be reduced by another $117,283 attributable to alleged loss that has no evidentiary connection to the relevant conduct. Paragraph 124(f) of the PSR purports to include two additional one-kilogram gold bars in the loss amount, simply because Nadine sold those gold bars a few months after she sold other gold bars that the Government contended were connected with Daibes. Here, just like the bags of cash, the Government appears to be relying on a mere proximity argument—this time, temporal proximity. Again, the Government's speculation is insufficient. [5]

As a threshold matter, these bars were sold in June 2022, not May 2022. In any event, the Government failed to prove that these gold bars had any connection to the alleged scheme. The Government must prove by a preponderance of the evidence that sale of these specific gold bars by Nadine was conduct relevant to the criminal scheme. *See Helm*, 58 F.4th at 88; U.S.S.G. § 1B1.3(a)(1)(A). They have not done so. There was no testimony or other evidence provided at trial (or information included in the PSR) that the gold bars sold in June 2022 had any connection whatsoever, by way of serial numbers, fingerprints, or otherwise, to the conduct at issue in the case.[6] Because there is insufficient evidence that these specific gold bars were proceeds of the scheme, the Government has not met their burden of proof and the amount characterized in Paragraph 124(f) must be excluded from the loss calculation in its entirety.

The loss calculation must also exclude $82,500 with only an attenuated connection to Nadine. Specifically, Paragraph 124(h) of the PSR incorrectly asserts that ten envelopes of cash with Daibes's fingerprint or DNA is somehow attributable to Nadine, without sufficient factual support. Yet, at least in part, the cash relates to the Qatar scheme for which there is insufficient evidence that Nadine was involved.

The Government never pursued any theory on the Qatar scheme at Nadine's trial. Rather, the PSR presumably relies on evidence presented at the Senator's trial related to the Qatar scheme. But even viewing that evidence in the light most favorable to the Government's theory, the PSR sets forth insufficient evidence that Nadine had any substantive involvement in the Qatar-related scheme. She did not communicate with any Qatari actors nor otherwise acted as an intermediary between any co-conspirators and Qatari actors. The PSR cites a one-off message from Nadine to Senator Menendez asking: "Is it just you, Fred and the Qataris in the private room this entire time?" PSR ¶ 112. But no reasonable inference from that stand-alone text can

_____

[5]     The Government also improperly uses the spot price of gold on June 16, 2022 (the date of the FBI's raid on the Menendez's home) to value the unsold gold bars. The spot price of gold fluctuates wildly on a day to day basis and the date of the FBI raid is an arbitrary date that likely benefits the Government, as the spot price of gold has risen exponentially since the Covid-19 pandemic. See KITCO, Gold Price | Live Chart, https://www.kitco.com/charts/gold (last visited Aug. 13, 2025) (filtering by "5Y").

[6]     Katia Tabourian, Nadine's sister, testified that Nadine received gifts of gold from her grandmother, including gold bars. Trial Tr. 2707, 2721-22.

The Honorable Sidney H. Stein
August 14, 2025
Page 9

be made that contemplates that Nadine participated in a yearslong scheme so that Daibes could gain investment funding from a firm with ties to the Qatari Royal Family.

Indeed, the heading to that section in the PSR contemplates only the involvement of Senator Menendez and Daibes. Thus, even crediting the Government's theories regarding the Qatar scheme, the allegations related to Nadine are nothing more than conclusory assertions that somehow Nadine could have foreseen the Qatar-related losses. But those conclusory allegations are impermissible at this stage of the proceedings and should be rejected. *Coppola*, 671 F.3d at 249. Because the cash set forth in Paragraph 124(h) relies in part, and with no differentiation, on the conduct related to the Qatar scheme, the Court should exclude the entire value of Paragraph 124(h) from the loss calculation.

For all of these reasons, Nadine's loss calculation must be reduced by a total of $484,783, resulting in a total loss amount of $399,995.39. This reduces the offense conduct by two levels.

### ii. The Three-Point Enhancement under USSG § 3B1.1(b) is inapplicable to Mrs. Menendez.

The Government also misapplies the three-point role enhancement under USSG § 3B1.1(b). Nadine's actions and participation in the scheme do not constitute the conduct of a "manager" or "supervisor," and the Court should reject the proposed sentencing enhancement. In applying an enhancement, the Court must "make specific findings as to why a particular subsection of § 3B1.1 adjustment applies." *United States v. Ware*, 577 F.3d 442, 451 (2d Cir. 2009). Courts typically apply the manager/supervisor role enhancement under very different factual circumstances. *See, e.g., United States v. Silverio*, 118 F. App'x 541, 542 (2d Cir. 2004) (summary order) (enhancement applied where the facts presented by the Government at a hearing showed that the defendant was involved in overseeing a drug operation, and that he recruited and controlled another participant); *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002) (affirming managerial enhancement when a defendant acted as an organization's "lieutenant" who "was the person in day-to-day charge of the street-selling aspects of the operation").

Here, there is no basis for the application of a manager/supervisor enhancement. The Government's strained reasoning for applying the role enhancement is set forth in paragraph 133 of the PSR. Despite the Government's strategic use of key words like "managed," "supervised," and "recruited," the Government has presented no *facts* underlying its rhetoric. The Government's theory is that Nadine "recruited" Hana and Uribe and exercised "a degree of control over them and other participants." PSR ¶ 133(a). This is absurd, and contrary to the evidence that the Government itself presented at the trial.

