

Alexander S. Bardey, M.D., PLLC
Francheska Bidot-Rodriguez, Ph.D.
Ally Melnick, Psy.D.
Amy DeSimon, LMHC

## FORENSIC-PSYCHIATRIC EVALUATION
### Nadine Menendez
### Indictment No.: SR 23 Cr. 490

### August 13, 2025

Sarah Krissoff, Esq.
Cozen O' Connor
175 Greenwich Street, 55th Floor
New York, NY 10001

Dear Ms. Krissoff,

At your request, we (Alexander S. Bardey, M.D. and Amy DeSimon, LMHC-D) performed a psychiatric evaluation of your client, Nadine Menendez, a 58-year-old woman who was convicted on April 21, 2025, of the following charges: conspiracy to commit bribery; conspiracy to commit honest services wire fraud; conspiracy to commit extortion under color of official right; two counts of conspiracy to commit obstruction of justice; two counts of bribery; two counts of honest services wire fraud; three counts of extortion under color of official right; honest services wire fraud; conspiracy for a public official to act as a foreign agent; and obstruction of justice.

Ms. Menendez is currently residing in the community in New Jersey. The examination took place in our Midtown office on July 31, 2025. The limits of confidentiality inherent to such an evaluation were explained to Ms. Menendez. She demonstrated an adequate understanding of these concepts and consented to participate. As part of our evaluation, we conducted a comprehensive clinical interview to collect information about Ms. Menendez's developmental, personal, social, academic, vocational, medical, legal, and psychiatric histories. We performed a mental status examination in order to assess Ms. Menendez's intelligence, thought processes, cognitive functioning, memory, credibility, orientation, judgment, insight, and impulse control.

In addition to our examination, the following collateral telephone interviews were conducted:

1.  Katia Tabourian, Ms. Menendez's sister, on August 5, 2025

Finally, we reviewed the following sources of information:

*Forensic-Psychiatric Report*
*Nadine Menendez*

1. Legal Discovery
   a. Fort Lee Police Department, Police Report, dated August 2, 2021
   b. Email Correspondence from ██████████ to Nadine Menendez, dated August 8, 2017
   c. Englewood Cliffs Police, Domestic Violence Reports, dated April 4, 2018, to April 5, 2018
   d. New Jersey Domestic Violence Court Order, Temporary Restraining Order, dated May 21, 2018
   e. Indictment, The United States of America v. Robert Menendez, Nadine Menendez a/k/a "Nadine Arslanian", Wael Hana a/k/a "Will Hana," and Fred Daibes, date not indicated
   f. United States of America v. Robert Menendez, Sentencing Memorandum on Behalf of Robert Menendez, dated January 2, 2025
   g. United States of America v. Robert Menendez, et al., Sentencing Memorandum on Behalf of Defendant Wael Hana, dated January 2, 2025
   h. Presentence Investigation Report Draft, United States of America v. Nadine Menendez, dated July 1, 2025
   i. Various letters of support written on behalf of Nadine Menendez, dated largely August 2025

2. Medical Records
   a. Teaneck Gastroenterology and Endoscopy Center, Medical records, dated July 28, 2017
   b. Englewood Hospital and Medical Center, Medical records, dated October 1, 2017
   c. Englewood Hospital and Medical Center, Discharge Instructions, dated October 6, 2017
   d. Neurosurgery at Lenox Hill, Medical records, dated January 11, 2018
   e. Hackensack University Medical Center, Medical records, dated March 14, 2024, to May 2, 2024
   f. ██████████ Aesthetic & Reconstructive Surgery, Medical records, dated November 12, 2024, to April 1, 2025
   g. Advanced Psychiatric Associates, Medical records, dated October 30, 2024, to November 13, 2024
   h. Surgical Specialists of Greater New York, LLP., Medical Records, dated May 5, 2025
   i. Surgical Specialists of Greater New York, LLP., Medical Records, dated May 19, 2025
   j. ██████████, MD., Medical Records, dated June 26, 2025

*Forensic-Psychiatric Report*
*Nadine Menendez*

Our opinion is based on the information derived from the present evaluation and our review of the available collateral information provided at the time of this report, included herein. We reserve the right to modify or supplement any conclusions rendered upon receipt of additional pertinent documentation or information.