The Government's contention that Nadine recruited Hana and Uribe has no basis in reality. Nadine worked for Hana for a period of time, not the other way around. *See, e.g.*, Trial Tr. p. 460:15-21 (Moldovan testifying that he prepared consulting agreement for Mrs. Menendez on behalf of Hana and IS EG Halal). And their close friendship went back years, during which they offered support to each other as needed. Dkt. 687, at 18-19. Further contradicting the Government's position, Uribe himself testified to first requesting that *Hana* discuss the New

The Honorable Sidney H. Stein
August 14, 2025
Page 10

_____

Jersey state criminal matters with the Senator in October 2018. *See* GX 1309. Tellingly, the Government's contention now regarding Nadine's role is also contradicted by their *own* arguments at Hana's sentencing in February earlier this year. There, in reference to the scheme to disrupt the New Jersey Attorney General's investigation and prosecution of Parra and Uribe's associates, the Government stated that: "Mr. Hana [ ] was the one who initiated that scheme and that aspect of the scheme as well." Sentencing Tr. p. 35, Dkt. 750 (Feb. 11, 2025). The Government cannot change the facts as they wish.[7]

The Government's suggestion that Nadine had control over Hana and Uribe is likewise incorrect. The record demonstrated that Nadine did not have control over the participants in the scheme. As aforementioned, the evidence showed that Hana and Nadine were long-time friends. In this relationship, the two treated each other as equals—not that Nadine had control over Hana. Prior Trial Tr. 1155, 5157. Similarly, Uribe had known Nadine for "15, 20 years." Trial Tr. 1749. He even often referred to Nadine as "hermana," the Spanish word for sister—indicating the closeness of their relationship. Trial Tr. 1767, Prior Trial Tr. 3052; *see also* Ex. 1352, no. 787 ("I am grateful beyond words… to count on you as a brother who is honest, caring, and a man of his word."). The Government's theory of control is also undermined by everything we know about Nadine's psychiatric, medical, and neurological challenges. She was not the boss of anyone, not even herself. Indeed, the Government itself claims that Senator Menendez led Nadine, directing her to pass information and documents along from him to Hana, directing her how to convey an invitation to Hana, directing her how to communicate with Daibes, and using her as a go-between. PSR ¶ 132.

The proposed enhancement is also inconsistent with the Government's own arguments at trial, where the Government alleged that Nadine was an intermediary, not some sort of manager or supervisor. *See, e.g.*, Trial Tr. 2814 (Monteleoni: "The defendant was [Menendez's] go-between[.]."); *id.* 2819-23, 2831, 2834, 2836-37 (laying out the evidence that the defendant was a go-between for Menendez's scheme). Moreover, Nadine was the alleged bribee in this scheme. Any of her attempts to communicate with other participants related to low-level coordination that made her a mere member of the bribery agreement, not its manager. Indeed, courts have not applied the enhancement where the bribee acts only in accordance within her function as a recipient of bribes. *See, e.g. United States v. Anderson*, 85 F. Supp. 2d 1084, 1097 (D. Kan. 1999) (same; holding that one of the defendants was not a "manager or supervisor" of the

_____

[7]     The cases the Government cites in its letter to Probation in support of the enhancement are inapposite as they address factually distinct circumstances. *See* July 23, 2025 Gov't Ltr to Probation, p. 8. In *United States v. Horton*, 381 F. App'x 7 (2d Cir. 2019), the court applied the manager/supervisor enhancement where the defendant had, in part, recruited others in the gun-distribution scheme. *Id.* at *9. *United States v. Mi Sun Cho*, 713 F.3d 716 (2d Cir. 2013), is wholly irrelevant as it involved the application of the leader/organizer enhancement—a four-point sentencing enhancement requiring different factual requirements—where the defendant was convicted under sex trafficking laws and personally transported prostitutes to brothels. *Id.* at 723.

The Honorable Sidney H. Stein
August 14, 2025
Page 11

_____

scheme). For all of these reasons, the Court should not apply the role enhancement under Section 3B1.1(b).

### iii.  The Total Offense Level Should Be 32.

After resolving the above Guidelines disputes, the Court should find that the applicable offense level is 32, and that the applicable Guidelines Range is 121 to 151 months' imprisonment, calculated as follows[8]:

| | |
|---|---|
| Base Offense Level: | 12 (U.S.S.G. §§2X1.1(a) & 2C1.1(a)(2)) |
| Loss Amount: | +12 (U.S.S.G. §2B1.1(b)(1)(G)) |
| More than One Bribe: | +2 (USSG §2C1.1(b)(1)) |
| Offense Involved a Public Official: | +4 (USSG §2C1.1(b)(3)) |
| Obstruction of Justice: | +2 (USSG §3C1.1) |
| | |
| Total Offense Level of 32/Criminal History Category I:  121 to 151 months' imprisonment | |

## II.    Section 3553(a) Factors

Upon consideration of the Section 3553(a) factors, it is clear that a significantly below-Guidelines sentence is appropriate. Dr. Bardey's report provides essential insight into Nadine's ██████████████████████████████████████████████████████. On top of that, Nadine's ongoing fight with breast cancer militates strongly against a lengthy sentence. Finally, a shorter sentence is necessary to avoid unwarranted sentencing disparities and account for the disproportionate loss Guidelines.

### a.  Nadine's █████████████████████████ Warrant a Below-Guidelines Sentence.

Dr. Bardey's work provides crucial insight into Nadine's history and characteristics. As he documented, she "has never functioned independently in any significant domain." Ex. A, at 5. The trauma inflicted upon Nadine started at a young age, while living with her family in wartime Lebanon. PSR ¶¶ 163-167. She regularly observed violence, brutality, and torture, including one instance she described where she saw a man being dragged behind a Jeep, with the man's skin and flesh coming off as the Jeep drove down a rocky road. *Id.*; Ex. A, at 3. Nadine's early life in a war zone forced her to endure unspeakable things: averting her eyes to avoid seeing dead bodies and severed limbs, hiding in the bomb shelter for extended periods of time,

_____

[8] Probation recommended a sentence that is approximately 45.71% of the low end of the Guidelines range calculated by Probation. PSR, at 77. 45.71% of 121 months' imprisonment, which is the low end of the correct Guidelines range, would result in a sentence of 55 months.