# PERSONAL HISTORY

*The following narrative is based on Ms. Menendez's self-report gathered during the present assessment, supplemented with information retrieved from collateral sources wherever indicated.*

Ms. Menendez is a 58-year-old woman of Armenian descent born on ████ 1967, in Beirut, Lebanon. She is the eldest of two children born to her father, Garbis Tabourian (age 96) and mother, Ida Tabourian, who passed away on August 11, 2013. Ms. Menendez has a younger sister, Katia Tabourian. She reported experiencing a "beautiful" early childhood, growing up in an intact family. Mr. Tabourian's occupation as an engineer and inheriting his father's Persian carpets business allowed the family to live an affluent lifestyle, including hiring drivers and separate nannies for the children. Ms. Menendez denied any complications with her birth and delivery and reportedly met all developmental milestones in an appropriate time frame and without difficulty. She further denied a family history of medical, mental health, or substance use issues. However, by the age of 12, Ms. Menendez and her family had relocated to the United States.

Ms. Menendez and her family suffered tremendous trauma during the conflict in Lebanon. Although they were eventually able to escape Lebanon, they experienced and witnessed human suffering, deprivation, and violence while there. Ms. Menendez recalled frequent bombings, limited electricity, food scarcity, and witnessing heinous acts of violence. "It was very scary for me," she expressed. She reported receiving warnings from her mother to never pick up a toy or "anything shiny" off the streets as it may explode. According to Ms. Menendez, she had to travel crouched down in the car to avoid seeing the severe limbs and bodies of dead children and adults on the street on her way to school; however, as the violence escalated, it became too unsafe for her to attend school any longer so she had to stop her studies to remain in a bomb shelter. Ms. Menendez recalled witnessing one particular act of violence as a young girl: "I heard screaming and screaming…when I lifted the shutters, I saw a man face down with his hands tied to the end of a jeep being dragged." She further described seeing the skin and flesh coming off his arms and legs and watching as his bloody body was flipped "this way and that way" as the jeep kept driving over a rocky road. Furthermore, Ms. Menendez shared that she and her family felt directly threatened, as their home was hit with missile fire. On one occasion, a bullet came through her mother's bedroom window, "just missing her" as she turned her face away when her name was called.

Ms. Menendez shared that her parents did their best to protect her and her younger sister. She described how her father would place her in the bathtub with pillows piled around her during

*Forensic-Psychiatric Report*
*Nadine Menendez*

bombings and her mother did the same with her sister. Through tears, Ms. Menendez explained that she would also push her sister under the bed and place pillows between them so that if soldiers entered the home, they would take her and not her sister. The entire family would reportedly sleep with their clothes on, with suitcases packed in case they had to evacuate. During a food shortage, Ms. Menendez reported, her mother travelled by boat to Cyprus, Greece to collect rations of canned food for the family. In another effort to keep her safe from increased kidnappings.

Because of the growing violence and fear, Ms. Menendez and her family reportedly spent a significant amount of time in a bomb shelter. Despite their efforts, her father was kidnapped and taken hostage. Ms. Menendez vividly, and tearfully, recalled that day her father was taken hostage. She disclosed that two boys had come to the bomb shelter looking for her father. While she and her sister hid in a corner of the shelter, the boys took her father as a prisoner, eventually to Syria. Having lost track of time because due to the isolation in the bomb shelter, Ms. Menendez could not recall how long her father was held hostage. She explained that her mother eventually left her and her sister behind to travel to Syria to negotiate her father's release and pay the ransom for his return. Ms. Menendez recalled that when her father did return after what "had to be months," he was unrecognizable to her. She recalled feeling scared by his appearance, as he looked exhausted and his hair had turned from brown to completely white; in retrospect, she attributed the vast change in his appearance was a torture response. Once the family was reunified, they made the decision to leave their country of origin.