The Honorable Sidney H. Stein
August 14, 2025
Page 12

and avoiding the armored tanks parked at the end of her road.  *Id*.  The violence culminated with the kidnapping of Nadine's own father.  *Id*. at 4; PSR ¶ 167.  Eventually, the family was able to leave with the assistance of international aid, on an American ship.  *Id*. ¶ 168.  After a short stay in Europe, the family initially resided in California, and then moved to Long Island.  *Id*.  ¶ 170. Nadine was only 11 or 12 years old, and did not know English.

Despite this remarkable and horrific early childhood, Nadine was a smart kid and a good student in the United States.  She did well in high school, and went to college at New York University.  *Id*.  ¶¶ 201-203.  She met her first husband, Raffi Arslanian, when she was in high school, and they married when Nadine was only in her early twenties.  *Id*.  ¶ 173; Ex. A, at 4.



Ex. B, at 2.

Nadine's victimization at the hands of men has had lasting and devastating effects that are sadly all too common.  Dr. Dawn Hughes, a clinical and forensic psychologist, detailed the

The Honorable Sidney H. Stein
August 14, 2025
Page 13

_____

psychological impact on victims in abusive relationships—both during and after the
relationship—as a Government witness at the recent trial of Sean Combs. Ex. J, Sean Combs
Trial, Testimony of Dawn Hughes. Critically, Dr. Hughes explained that it is "very common"
for victims to remain in abusive relationships because the abuse makes it especially difficult to
leave. *Id.* at 2083:21-2084:7. Whether it is physical, psychological, or emotional, abuse
generates fear, shame, and low self-worth in the victim, impeding his or her ability to confide in
people outside the relationship and make large-scale plans about how to leave. *Id.* at 2086-2092.

Dr. Hughes recounted the negative impact of abuse on a victim's memory. For example,
disassociation is one involuntary coping mechanism by which victims "protect[] themselves
from the onslaught of the psychological consequences of the abuse while still being able to
maintain the status quo and stay in the relationship." *Id.* 2105:14-18. When a person is
disassociating, their mind stops focusing on the present situation, which Dr. Hughes testified
"often leads to impairments in memory." *Id.* 2106:17-25. The trauma of the abusive relationship
further disrupts and harms memory. As Dr. Hughes explained, the victim of an assaultive
episode is "pushing [the memory] further in the recesses of their brain," which is also recognized
as a component of a PTSD diagnosis. *Id.* 2117:4-12. A victim of abuse "deliberately [tries] not
to remember" and thereafter may struggle to recall information. *Id.*

Here, the profound trauma that Nadine has endured, which has affected her both
physically and mentally in complex ways, mandates a lenient sentence. Dr. Bardey summarizes
the necessity of this outcome:

> During the period of the offense conduct, Ms. Menendez was suffering from the
> cumulative impact of lifelong unresolved trauma, longstanding patterns of
> ███████████████, and significant ███████████████████████████████████
> ████████████████████████████████████████████████████████████. The
> interplay of ███████████████████████████████████████ impaired her
> capacity for independent decision-making, increased her reliance on others for
> guidance and support, and limited her ability to evaluate situations critically or
> advocate for her own needs. ████████████████████████████████████
> ████████████████████████████████████████████, further
> reduced her capacity for independent problem solving and increased her reliance
> on others for guidance. These factors, rooted in ██████████████████████
> ███████████████████████████████████████████████████████████████,
> left her particularly vulnerable to the influence of those she trusted. This
> convergence of ████████████████████████████████████████████████
> ██████████████████████ shaped the interpersonal and situational context in which the
> instant offense occurred.

Ex. A, at 19.

Importantly, the work done by Bardey is corroborated and confirmed by Dr. Howard;
extensive documentary evidence, including medical records and police reports; and the myriad
letters submitted on Nadine's behalf. Nadine's challenges are profound, and have been so for
many years. This ***context*** necessitates the requested sentence of 12 months and 1 day. *See*

The Honorable Sidney H. Stein
August 14, 2025
Page 14

_____

*United States v. Gonzalez*, No. 03-CR-0285, 2004 WL 230992, at *6 (S.D.N.Y. Feb. 5, 2004) (finding that the defendant's PTSD, combined with his parental neglect, head trauma suffered early in life, and borderline personality disorder warranted a 2-level downward variance); *United States v. Cantu*, 12 F.3d 1506, 1513 (9th Cir. 1993) (holding that defendant's post-traumatic stress disorder constituted significantly reduced mental capacity for the purpose of § 5K2.13 and remanding for consideration of a downward departure in sentencing); *United States v. Allen*, 250 F. Supp. 2d 317, 322 (S.D.N.Y. 2003) (finding that defendant's lack of mental maturity due to a head injury when he was 14 warranted a downward departure in sentencing); *United States v. Armstrong*, No. 21-8075, 2022 WL 1040277, at *2, *4 (10th Cir. Apr. 7, 2022) (affirming district court's downward variance for mental health issues and noting the district court's frustration with the BOP's lack of treatment options for mental health).

### b.  The Court Should Take Into Account Nadine's Breast Cancer Fight.

The Court is well-aware, as is much of the world, of Nadine's fight with breast cancer.

Nadine's trial began shortly after her last surgery, preventing her from taking pain medication that affected her ability to focus on the trial,

_____

[9] In addition to the needed breast-cancer related surgeries, Nadine is slated to have outpatient surgery this fall to address █████████████████████████████████

The Honorable Sidney H. Stein
August 14, 2025
Page 15

_____

      The needed series of surgeries will render Nadine totally disabled for three to six months and partially disabled for at least a year.  She will require ██████████████████ ████████████████████████████████████████████.  *Id.*; Ex. B, at 3.

      On top of the needed surgeries, the standard of care follow-up for breast cancer is very complex.  *Id.* at 4.  Nadine needs frequent visits with her oncologist, as such monitoring is "critical for early detection of any cancer re-occurrence."  Ex. I, August 14, 2025 letter from ███ ████; Ex. B, at 4; PSR ¶ 52.  The necessary screenings will likely include a diagnostic mammogram (which is different from a standard screening mammogram)[10], as well as a sonogram or MRI.  Ex. I, August 14, 2025 letter from ████████████.