According to Ms. Menendez, it was with international aid that she and her family were able to secure placement on an American ship bound for Athens, Greece and then London. During the current evaluation, Ms. Menendez recalled, she experienced disbelief upon learning that the American ships were only taking women and children under 12-years-old to safety, noting that this policy "went against everything I had heard about the United States." Nevertheless, her mother was able to contact their neighbor, an American ambassador, and an exception was made, permitting her father to accompany them. Ultimately, the family eventually entered the United States, where they initially settled in Palo Alto, CA, when Ms. Menendez was 11 years old.

Ms. Menendez stated that she subsequently attended a public school in Palo Alto for one year, requiring the assistance of an interpreter throughout that time. However, her parents had begun to teach her the English language at home. By the time her mother decided to move the family closer to relatives in Manhasset, NY one year later, Ms. Menendez was speaking English and performing exceptionally well academically. She noted that she was a high honors student in high school. Socially, she was able to form friendships with her peers and denied any experiences with bullying. After graduating high school in 1985, Ms. Menendez attended New York University to complete both her undergraduate and graduate studies in French culture and civilizations. Although there were no academic concerns throughout college, Ms. Menendez reportedly struggled with being "alone" in New York City. As such, her father would pick her up from campus every Friday and bring her to the family home for the weekend before driving her back on Monday. Ms. Menendez obtained a bachelor's degree in 1989 and a master's degree in 1991. Ms. Menendez reported that for a period during her previous marriage, which lasted from

*Forensic-Psychiatric Report*
*Nadine Menendez*

1989 until they separated in 2003, she was briefly employed alongside her former husband, a contractor, on the job site of a 42-home construction subdivision in New Jersey. Since that time, Ms. Menendez has not maintained formal employment and has been financially supported by her former husband and her parents.

Ms. Menendez denied a history of substance use. She additionally denied any prior criminal justice involvement preceding the instant offense.

Regarding her medical history, Ms. Menendez underwent

Reviewed medical records corroborate her account.[34]

In March 2024, Ms. Menendez was diagnosed with nuclear grade 3 breast cancer,



## MS. MENDENDEZ'S RELATIONSHIP HISTORY

Of note, Ms. Menendez has never functioned independently in any significant domain. She has always been cared for by family or by significant others.

Ms. Menendez reported ▮ significant romantic relationships prior to her most recent marriage to Mr. Robert Menendez, ▮ which involved emotional, psychological, and physical abuse at the hands of her romantic partners.

---

[1] ▮▮▮, MD, LLC, Medical records, dated December 27, 2023
[2] Englewood Hospital and Medical Center, Medical records, dated October 1, 2017
[3] Englewood Hospital and Medical Center, Medical records, dated October 1, 2017
[4] Englewood Hospital and Medical Center, Discharge Instructions, dated October 6, 2017
[5] Hackensack University Medical Center, Medical Records, dated March 27, 2024, to May 2, 2024
[6] Surgical Specialists of Greater New York, LLP., Medical Records, dated May 19, 2025
[7] Surgical Specialists of Greater New York, LLP., Medical Records, dated May 5, 2025
[8] ▮▮▮, MD., Medical Records, dated June 26, 2025

Ms. Menendez reported that her first significant romantic relationship with Mr. Raffi Arslanian began when she was attending her undergraduate studies at NYU. The two were engaged during her junior year of college and later married after she graduated in 1989. Their union produced two children: ███████████████████████████████ The marriage lasted for 15 years before ending in divorce on April 15, 2005.[9]