      As explained in Dr. Howard's report, the Bureau of Prisons is remarkably unequipped to provide the needed, specialized care.  There is a single medical facility in the entire Bureau of Prisons system for women, in Carswell, Texas.  That facility, which is not even equipped to provide specialized cancer care, is infamous for the repeated sexual abuse of its inmates.  *See*, *e.g.*, Press Release, United States Department of Justice Office of the Inspector General, Former BOP Correctional Officer Indicted and Arrested for Sexual Abuse of a Ward (May 19, 2025), https://oig.justice.gov/news/press-release/former-bop-correctional-officer-indicted-and-arrested-sexual-abuse-ward; Press Release, U.S. Congressman Marc Veasey, Rep. Veasey Urges House Judiciary Committee to Investigate Bureau of Prisons Handling of Prisons With High Number of Sexual Abuse Claims (Sept. 7, 2022),  https://veasey.house.gov/media-center/press-releases/rep-veasey-urges-house-judiciary-committee-to-investigate-bureau-of; Steve Wilson & Kaley Johnson, *Fort Worth facility reported most sexual abuse allegations at any federal women's prison*, Fort Worth Star-Telegram (Aug. 26, 2022),  https://www.star-telegram.com/news/local/crime/article264906284.html.

      The flood of compassionate release motions in recent years has shined a light on the Bureau of Prison's failure to provide appropriate medical care.  Particularly in cases where an inmate has cancer or other significant medical conditions, the Bureau of Prisons regularly fails to provide for adequate medical diagnosis and treatment, ultimately leading to compassionate release.  *United States v. Burr*, No. 1:15-CR-362-1, 2022 WL 17357233, at *8-9 (M.D.N.C. Dec. 1, 2022) ("The uncontradicted evidence shows that the BOP has failed to obtain a medically-ordered test for over two years . . . . Continued incarceration in the face of ongoing constitutionally deficient medical care is unjust punishment, not just punishment."); *United States v. Beck*, 425 F. Supp. 3d 573, 580-81 (M.D.N.C. 2019) (finding that the BOP's "grossly inadequate treatment" for invasive cancer was an extraordinary and compelling reason to grant release).  The Southern District of California granted compassionate release to a defendant suffering from multiple serious medical conditions because the defendant "ha[d] not received the consistent care, monitoring, and treatment required for her conditions, including a much-needed heart surgery which has yet to even be scheduled."  *United States v. Robles*, 2022 WL 229362, at *2 (S.D. Cal. Jan. 26, 2022).  There are numerous additional examples.  *See, e.g.*, *United States v. Derentz*, 608 F. Supp. 3d 189, 197 (E.D. Pa. 2022) (granting compassionate release motion after finding unexplained and unjustified delays in treating the defendant); *United States v.*

_____

[10] *See* https://www.bcrf.org/about-breast-cancer/screening-vs-diagnostic-mammogram/.

The Honorable Sidney H. Stein
August 14, 2025
Page 16

_____

*Verasawmi*, 2022 WL 2763518, at *8, *11 (D.N.J. July 15, 2022) (same, even though medical care had improved once the district court intervened).

Moreover, due to the overall gender disparity in the prison population, women receive significantly worse medical care than men. U.S. COMM'N ON CIV. RTS., Women in Prison: Seeking Justice Behind Bars, 98-99 (Feb. 2020), https://www.usccr.gov/files/pubs/2020/02-26-Women-in-Prison.pdf.  The U.S. prison system is built on a male-specific model, leaving facilities unprepared to meet women's biological and psychological needs. *Id.* at 7. Many federal prisons lack providers trained in obstetrics and gynecology, leading to missed or misinterpreted screenings for breast and ovarian cancer. *Id.* at 228.  Despite high rates of trauma and mental illness among incarcerated women, mental health services are limited, and staff are often not trained in trauma-informed care. *Id.* at 92.  Women report significant delays in receiving medications, diagnostic tests, and follow-up care.  In some cases, chronic conditions worsened due to neglect. *Id.* at 93.

While the Government will undoubtedly provide some sort of documentation or letter from Bureau of Prisons recounting the BOP's ability to handle inmates with medical needs, we all know that this medical care will not be adequately or timely provided.  As Dr. Howard, who is himself a former BOP Medical Officer and physician explains, even if the BOP has good intentions with regard to the provision of medical care to Nadine, she will not receive the essential care.  Among other things: (1) the BOP does not deliver appropriate preventive health care; (2) the need for sub-specialty consults for Nadine will require outside trip arrangements that simply won't be properly or timely executed; (3) she will not get the required and essential ongoing imaging studies; (4) the single cancer referral center in the BOP is at an all-male institution; and (5) there is no facility or programming in the BOP to provide mental health support ██████████████.  Ex. B, at 6.  Due to all of this, Dr. Howard has recommended that the Court sentence Nadine to a period of home confinement rather than a term of incarceration. *Id.*

Nadine's ongoing struggle with breast cancer, particularly when coupled with ██████ ███████████████ weighs strongly in favor of a significantly below Guidelines sentence. *United States v. Guldi*, 141 F.4th 435, 451 (2d Cir. 2025) (affirming district court's below-Guidelines sentence for defendant who had prostate cancer who would have been given longer sentence but for his cancer).  In *United States v. Maltese*, 1993 WL 222350, *9 (N.D. Ill. June 23, 1993), the court granted a 62-year-old defendant, who had been suffering from liver cancer for a year prior to the sentencing, a downward departure for his sentence accompanying an illegal gambling conviction.  The court found that the defendant's life expectancy had been shortened due to an operation for the cancer, and that the defendant's required medical treatment, chemotherapy, would be too expensive for the state to provide. *See also United States v. Libutti*, 1994 WL 774647, at *10 (D.N.J. Dec. 23, 1994) (downward departure granted for 62-year old defendant, suffering from coronary problems, a personality disorder and several psychiatric conditions and phobias).