Ms. Menendez reported that in the early stages of their marriage, she was happy, describing Mr. Arslanian as her "Prince Charming." She was supportive of his career endeavors, which involved building homes in New Jersey. Ms. Menendez stated that she assisted her husband with a subdivision project consisting of 42 homes. However, she noted that her husband frequently incurred financial losses on each property within the developments. ████████

Approximately four years later, Ms. Menendez reportedly initiated a relationship with ████

---

[9] Presentence Investigation Report Draft, United States of America v. Nadine Menendez, dated July 1, 2025
[10] Presentence Investigation Report Draft, United States of America v. Nadine Menendez, dated July 1, 2025
[11] Fort Lee Police Department, Police Report, no date indicated

*Forensic-Psychiatric Report*
*Nadine Menendez*

Ms. Menendez reported that she subsequently began a relationship with Mr. in 2014. During that relationship, she aided



---

[12] Presentence Investigation Report Draft, United States of America v. Nadine Menendez, dated July 1, 2025
[13] Englewood Cliffs Police, Domestic Violence Reports, dated April 4, 2018, to April 5, 2018

*Forensic-Psychiatric Report*
*Nadine Menendez*



In 2018, Ms. Menendez met her current husband, Mr. Robert Menendez. She reported that she did not realize the full scope of his career or his authority as a "state senator." When discussing her relationship with Mr. Menendez, she stated that she felt safe with him and that he was not abusive toward her. She further stated that he reminded her of her father, reminiscing that Mr. Menendez looked like him in some of their wedding photos.[17] During a collateral call with Ms. Menendez's sister, she corroborated that Mr. Menendez was "very good" to Ms. Menendez and that she was incredibly reliant on him.

## REVIEW OF COLLATERAL DOCUMENTS RELATED TO THE ABUSE OF MS. MENENDEZ PERPETRATED ██████████



---

[14] Englewood Cliffs Police, Domestic Violence Reports, dated April 4, 2018, to April 5, 2018
[15] New Jersey Domestic Violence Court Order, Temporary Restraining Order, dated May 21, 2018
[16] Presentence Investigation Report Draft, United States of America v. Nadine Menendez, dated July 1, 2025
[17] Presentence Investigation Report Draft, United States of America v. Nadine Menendez, dated July 1, 2025
[18] Email Correspondence from ████████ to Nadine Menendez, dated August 8, 2017

*Forensic-Psychiatric Report*
*Nadine Menendez*



---

[19] Email Correspondence from ▮▮▮▮▮▮▮ to Nadine Menendez, dated August 8, 2017
[20] Email Correspondence from ▮▮▮▮▮▮▮ to Nadine Menendez, dated August 8, 2017
[21] Englewood Hospital and Medical Center, Medical records, dated October 1, 2017
[22] Englewood Hospital and Medical Center, Medical records, dated October 1, 2017
[23] Englewood Hospital and Medical Center, Discharge Instructions, dated October 1, 2017
[24] Advanced Psychiatric Associates, Medical records, dated October 30, 2024, to November 13, 2024
[25] Neurosurgery at Lenox Hill, Medical records, dated January 11, 2018
[26] ▮▮▮▮▮▮▮, MD, LLC, Medical records, dated December 27, 2023

*Forensic-Psychiatric Report*
*Nadine Menendez*

## MEDICAL AND PSYCHIATRIC HISTORY



Ms. Menendez's breast cancer diagnosis and treatment in 2024 coincided with ongoing legal proceedings involving herself and Mr. Menendez.