The Honorable Sidney H. Stein
August 14, 2025
Page 17

_____

      **c.  The Court Should Take Into Account Nadine's Character and Charitable Work.**

Among the community of individuals who know her, Nadine is uniformly described as someone who exemplifies compassion and devotion to caring for others, including strangers, even as she has faced great personal challenges and trauma in her own life. The adage that you can easily judge the character of a person by how she treats those who can do nothing for her is particularly applicable here. And that adage is all the more telling because Nadine has lived a life of service to others, despite enduring great adversity that could otherwise have made her bitter and self-focused. It is a testament to Nadine's character that she submits letters of support from twenty individuals, some who have known her their entire lives and some who met her more recently. While all are not quoted herein, each letter negates the trope of a greedy woman advanced by the media and by the Government at trial (and most certainly to be advanced again in this sentencing).

By contrast, the constant refrain in each of those letters is that Nadine is a kind, empathetic individual who is thoroughly devoted to her children and family, despite a traumatic childhood and a series of unhealthy romantic relationships. The scars of Nadine's childhood followed her to the United States and to college where, as Mrs. Tether recounts, Nadine had an aversion to refrigerators after getting stuck in one while living in Lebanon as a child. Ex. C-19. While such a fear could seem extreme without the context of Nadine's life experience, it was rooted in a childhood in which Nadine lacked a general sense of physical safety—a sense of safety that the vast majority of people take for granted. Despite the power of this phobia, Nadine's strong character is evident in the fact that she confronted that fear and sought professional treatment upon her pregnancy with her daughter in order to be the best mother she could be. *Id.*

However, Nadine's friends and her son note that her personal relationships had a pattern of being unhealthy and abusive. Her subservience to the men in her life is a pattern recognized by family and friends. *See* Ex. C-12, Letter from ███████████; Ex. C-4 Letter from Brent Burns. As noted by her sister, Mrs. Menendez struggled with her independence. Ex. C-18. Her first marriage ended in ███████████████████████, and Nadine experienced severe financial strains trying to manage that transition with a house, car, and two kids. As Ms. Dominguez describes, Nadine would sacrifice to ensure that her children's needs were met, and she could experience their joy in receiving simple things that they wanted. Ex. C-2. Her son observes that his mother "doesn't have the ability to really think about the intentions or motives of the people around her," making her easily susceptible to exploitation. Ex. C-2. That trait was further confirmed by her husband, who notes that he "found her always wanting to help people with requests that came her way," resulting in friends and boyfriends often taking advantage of her. Ex. C-11.

Despite the stark realities of rebuilding her life as a single mother, Nadine's commitment to family never wavered. What the outside world may belittlingly perceive as materialistic is actually a deep sentimental appreciation for items and the relationships they embody, rather than the market value of any items. As ██████ explains, Nadine values jewelry "not because it is

The Honorable Sidney H. Stein
August 14, 2025
Page 18

jewelry, but because it's her mother's and grandmother's jewelry." Ex. C-2. Material items take on a much more nuanced and profound meaning for someone who had to abandon everything to escape a war in which her own father was kidnapped.

Both her son and daughter describe the hours Nadine spent shepherding them—literally and figuratively—through their school years and to this day. Nadine drove approximately ten hours weekly to Syracuse to support her daughter as she struggled to adjust to life at college away from home. Ex. C-3. And she did that after years of driving her kids into New York on weekdays to attend school. Even after her children were grown, Nadine continues to spend hours in the car. She drove her husband to D.C. during Covid as a health precaution, and she continues to drive from New Jersey to New York on a weekly basis to care for her 96-year-old father, a responsibility she shares with her sister who works full time. Ex. C-18, Letter from Katia Tabourian. She fulfilled a similar caregiver role to her mother, who passed away over a decade ago. Ex. C-10, Aug. 3, 2025 Letter from Geoffrey Manicone. Being present and serving family is central to Nadine's life, and many people rely upon her for her support.

In addition to family, caring for children and others has been a hallmark of Nadine's life. Dr. Petrocelli describes Nadine as having been "a fixture at many of the philanthropic and social events" while serving on the board of the Joseph M. Sanzari Children's Hospital at Hackensack University Medical Center. Ex. C-13. The chair of the board also noted Nadine's work as a member of the Advisory Committee and her "countless hours" visiting children, parents, and medical staff with treats. Ex. C-16, Letter from Rosemarie Sorce. Nadine also championed expansion of autism resources in New Jersey. When reports stated that New Jersey had a higher occurrence of autism than the national average,[11] Nadine became involved with the Autism CAN Committee and supported fundraising efforts geared toward providing more effective and comfortable care options for children with autism seeking medical treatment. Ex. D, Autism CAN Booklet; see also Ex. C-11, Letter from Robert Menendez. While Nadine's concern for the care of children is certainly admirable on its own, the consideration she exhibits for others is holistic and far from superficial. She sees people beyond the professional roles in which she encounters them. For instance, Dr. Petrocelli noted that Nadine showed great empathy and kindness to him upon the death of his own grandmother and upon similar circumstances for others within the hospital community. Ex. C-13. Of her own accord, she supported Ms. Sorce by coming to the hospital to offer companionship and comfort before Ms. Sorce's admittance for surgery. Ex. C-16. She also acknowledged and thanked public servants outside the hospital setting for their service to the community. For instance, she routinely donated food as a token of appreciation to local law enforcement. Ex. E. As a further testament to her charitable leadership, she also organized relief supplies after an earthquake in Armenia. Ex. C-11; Ex. C-18.