As indicated in ▮▮▮▮▮ records, following Mr. Menendez's incarceration in 2025, Ms. Menendez added that contact with him had been challenging, as he was initially in isolation, so she was not able to communicate with him via phone or e-mail for some time. Communication then resumed though visits have not been permitted because of Ms. Menendez's status as a co-defendant. The separation was especially difficult as Ms. Menendez heavily relied on her husband during her cancer treatment, both physically and emotionally; he was her primary caretaker at the time, from scheduling her medical appointments to changing her tubes following her surgery.[29]

---

[27] Presentence Investigation Report Draft, United States of America v. Nadine Menendez, dated July 1, 2025
[28] ▮▮▮▮▮, MD., Medical Records, dated June 26, 2025
[29] United States of America v. Robert Menendez, Sentencing Memorandum on Behalf of Robert Menendez, dated January 2, 2025
[30] ▮▮▮▮▮ Aesthetic & Reconstructive Surgery, Medical records, dated November 12, 2024, to April 1, 2025
[31] ▮▮▮▮▮ Aesthetic & Reconstructive Surgery, Medical records, dated November 12, 2024, to April 1, 2025
[32] ▮▮▮▮▮ Aesthetic & Reconstructive Surgery, Medical records, dated November 12, 2024, to April 1, 2025
[33] ▮▮▮▮▮ Aesthetic & Reconstructive Surgery, Medical records, dated November 12, 2024, to April 1, 2025



## COLLATERAL INFORMATION

### Interview with Katia Tabourian

On August 5, 2025, Ms. Katia Tabourian, Ms. Menendez's sister, was interviewed by phone to provide insight into Ms. Menendez's personality and level of functioning. Ms. Tabourian corroborated that the two had a "very nice upbringing" in Beirut, Lebanon prior to the civil war. She explained that during the civil war, their electricity and telephone lines were cut, there was food scarcity, and most of their time was spent in a bomb shelter. According to Ms. Tabourian, the Syrian army planted themselves right next to their family's apartment building

---

[34] Advanced Psychiatric Associates, Medical records, dated October 30, 2024, to November 13, 2024
[35] Advanced Psychiatric Associates, Medical records, dated October 30, 2024, to November 13, 2024, p. 5

*Forensic-Psychiatric Report*
*Nadine Menendez*

with their tanks, placing their home directly in the path of the shooting and violence. She also confirmed that Ms. Menendez, as the eldest child, was at risk of being kidnapped and that eventually their father was taken as a prisoner of war. Regarding their experience during the Lebanese civil Ww, Ms. Tabourian expressed that Ms. Menendez "has taken on a lot more trauma from the war and how it affected my family."

Ms. Tabourian verbalized how Ms. Menendez was severely impacted by the loss of their mother, who "ran the household," in August 2013. She reported Ms. Menendez always listened to and made decisions based on her mother's word; this included where she went to school and her choice in male suitors. Ms. Tabourian recalled that their mother had stated they "must marry Armenian." However, since their mother passed away, Ms. Tabourian stated that Ms. Menendez had "lost her way" and "fell into the wrong hands of men."

Regarding Ms. Menendez's romantic relationships, Ms. Tabourian corroborated the information Ms. Menendez shared regarding her first marriage and divorce.



**Letters of support written on behalf of Nadine Menendez, dated August 2025[36]**

We received twelve letters written by various relatives and friends, which provided additional insight into Ms. Menendez's personality and level of functioning. The supplemental documents corroborate the childhood trauma and domestic violence Ms. Menendez experienced

---

[36] Various letter of support written on behalf of Nadine Menendez, largely dated August 2025

*Forensic-Psychiatric Report*
*Nadine Menendez*

in her life. A letter submitted by Mr. Menendez further detailed the abusive behaviors exhibited by



Accounts from her family highlighted Ms. Menendez's devotion to her children and father, her only remaining parent. Due to his age and declining health, Ms. Menendez has taken the role of his primary caregiver, sharing the role with her sister, Ms. Tabourian, providing him with not only essential daily assistance but emotional support. Ms. Menendez regularly stays with her father, driving from New Jersey to Long Island, to provide this support. Additionally, close relatives emphasized her dependence on others—particularly the men she was involved with—and her people-pleasing tendencies, which were attributed to feelings of insecurity and a fear of experiencing further instability in her life. Her trusting nature often resulted in her being taken advantage of. In a letter submitted by her son, █████ he expressed his frustration at watching both friends and partners "take advantage of her and abuse her...she [Ms. Menendez] continues to spend time around the wrong people."[38]

Despite this, Ms. Menendez was described as a selfless and charitable individual, donating to the less fortunate and participating in volunteer work. Her efforts led to her becoming a board member of the Hackensack University Children's Hospital Advisory Committee and co-chair of the Gregory Hirsch Heart Foundation. However, during the present evaluation, Ms. Menendez tearfully reported that due to her current legal matters, she was removed from both positions.