Nadine's life certainly changed when she met and married Senator Menendez. Yet Nadine continued to live with humility and care for others in all stations of life. Both Ms. Vass and Ms. Juliano work at a business at which Nadine is a customer and describe building a bond with Nadine. Exs. C-8, C-20. They both in particular recall being touched by stories of Nadine

---

[11] See https://autismnj.org/understanding-autism/prevalence-rates/.

The Honorable Sidney H. Stein
August 14, 2025
Page 19

_____

extending her care and compassion beyond her family, for which she places the upmost importance, to include strangers.  Ms. Juliano remembers Nadine exhibiting overwhelming empathy and concern for a young boy and his sister in Lebanon and affirmatively taking action to ensure that they had food and other necessities.  Ex. C-8.

These stories are just a limited subset of the countless expressions of generosity and compassion that define Nadine's life.

### d.  The Loss Calculation Results in a Guidelines Range that Substantially Overstates the Seriousness of the Offense.

Within this context of incredible charity and generosity which threads Nadine's life, the loss calculation under the federal Sentencing Guidelines improperly overstate the seriousness of Nadine's offense.  Beyond her personal history and characteristics, the disproportionate loss Guidelines further militate in favor of a shorter sentence.  The PSR's recommendation of a 14-level increase in the base offense level based upon the purported loss would result in a disparate sentence for Nadine. There is broad consensus that the loss table under § 2B1.1, formulated without an empirical approach, produces unduly harsh sentencing that bear little or no connection to the seriousness of the offense.  *See, e.g.*, *United States v. Johnson*, 2018 WL 1997975, *3 (S.D.N.Y. Apr. 26, 2018) (criticizing lack of "empirical approach" for loss guideline; "That this situation continues unabated is a great shame for the many offenders sentenced . . . who do not receive a sentence that makes any sense for the actual crime of conviction."); *United States v. Faibish*, 2015 WL 4637013, *2 (E.D.N.Y. Aug. 3, 2015) ("The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime."); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("numbers assigned . . . appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology"), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v. Lenagh*, 2009 WL 296999, at *3 (D. Neb. Feb. 6, 2009) (giving fraud Guidelines "less deference" for not being empirically grounded); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (criticizing the loss tables as "patently absurd" and a "black stain on common sense").

Courts have concluded that imposing sentences corresponding to the loss tables would "effectively guarantee[] that many such sentences would be irrational on their face."  *Gupta*, 904 F. Supp. 2d at 351; *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring) ("The widespread perception that the loss guideline is broken leaves district judges without meaningful guidance in high-loss cases; that void can only be filled through the common law, which requires that we reach the substantive reasonableness of these sentences."); *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (placing more emphasis on the § 3553(a) factors "[w]here, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face").

The Honorable Sidney H. Stein
August 14, 2025
Page 20

_____

    In line with this broad consensus, on August 6, 2025, the U.S. Sentencing Commission
published its priorities for amending the Sentencing Guidelines in the latest amendment cycle.[12]
One of the priorities that the Commission identified as a priority for amendment was a
reexamination of the role of actual loss, intended loss, and gain as well as whether the loss table
in §2B1.1 should be revised.  Specifically, the Commission's notice in the Federal Register
stated:

> (3)    Examination of §2B1.1 (Theft, Property Destruction, and
> Fraud) and related guidelines to ensure the guidelines appropriately
> reflect the culpability of the individual and the harm to the victim,
> including (A) reassessing the role of actual loss, intended loss, and
> gain; (B) considering whether the loss table in §2B1.1 should be
> revised to simplify application or to adjust for inflation; (C)
> considering the application and impact of the victims table in
> §2B1.1 and adjustments in Chapter Three, Part A (Victim-Related
> Adjustments), relating to victims; (D) considering the application
> and impact of adjustments in Chapter Three, Part B (Role in the
> Offense) relating to role in the offense; and (E) possible
> consideration of amendments that might be appropriate.[13]

    Here, the application of the loss table improperly inflates Nadine's offense level with a
14-point enhancement, more than doubling her sentencing range simply based on the loss
amount. As the Second Circuit explained in *United States v. Algahaim*, 842 F.3d 796, 800 (2d
Cir. 2016), "[w]here the Commission has assigned a rather low base offense level to a crime and
then increased it significantly by a loss enhancement, that combination of circumstances entitles
a sentencing judge to consider a non-Guidelines sentence."  In *Algahaim*, a case involving the
misuse of Government benefits under the food stamps program, the Second Circuit remanded the
sentences of two defendants for the sentencing judge "to consider whether the significant effect
of the loss enhancement, in relation to the low base offense level, should result in a non-
Guidelines sentence." *Id*.  Therein, the defendants' offense levels, pursuant to the § 2B1.1 loss
enhancement, increased between 10 to 12 points. *Id*.  Because Nadine's offense level jumps 14
points based on the loss enhancement alone, a below-Guidelines sentence should be considered.

    Adding the 14-point enhancement to the base level offense and the additional
enhancements pushed by the Government results in an absurd 37-point total offense level—a
potential 210-262 month sentence.  Such an offense level places Nadine's Guideline Range
higher than those convicted of providing material support to terrorist organizations (U.S.S.G. §
2M5.1); kidnapping, involving injury or ransom demands (U.S.S.G. § 2A4.1); and use of
weapons of mass destruction (U.S.S.G. § 2M6.1) among other crimes.  The fact that Nadine's
proposed Guidelines Range is higher than these crimes simply because of her loss calculations is
patently unworkable.  The notion that Nadine's non-violent financial crime renders her as

_____

[12] U.S. SENT'G COMM'N, *Federal Register Notice of Final 2025-2026 Priorities*,
https://www.ussc.gov/policymaking/federal-register-notices/federal-register-notice-final-2025-2026-
priorities (last visited Aug 10, 2025).
[13] *Id.*

The Honorable Sidney H. Stein
August 14, 2025
Page 21

_____

culpable as some of the most dangerous violent criminal offenders in our country illustrates the outrageously disproportionate nature of the loss enhancement and merits a downward variance.