## RESULTS OF PSYCHOLOGICAL TESTING[39]

Psychological testing is one aspect of a psychiatric evaluation which generates hypotheses about an individual's psychological functioning and symptoms that should be integrated with other sources of information.

### Minnesota Multiphasic Personality Inventory-3 (MMPI-3)[40]

On July 31, 2025, Ms. Menendez was administered the Minnesota Multiphasic Personality Inventory-3 (MMPI-3) in office through the HIPAA compliant online platform, Q-global. All elements of test standardization procedures were satisfied in the administration. The MMPI-3 is an objective self-report measure designed to provide a comprehensive assessment of a test taker's psychological functioning. Domains assessed include cognitive, somatic, emotional, thought,

---

[37] Various letter of support written on behalf of Nadine Menendez, largely dated August 2025
[38] Various letter of support written on behalf of Nadine Menendez, largely dated August 2025
[39] A licensed clinical psychologist, Francheska Bidot-Rodriguez, Ph.D., supervised the administration and interpretation of the psychological assessment measures.
[40] Ben-Porath, Y., & Tellegan, A. (2020). *Minnesota Multiphasic Personality Inventory-3 (MMPI-3): Manual for Administration, Scoring, and Interpretation.* Pearson.

*Forensic-Psychiatric Report*
*Nadine Menendez*

behavioral, and interpersonal dysfunction. The MMPI-3 is one of the most widely utilized empirically based self-report measures in clinical, forensic, and medical settings. Because of the limitations of self-reported-based assessment, the MMPI-3 includes a careful analysis of the validity of the test protocol. Validity scales are used to determine whether the test results are interpretable, and if so, whether any interpretive caveats are called for.



### Trauma Symptom Inventory – 2 (TSI-2)[41]

On July 31, 2025, Ms. Menendez was administered the Trauma Symptom Inventory – 2 in the office through the HIPAA compliant online platform, PARiConnect. All elements of test standardization procedures were satisfied in the administration. The TSI-2 is a self-report measure designed to assess symptoms and behaviors associated with trauma throughout an individual's lifetime. Because of the limitations of self-reported-based assessments, the TSI-2 includes an analysis of the validity of the test protocol. Validity scales are used to determine whether the test results are interpretable.



---

[41] Briere, J. (2011). *Trauma Symptom Inventory-2 (TSI-2): Professional Manual.* PAR.

*Forensic-Psychiatric Report*
*Nadine Menendez*

███████████████████████████████████████████████████████████

### Repeatable Battery for the Assessment of Neuropsychological Status (RBANS)[42]

Ms. Menendez was administered the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS).████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████

The RBANS is a screening tool designed to assess potential cognitive decline or impairment across multiple domains. It consists of 12 subtests that evaluate five areas of cognitive functioning: Immediate Memory, Visuospatial/Constructional Abilities, Language, Attention, and Delayed Memory. While the RBANS is useful for identifying areas of cognitive weakness and provides an overall estimate of neurocognitive status, it is not intended to serve as a stand-alone diagnostic tool. Performance across specific domains is discussed below.



---

[42] Randolph, C. (1998). Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) Manual. San Antonio, TX: The Psychological Corporation.



**Summary**:

Ms. Menendez's neuropsychological testing demonstrated



It is important to note that the assessment conducted was a neuropsychological screening and should be considered preliminary rather than a replacement for a comprehensive neuropsychological evaluation.

recommended.