Because of the loss enhancement's disproportionate nature, courts often vary below the Guidelines applying the loss table under § 2B1.1, especially for first time offenders. For example, according to data compiled by the Sentencing Commission, between 2019 and 2024, courts issued below guideline sentences in 100 percent of cases for defendants whose primary guideline was § 2C1.1, had a criminal history category of I, and a Final Offense Level of 32 (the proper offense level here).[14]

The average sentence length for a defendant in Criminal History Category I for bribery/corruption offenses under § 2C1.1 is only 20 months, and the median is 12 months. *See* U.S. SENT'G COMM'N, Interactive Data Analyzer, Sentencing Outcomes, Sentence Length, Average and Median Sentence Length, https://ida.ussc.gov/analytics/saw.dll?Dashboard (filtering for Fiscal Year 2024, Crime Type Bribery/Corruption, Primary Guideline § 2C1.1, and Criminal History Category I) (last visited Aug 9, 2025). Likewise, for a defendant in Criminal History Category I sentenced for a fraud offense under USSG § 2B1.1, the average sentence length is 18 months, and the median is only 8 months. *See* U.S. SENT'G COMM'N, Interactive Data Analyzer, Sentencing Outcomes, Sentence Length, Average and Median Sentence Length, https://ida.ussc.gov/analytics/saw.dll?Dashboard (filtering for Fiscal Year 2024, Crime Type Fraud/Theft/Embezzlement, Primary Guideline § 2B1.1, and Criminal History Category I).

As to the extent of the variances imposed, Sentencing Commission data also shows that in 2024, the average downward variance for Bribery/Corruption crimes reduced a defendant's sentence by 21 months. 2024 U.S.S.C. Sourcebook, Table 40.[15] Furthermore, since 2015, downward variances or departure were imposed in 50% of all cases under § 2C1.1. *See* U.S. SENT'G COMM'N, Interactive Data Analyzer, Guidelines Application, https://ida.ussc.gov/analytics /saw.dll?Dashboard (filtering for Crime Type Bribery/Corruption, Primary Guideline § 2C1.1, and Criminal History Category I) (last visited Aug 9, 2025).

### e. Probation's Recommended Sentence of 96 Months Would Create an Unwarranted Sentencing Disparity Among Similarly Situated Defendants.

Probation's recommended sentence of 96 months for Nadine would create an unwarranted sentencing disparity among similarly situated defendants. "The primary purpose of Section 3553(a)(6) is to 'minimize nationwide disparities.'" *United States v. Stewart*, No. 23-CR-6330, 2024 WL 3517853, *2 (2d Cir. 2024) (Summary Order) (citing *United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007)). In making its recommendation of 96 months, the Probation Office reviewed the last five fiscal years of nationwide sentencing data as published by JSIN; however, Probation could not find a single defendant in the last five years with the same primary guideline and offense level as Nadine. *See* PSR, at 65. The PSR provides:

_____

[14] Data *available at*: https://jsin.ussc.gov/analytics/saw.dll?Dashboard.
[15] *Available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/Table40.pdf.

_____

> During the last five fiscal years (FY2020-2024), there was an
> insufficient number of defendants (1) whose primary guideline was
> §2C1.1, with a Final Offense Level of 37 and a Criminal History
> Category of I, after excluding defendants who received a §5K1.1
> substantial assistance departure; and (2) who received a sentence of
> imprisonment in whole or in part.

A sentence within the Guidelines range or even the one recommended by Probation would result in dramatic unwarranted disparities under §3553(A)(6) and stand in stark contrast to sentences handed down to co-conspirators in bribery schemes implicating elected officials for conduct far more egregious than present here: conduct that involved the extortion of those with business before the State, actual pressure and threats of others for corrupt payments, and the sale of public contracts.[16]

### 1.    *United States v. Skelos*

The case of *United States v. Skelos* presents a clear example of conduct by a non-elected co-conspirator—Adam Skelos—that is more egregious than Nadine but received a significantly shorter sentence than Probation is recommending here.  *See United States v. Skelos*, No. 15-CR-00317 (S.D.N.Y. Oct. 19, 2018), Dkt. 458.[17]  Adam was not merely a passive recipient of illicit benefits; he was a central and aggressive participant in multiple extortion and bribery schemes orchestrated through his father, then-Senate Majority Leader Dean Skelos.  *Id.*

Adam's conduct included direct threats to business executives, explicit demands for payments, and leveraging his father's legislative power to coerce compliance. Adam secured monthly payments for no-show consulting work.  His behavior was described as entitled, hostile, and intimidating, including statements such as "If you stop paying me, my father will stop helping you," which underscored the coercive nature of the arrangement.  When Adam was terminated from one of these jobs, Dean Skelos retaliated by threatening legislative consequences unless Adam was rehired or compensated.

Adam Skelos, with a pattern of active manipulation, direct threats, and exploitation of public office, received a sentence of 48 months.

### 2.    *United States v. McDonnell*

Maureen McDonnell, wife of former Virginia Governor Robert McDonnell, was convicted of nine felony counts, including honest services wire fraud and obtaining property under color of official right.  Despite her active role in soliciting and accepting over $175,000 in gifts—including luxury goods, vacations, and loans—from a businessman seeking political

_____

[16] Mrs. Menendez's co-defendants have already received disparate sentences that are not commensurate with their level of culpability and much greater than similarly situated defendants.

[17] Adam and Dean Skelos were initially tried and sentenced, but their conviction was overturned on appeal when the Second Circuit narrowed the legal definition of bribery. They were both retried and convicted, leading to this sentence.

The Honorable Sidney H. Stein
August 14, 2025
Page 23

---

favors, Maureen McDonnell was sentenced to one year and one day in prison.  *See United States v. McDonnell*, No. 14-CR-00012-JRS (E.D.V.A. 2014), Dkt. 635, 637, 639.