## MENTAL STATUS EXAMINATION

Ms. Menendez is a 58-year-old woman of Armenian descent who appeared her stated age at the time of the evaluation. She was dressed appropriately and well-groomed. Ms. Menendez was alert and fully oriented to time, person, and place. She was polite and cooperative with the evaluation and was able to provide a coherent biographic narrative.

*Forensic-Psychiatric Report*
*Nadine Menendez*



## DIAGNOSIS AND FORMULATION

Ms. Nadine Menendez is a 58-year-old woman of Armenian descent ████████ ████ She was psychiatrically evaluated at the request of counsel. The purpose of this evaluation was to assist counsel and the Court in gaining a better understanding of any underlying factors that may be considered mitigating at sentencing.

As a result of our examination and review of the available collateral data, we have come to the following diagnostic categorization, as defined by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition – Text Revision (DSM-5-TR):



Ms. Menendez's childhood was a period of intense adversity. At a young age, she witnessed the death and violence caused by the Lebanese civil war, including bombings and gunshots, witnessing the torture of another individual, and her father's kidnapping and experience of torture while in Syria as a prisoner of war. During approximately one year of the conflict, Ms. Menendez was sent to live in London to avoid being kidnapped herself, resulting in very limited communication with her family. This experience deprived her of the safety and stability that children typically rely on, and it also initiated a cycle of uncertainty and displacement.

Beginning in childhood, Ms. Menendez's life was characterized by reliance on others for safety, stability, and guidance. During the Lebanese civil war, her parents assumed a highly protective role, shielding her from violence, making decisions on her behalf, and orchestrating every aspect of her survival.

Ms. Menendez reported a longstanding pattern of domestic violence across multiple relationships, each marked by escalating control, isolation, and physical, emotional, and

psychological abuse.

. Most recently, Ms. Menendez was diagnosed with breast cancer (nuclear grade 3) in March 2024,

---

[43] Coker, A.L., Follingstad D.R., Garcia L.S., & Bush, H.M. (2017). Intimate partner violence and women's cancer quality of life. *Cancer Causes & Control, 28*(1), 23-39.



During the period of the offense conduct, Ms. Menendez was suffering from the cumulative impact of lifelong unresolved trauma, longstanding patterns of ████████, and significant ████. ███████████████████. The interplay of ████████████████████ impaired her capacity for independent decision-making, increased her reliance on others for guidance and support, and limited her ability to evaluate situations critically or advocate for her own needs. ████████████████████ further reduced her capacity for independent problem solving and increased her reliance on others for guidance. These factors, rooted in ████████, ██████████████, left her particularly vulnerable to the influence of those she trusted. This convergence of longstanding ████████████ shaped the interpersonal and situational context in which the instant offense occurred.

*Forensic-Psychiatric Report*
*Nadine Menendez*

It is therefore our opinion, within a reasonable degree of medical and psychological certainty, that Ms. Menendez was suffering from untreated symptoms ███████████ ████████████████████████████████████████████████████, in the context of unresolved trauma and long-term effects of medical conditions, when the instant offense occurred; these symptoms significantly impacted her judgment, thinking, and decision making. The Court may wish to consider these psychological factors as mitigating in reaching an appropriate sentence for Ms. Menendez.

Respectfully submitted,

**Amy DeSimon, LMHC**
**FIFTH AVENUE FORENSICS**
Forensic Mitigation Specialist/Trauma-Informed Psychotherapist

**Alexander Sasha Bardey, M.D.**
**FIFTH AVENUE FORENSICS**
Diplomate in Psychiatry and Forensic Psychiatry, American Board of Psychiatry and Neurology
Assistant Professor, Department of Psychiatry, New York University Langone Medical Center
Adjunct Assistant Professor, Department of Psychiatry and Behavioral Sciences, New York Medical College