Maureen's conduct involved direct solicitation of bribes, coordination of access to state officials, and promotion of a private product through state channels, all while serving as First Lady of Virginia.  Her actions were not peripheral; they were central to the execution of the scheme.  Nonetheless, the court recognized her non-elected status, lack of control over official decisions, and personal financial distress as mitigating factors warranting a downward departure from the statutory maximum.

Accordingly, the court should consider the McDonnell precedent as a benchmark for sentencing parity.

### 3.   *United States v. Lindberg*

In *United States v. Lindberg*, political consultant John Gray was convicted at trial for his central role in a bribery scheme involving campaign contributions of over $1.4 million in exchange for official action.  Gray actively negotiated the terms of the bribe, structured payments, and explicitly linked financial support to the reassignment of a state regulator, demonstrating strategic intent and operational control. *See United States v. Lindberg*, No. 19-CR-00022 (W.D.N.C., Aug. 12, 2020), Dkt. 245, 262.  The total offense level was similar to Nadine's at 34.  *Id.* at Dkt. 245.  The Government recommended a sentence of 168 months for Gray.  *Id.* at Dkt. 245.  Gray was ultimately sentenced to 30 months.[18]

### 4.   *Other Cases*

In assessing the proportionality of Nadine's proposed 96-month sentence, the case of Basheer Jones, and his romantic partner, Sinera Jones, provides another compelling benchmark.  *United States v. Jones*, No. 1:25-CR-00127 (N.D. Ohio).  In that case, Sinera Jones acted as a conduit for fraudulent payments, receiving over $200,000 through sham consulting contracts and property transactions.  She played a supporting role in concealing the scheme and laundering funds, yet was not an elected official and did not direct policy decisions.  Although she reached in a plea agreement, her sentence of 28 months reflects her culpability as a non-official intermediary who facilitated corruption but lacked control over governmental actions.[19]

In *United States v. Renzi*, James Sandlin—a real estate investor and close associate of Congressman Rick Renzi—was convicted at trial for his role in a corrupt federal land swap scheme designed to repay a personal debt.  No. 4:08-CR-00212-DCB-BPV-2 (D. Ariz. June 11, 2013), Dkt 1220.  Sandlin owed Renzi $700,000 from prior business dealings, and Renzi used his legislative influence to pressure private entities to purchase Sandlin's property in Cochise County, Arizona.  When one party refused, Renzi offered support to another in exchange for the same purchase.  Sandlin ultimately received $1.6 million from the land deal, out of which he

---

[18] Gray's sentence was ultimately vacated and he was retried later.
[19] U.S. DEP'T OF J., *Ohio Woman Sentenced for Role in Public Corruption Scheme*, https://www.justice.gov/usao-ndoh/pr/ohio-woman-sentenced-role-public-corruption-scheme (last visited Aug 10, 2025).

The Honorable Sidney H. Stein
August 14, 2025
Page 24

_____

paid Renzi over $733,000 in two separate payments.   Sandlin was convicted of 13 felony counts, including conspiracy, honest services wire fraud, extortion under color of official right, and money laundering, and was sentenced to 18 months in prison.  *Id.* at Dkt. 1299, 1306, 1319. Sandlin was a non-elected intermediary who facilitated a corrupt transaction that benefited a public official.  However, Sandlin's conduct involved direct financial coordination, structured kickbacks, and active participation in extortion.

Finally, the requested sentence Nadine seeks would not produce an unwarranted sentencing disparity between Nadine and her co-defendants.  Even under the Government's theory of the case, the circumstances of each defendant's involvement in the case were quite different.  Nadine was not an elected politician, a pillar in her community, or even a businesswomen—she was an obedient wife with significant challenges, who had no control over her husband's actions.  It is incumbent on the Court to sentence each defendant individually. Mrs. Menendez must receive an ***individualized*** sentence based on her ***own*** actions and on her ***own*** personal characteristics relevant to the factors outlined in § 3553(a). *See Pepper v. United States*, 562 U.S. 476, 487 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

### f.  The Requested Sentence Will Afford Adequate Deterrence

This entire case has been an exercise in deterrence.  There is no need for additional specific deterrence.  In her late 50s, Nadine is a first-time offender with no risk of re-offending. Nadine's entire life has already been destroyed—her husband is serving an 11-year sentence, she is a social pariah, and she cannot step outside of her home or go to the grocery store without attracting attention (and often, the media).  Scapegoated by her co-defendants, and presented to the world incorrectly (and in a sexist manner) as a *femme fatale*, Nadine's world has shrunk to a very small circle.  She is no longer welcome in charitable organizations, banks will not allow her to maintain simple checking and savings accounts, and her face (and her breast cancer struggles) have been plastered on the nightly news for years.  Underscoring that there is no need for specific deterrence, Nadine has also done very well on pretrial release.  She developed a strong relationship with her pre-trial services officer, and has been fully compliant with all the terms of her release.

To the extent the Court is concerned about general deterrence, that goal has already been met through the aggressive investigation and prosecution of this case, the convictions at highly publicized trials, and the steep sentences previously imposed.  A lengthy prison term for Nadine Menendez would not further deter white collar crime.  The message has been sent to, and heard by, the entire world already.

The Honorable Sidney H. Stein
August 14, 2025
Page 25

_____

**III.     Conclusion**

Nadine is not her husband, or her co-defendants.  Despite all of the Government's efforts to present her as a vixen, the reality is far from that.  She is a deeply traumatized woman with ███████████████████████.  Her entire life has been marked by men who have taken advantage of her, and harmed her, in myriad ways.  An extended sentence is not warranted, needed, or appropriate under these circumstances.  For all the reasons set forth above, a below-Guidelines sentence, of 12 months and 1 day of imprisonment, would properly reflect the factors set forth in Title 18, United States Code, Section 3553(a), and would constitute a sentence that is sufficient, but no greater than necessary.

Sincerely,

COZEN O'CONNOR

By:     Sarah Krissoff
        Catherine Yun
        Andrew Vazquez