UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                        :

UNITED STATES OF AMERICA                :

                                       :

              -*v.*-                     :       S4 23 Cr. 490 (SHS)

                                       :

NADINE MENENDEZ,                   :

                                       :

                                       :

                Defendant.          :

                                       :

------------------------------------------------------------x

## SENTENCING MEMORANDUM OF THE
## UNITED STATES OF AMERICA

JAY CLAYTON
United States Attorney

Eli J. Mark
Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Catherine Ghosh
Assistant United States Attorneys

Christina A. Clark
Special Assistant United States Attorney

- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.    The Offense Conduct ................................................................................................. 3

   A.    The Bribery and Foreign Influence Conduct Related to Egypt ........................... 4

   B.    The Bribery Conduct Related to New Jersey State Criminal Matters ................... 8

   C.    The Bribery Conduct Related to Daibes's Federal Prosecution .......................... 11

   D.    The Obstruction of the Grand Jury's Investigation ........................................... 13

II.   The Presentence Investigation Report ....................................................................... 14

DISCUSSION ..................................................................................................................... 15

I.    THE SENTENCING RANGE SET FORTH IN THE PRESENTENCE REPORT IS
      ACCURATE ............................................................................................................. 15

   A.    Applicable Law ............................................................................................... 15

   B.    Discussion ...................................................................................................... 16

         1.    Bribe Amounts Attributable to the Defendant ........................................ 16

               a)    Hana's Promised $120,000 Annual Salary to the Defendant Is
                     Correctly Included in the List of Items of Value Promised to the
                     Defendant ..................................................................................... 17

               b)    The Two Bags Containing $95,000 and $100,000 in Cash Are
                     Correctly Included in the List of Items of Value Received by the
                     Defendant ..................................................................................... 19

               c)    The Value of the Two Additional One-Kilogram Gold Bars that the
                     Defendant Sold In Approximately June 2022 Are Correctly
                     Included In the List of Items of Value Received by the Defendant
                     ..................................................................................................... 21

               d)    The Ten Envelopes of Cash from Daibes Are Correctly Included In
                     the List of Items of Value Received by the Defendant ................... 23

         2.    The Defendant's Role as a Manager or Supervisor ................................. 25

II.   A SUBSTANTIAL SENTENCE OF IMPRISONMENT IS WARRANTED ................. 28

   A.    Discussion ...................................................................................................... 28

       1.     The Defendant Should Receive a Sentence of At Least 84 Months' Imprisonment ........................................................................... 28

          a)     The Nature and Circumstances of the Offenses ........................... 28

          b)     The History and Characteristics of the Defendant ....................... 32

          c)     The Purposes of Sentencing ........................................................ 36

III.     THE COURT MUST ORDER FORFEITURE AND SHOULD ORDER A FINE .......... 41

    A.     Applicable Law ....................................................................................... 42

       1.     Forfeiture ................................................................................... 42

       2.     Fine ............................................................................................ 45

    B.     Discussion ............................................................................................... 47

       1.     The Defendant Must Forfeit the Proceeds of Her Crimes ......... 47

          a)     The Forfeiture Order .................................................................. 47

       2.     The Defendant Should Pay a Substantial Fine ........................... 54

CONCLUSION ................................................................................................. 55

## PRELIMINARY STATEMENT

The defendant played a critical role in a corrupt scheme to sell, for personal gain, the power of then-Senator Robert Menendez's office, power that she knew was supposed to be used on behalf of the public.  The defendant did not commit bribery reluctantly, fleetingly, or on a small scale. She did so eagerly, for years, and in a scheme implicating foreign relations, national security, and the integrity of state and federal law enforcement.  This conduct, which the defendant freely and unhesitatingly chose, in return for such non-essentials as a luxury convertible, necessitates substantial and meaningful punishment.

In April 2025, after a five-week trial before this Court, the defendant was found guilty by the jury of all charges, namely, multiple bribery, foreign agent, and obstruction of justice offenses, arising out of an egregious corruption and foreign influence scheme.  The defendant's convictions followed the July 2024 convictions of Robert Menendez, Wael Hana, and Fred Daibes after an approximately nine-week jury trial before this Court for their roles in the same scheme.  In January 2025, this Court sentenced Menendez, Hana, and Daibes to 132 months, 97 months, and 84 months in prison, respectively.

The defendant's extensive, deliberate, and exceedingly serious criminal conduct calls out for a substantial sentence.  She corruptly agreed and promised that her boyfriend and then husband, a United States Senator, would use his power and his office to secretly act on behalf of the people who were lining their pockets.  She corruptly agreed and promised to influence national security and foreign relations.  She promised that Menendez would approve billions of dollars in military aid to Egypt, and thereafter personally and secretly provided, to a foreign government, through Hana, sensitive non-public information—obtained from Menendez—that could put at risk U.S. and foreign nationals serving at an embassy abroad.  And she also corruptly agreed and promised

to subvert the rule of law by promising that Menendez would disrupt multiple felony criminal proceedings, state and federal.  In short, the defendant put the power of Menendez's office up for sale in exchange for hundreds of thousands of dollars of bribes, including cash, gold, paychecks for a fake job, and a Mercedes-Benz convertible (the "Mercedes Convertible").

Given the exceptionally serious nature of the defendant's years-long participation in the bribery and foreign influence scheme, the relevant factors under 18 U.S.C. § 3553(a) weigh heavily in favor of a substantial sentence.  The Government considers the defendant, who played a critical role at the heart of the scheme, to be the second most culpable member of the scheme, second only to Menendez.  But for the defendant's history of health conditions and unique personal circumstances, the Government would ask this Court to impose a higher sentence upon the defendant than upon Hana and Daibes.  A sentence far less than that imposed on Hana or Daibes, as the defendant requests, would create a serious unwarranted disparity given her greater culpability, even after accounting for the mitigating factors she presents.  That is particularly so given that an appropriate sentence of imprisonment—one commensurate with the seriousness and deliberate nature of her conduct—can be fashioned, while still providing the defendant with the opportunity to receive certain medical procedures before she begins serving a term of federal custody.

The Court should impose a substantial sentence of imprisonment—of at least 84 months' imprisonment—and significant financial penalties to provide just punishment for the defendant's exceedingly serious conduct that resulted in the betrayal of the public trust, and to deter others from engaging in similar conduct.

2

# BACKGROUND

## I.    The Offense Conduct

As proven at trial, the defendant engaged, for years, in a corruption and foreign influence scheme of stunning brazenness, breadth, and duration, resulting in exceptionally grave abuses of power at the highest levels of the Legislative Branch of the United States Government.

Because the Court is deeply familiar with the offense conduct from presiding over the trials of the defendant and her co-defendants and from its thorough opinion recognizing the sufficiency of the evidence and denying the defendant's motion for a new trial, *see United States v. Menendez*, No. S4 23 Cr. 490 (SHS), --- F. Supp. 3d ----, 2025 WL 2166135, at *4-19 (S.D.N.Y. July 29, 2025); *see also United States v. Menendez*, 759 F. Supp. 3d 460, 476-508 (S.D.N.Y. 2024) (same after trial of co-defendants), the Government focuses herein only on the principal aspects of the defendant's conduct that are relevant to sentencing.  For a more detailed description of the offense conduct, the Government respectfully refers the Court to the Government's memorandum in opposition to the defendant's post-trial motions (Dkt. 875 at 10-60), as well as to the presentence investigation report.[1]

---

[1] Citations to "Dkt." refer to docket entries in this case.  Citations to "Def. Mem." refer to the sentencing memorandum of the defendant.  Citations to "PSR" refer to the presentence investigation report of the defendant, dated July 25, 2025.  Citations to "Tr." refer to the transcript of the trial of the defendant and citations to "GX" refer to Government exhibits in that trial.  Citations to "Menendez Tr." refer to the transcript of the trial of her co-defendants.

### A.    The Bribery and Foreign Influence Conduct Related to Egypt

The defendant committed serious offenses related to Egypt that implicated national security, the foreign relations of the United States, and the security of U.S. employees stationed abroad and foreign nationals working for the United States abroad.

As an initial matter, the form of the bribes the defendant collected for Menendez's promises and acts related to Egypt underscores the defendant's contemporaneous understanding of the wrongfulness of her and her co-defendants' actions.  Many of the bribes took the form of payments from Hana's monopoly, whether to the defendant's mortgage company styled as a "loan", or to her sham consulting company, in exchange for patently insubstantial work under the guise of a supposed consulting job for the defendant.  *See, e.g.*, *Menendez*, 2025 WL 2166135, at *5-7; *see also id.* at *7 ("six months before any payment, defendant—referring to the possibility of IS EG being granted a monopoly by Egypt—wrote to Howard Dorian, one of Hana's associates, that she was willing to 'give 100% to make sure this goes skyhigh on condition that I start getting my $ 2500/week and health benefits and Will keeps his promises.'"); GX 1352 row 865 (defendant's voicemail to Daibes stating that Hana told her "he doesn't need me for anything and I haven't done anything to help him, and a whole bunch of other stuff that I need to be in the office eight hours a day").  Others involved kilogram bars of gold, physically delivered by Daibes upon the defendant's and Menendez's return from a trip to Egypt.  (*See, e.g.*, GX 1352 rows 1113-4, 1120-24.)  In each case, the bribes were delivered in secrecy and concealed with lies, showing that neither the defendant nor her co-defendants was deterred by the knowledge of the wrongfulness of their conduct.  (*See, e.g.*, GX 1352 rows 979-80 (defendant's text to Menendez asking if she "should text [Daibes]" and Menendez's response, "No, you should not text or email"); *Menendez*, 2025

WL 2166135, at * 7 ("[T]ellingly, defendant did not include the three $10,000 checks she received for her supposed work on her federal tax returns.").)

As serious as the receipt of bribes was, the acts the defendant and Menendez promised and that Menendez took in exchange for these bribes were truly alarming. While bribery offenses are serious crimes even when founded on promises to perform acts that are routine or potentially beneficial to the public, the acts that the defendant and Menendez promised and that Menendez attempted were far from routine or beneficial to the public.

The defendant's and Menendez's promises and Menendez's attempts to pressure the U.S. Department of Agriculture ("USDA") to accede to a business monopoly for Hana were a serious abuse of power affecting the foreign relations of the United States, businesses, and consumers. Egypt's decision to grant Hana a new monopoly on halal certification had sweeping and negative implications for U.S. businesses (Tr. 347-48, 366), and accordingly became a high-priority issue for the Under Secretary of Agriculture for Trade and Foreign Agricultural Affairs, Ted McKinney. (Tr. 1039 (McKinney testifying that halal monopoly was "very important"); Tr. 1042-43 ("Well, we were very worried. Again, I'll say this was unheard of. We were worried about the relationship with Egypt, which we had thought was very positive, serious, very good. Secondly was what it might do to destroy value to our ranchers, our processors, add cost to a consumer that might be enjoying beef livers").) This precipitous move, which caused a tenfold increase in the prices charged to U.S. beef exporters (a price that was largely passed on to Egyptian consumers, but with the likely effect of harming U.S. exporters by shrinking the export market (Tr. 286-88, 366, 404, 1041-42)), triggered an urgent response by the Executive Branch, including a campaign of diplomatic communication by the chargé d'affaires at the U.S. Embassy in Cairo and by Under

Secretary McKinney.  (Tr. 266-67, 360-70, 401-02, 1042-45, 1048-52.)  It was these diplomatic actions—the articulation and effectuation of the considered and official position of the United States on a significant matter affecting the foreign relations of the United States—that Menendez, at the defendant's urging and following a briefing by the defendant (*see, e.g.*, GX 1352 rows 624-47), sought to influence.  (*See, e.g.*, Tr. 1050).

The defendant and Menendez's promises with respect to Egypt—and the information that the defendant channeled from Menendez to Egypt as a deniable go-between—had significant implications for human rights and national security.  By virtue of his leadership position on the Senate Foreign Relations Committee, Menendez was privy to a wide variety of information that, while not formally classified, was non-public, sensitive, and not for distribution to foreign governments (or their agents).  Through the defendant and Hana, Menendez repeatedly provided such sensitive and non-public information.

For example, immediately after a meeting between the defendant, Menendez, and Hana on May 6, 2018 (GX 1352 rows 90-97), a Menendez staffer noted that Menendez was asking "how many Americans [are] posted to the embassy" in Cairo, and the staffer added, "Don't ask why I'm asking."  (GX 1352, row 98; *see also id.* rows 99-100.)  "This information was highly sensitive, nonpublic information."  *Menendez*, 2025 WL 2166135, at *16 (citing Tr. 267-68); *see also* Tr. 268-71 (explaining information was kept confidential in order to protect U.S. Embassy staff from being identified, located, and targeted by foreign intelligence services or others).  The information was so sensitive that it was not even shared *with Menendez* as a matter of course.  The very next day, Menendez texted the defendant with "detailed information on the numbers of both the Americans and Egyptians employed [at the American Embassy], along with their roles."

*Menendez*, 2025 WL 2166135, at *16. The defendant sprang into action, "immediately call[ing] Menendez, and as soon as they hung up, [the] defendant texted the same information in its entirety to Hana." *Id.* Hana then immediately forwarded the information on to an Egyptian official. *Id.*

Menendez repeatedly, and surreptitiously through the defendant, provided Egypt with advocacy adverse to his colleagues and sensitive information related to U.S. foreign policy. In multiple instances, Menendez, with the assistance of the defendant, advocated on behalf of the Egyptian government and provided assistance to the Egyptian government in a manner directly adverse to his own fellow U.S. Senators. Menendez helped ghost-write a letter seeking to justify Egypt's alleged human rights abuses against objections lodged by another U.S. Senator of his own party. In short, while a U.S. Senator himself, Menendez literally not just took the side of, but secretly authored a response in the voice of, a foreign government against his own fellow U.S. Senators. *See, e.g.*, *Menendez*, 2025 WL 2166135, at *16 ("While the sender and intended recipient of the letter are not identified, the letter is clearly written from the perspective of the Government of Egypt."). And Menendez did that *at the request of the defendant*. *See id.* (citing GX 1352 row 183, GX B102, GX B102-A).

Menendez also briefed the head of Egyptian intelligence on questions other U.S. Senators were preparing to ask regarding reports that Egypt had aided in a notorious human rights abuse, the murder and dismemberment of a U.S. lawful permanent resident journalist. *See Menendez*, 2025 WL 2166135, at *16. He did so, in the explicit words of the defendant to an Egyptian intelligence official in the Egyptian embassy in Washington, D.C., and friend of the defendant, so that the head of Egyptian intelligence could prepare his "rebuttals" (GX 1352 row 1084; GX B213-

4) and "answers" (GX 1352 row 1077; GX G301-1) to the questions of Menendez's fellow U.S. Senators.

In sum, the defendant was at Menendez's side, working closely with him, as he betrayed the trust placed in him, to secretly help a foreign country so that the defendant and Menendez could get paid. That alone demands substantial punishment. But the defendant did much more.

**B.    The Bribery Conduct Related to New Jersey State Criminal Matters**

The defendant's promises that Menendez would attempt to tamper with two pending state criminal matters, in exchange for cash and a luxury convertible for the defendant, were a serious threat to the integrity of the criminal justice system.

In exchange for a luxury convertible, the defendant and Menendez worked to fulfill Hana's promises to Jose Uribe to "make all of these investigations go away"—promises in which Hana had mentioned both the defendant and Menendez by name (Tr. 1484). In January 2019, in quick succession, the defendant complained to Hana about her lack of a car (*see, e.g.*, GX B105-31); Menendez performed web searches to ascertain the cost of a Mercedes C300 (GX A301-12); and Menendez, through the defendant, invited Hana and Uribe to a planning meeting (*see, e.g.*, GX E102-3 (Hana to Uribe: "bob he want have dinner with us tonight")). And the defendant was integral to Menendez's January 2019 call in which he attempted to pressure then-New Jersey Attorney General Gurbir Grewal. After that dinner, on January 29, 2019, Menendez contacted the defendant to request basic identifying details about Elvis Parra's case (but, notably, *not* any evidence of discrimination or any other grounds for intervention into that case), which the defendant in turn requested from Hana in an urgent series of calls and text messages. (*See, e.g.*, GX 6A-312-1 (Menendez call to defendant); GX 6A-112 (defendant calls to Hana); GX C115-3 (Hana WhatsApp messages with Parra); GX B105-32 (defendant texts with Hana).) After the

8

defendant reported back to Menendez, Menendez called Grewal.  (*See, e.g.*, GXs 6A-206-1, 6B-2401.)

The defendant's and Menendez's corrupt agreement continued well after the January 2019 contact with Grewal.  The defendant—who wanted a new car since her prior car had been damaged in an accident (GX 1343 row 88; GXs A109, A109-B)—reached an agreement with Uribe (who knew that Hana had promised the defendant a car) that, as long as she helped Uribe make the investigations go away, Uribe would provide her with a new car (Tr. 1517-20).  And in a stark display of the greed motivating her conduct, the defendant asked Uribe not just for any new car, but for a luxury convertible.

The defendant repeatedly lied and engaged in deceptive behavior to get the Mercedes-Benz she wanted.  She lied to Mercedes-Benz Financial Services about her job and income to pretend that she could afford the car herself and to conceal that Uribe was going to pay for the car (GXs 7E-1, 2436).  The defendant picked up a $15,000 cash bribe from Uribe in a parking lot.  (Tr. 1529-33; GX A105-E (defendant using coded language when describing to Menendez Uribe's provision of the cash for the down payment, telling Menendez she would be taken to "meet Jose for five minutes").)  She then broke that cash bribe into a series of small transactions over the next several days in order to deposit them into her bank account.  (GX 1345; Tr. 2626-31.)  After the defendant picked up her Mercedes Convertible in early April 2019, Uribe started making the monthly payments on the defendant's car for the next three years—including during the time when Menendez summoned Grewal to his state Senate office to attempt to pressure him face-to-face in September 2019—and did not stop until he learned in June 2022 that the Federal Bureau of Investigation ("FBI") was investigating this conduct.  (Tr. 1552, 1624-25.)

9

After the September 2019 meeting, Menendez met with Uribe as arranged by the defendant, and falsely encouraged Uribe, claiming the meeting with Grewal had been positive. (Tr. 1652-55; GX E109-2.) Several weeks later—upon learning from the defendant that Uribe was going to keep following up with the defendant until he got "peace"—Menendez called Uribe and falsely claimed that the matter had been resolved. (Tr. 1657-58; GXs B209-24, 6D-102-12.) In fact, Grewal had not said anything encouraging to Menendez, but had instead told Menendez that he could not discuss the case. (*See, e.g.*, Tr. 1406 (Grewal: "I can't speak to you about this matter.").)

Throughout the scheme, the defendant acted as the go-between, or the gatekeeper, to Menendez, controlling Uribe's access to Menendez and demanding things of value from Uribe. Uribe testified about at least four interactions with Menendez, all of which were either arranged by the defendant, attended by the defendant, or (in most cases) both: a May 2019 dinner at Sofia's with the defendant and Menendez, arranged by the defendant (Tr. 1562-63; GX 1317 ("Just got out of meeting. Do you want to have cigar or drink with bob?")); an August 2019 dinner at Il Villaggio with the defendant and Menendez where Uribe asked Menendez to stop the investigation (Tr. 1616-22); a September 5, 2019 meeting between Uribe and Menendez that the defendant arranged before Menendez's meeting with Grewal (Tr. 1639-40); and a September 6, 2019 meeting between Uribe and Menendez that the defendant arranged after Menendez's meeting with Grewal (Tr. 1649-50).

The defendant's conduct was deeply corrosive to public confidence in the justice system. But again, she did much more.

### C.     The Bribery Conduct Related to Daibes's Federal Prosecution

The defendant's and Menendez's solicitation and receipt of cash and gold bars in exchange for Menendez's attempted intervention into Daibes's federal criminal prosecution were another abuse of Menendez's powers and assault on the integrity of the criminal justice system.

As an initial matter, the nature of the bribes—bank envelopes stuffed with cash and kilogram bars of gold—shows the defendant's and her co-defendants' awareness of, and lack of care for, the wrongfulness of their actions.  Daibes provided at least ten envelopes stuffed with cash, totaling over $80,000, to the defendant and Menendez, which they secreted in the defendant's safe deposit box and their shared residence—including in their bedroom closet, and in the pocket of one of Menendez's jackets hanging in the basement (in close proximity to hundreds of thousands of dollars of other cash, including cash wrapped with money bands showing it was not withdrawn from the defendant's or Menendez's bank accounts (*see* GXs 1F-1264, 1F-1266)).  (*See, e.g.*, GX 1338; GXs 1F-1164, 1F-1165, 1F-1188, 1F-1239, B201-1A, 3D-6.)  None of this was disclosed on Menendez's Senate financial disclosure forms as required, even though it was all provided during the course of the scheme and required to be disclosed.  (*See, e.g.*, GXs 10E-4, 10E-5, 10E-6, 10E-7.)

Although serving as an intermediary to surreptitiously collect bribes on behalf of a sitting U.S. Senator is serious enough conduct, the defendant did far more.  She assured Daibes that Menendez was fixated on influencing Daibes's case (GX 1354 row 133), and she lied to convert the gold from Daibes into a check from a jeweler that she could deposit in her bank account with nobody knowing that it traced back to Daibes (*see, e.g.*, Tr. 2155-56 (Vasken Khorozian testifying that defendant (falsely) told him gold bars came from her family); GX B201-1A (photograph from

defendant's cellphone of two one-kilogram bars taken shortly before meeting with Khorozian); GX 3D-6 (Daibes inventory listing serial numbers matching pictured kilogram gold bars).)

Menendez's attempt to influence the pending federal felony prosecution of Daibes in the District of New Jersey was a serious attempt to undermine the federal criminal justice system. Menendez raised the Daibes case—*alone* among individual cases—in what Menendez characterized as a job interview for the position of U.S. Attorney for the District of New Jersey, then changed his decision on whom to recommend as U.S. Attorney based on his beliefs about whether that candidate would have to be recused from supervising the Daibes prosecution. *See Menendez*, 2025 WL 2166135, at *13. Following the U.S. Attorney's eventual confirmation, Menendez continued attempting to influence the Daibes prosecution, including by asking his outside political advisor to raise the case directly with the U.S. Attorney—notwithstanding Menendez's knowledge that the U.S. Attorney was recused from the case. *See id.* at *14; *see also* Tr. 2356-57 (Menendez's political advisor testifying about secretly refusing to carry out this directive).

The fact that Menendez's attempt to influence Daibes's prosecution involved the abuse of his power, as the senior U.S. Senator from New Jersey, to recommend to the White House his preferred candidate for U.S. Attorney for New Jersey escalates the severity of the offense. And the fact that Menendez allowed corrupt motives to influence his recommendation—which recommendation was ultimately accepted and led to the confirmation of the U.S. Attorney— imparts far-reaching potential consequences to the offense conduct. Although the U.S. Attorney was not implicated in any of the offense conduct (or otherwise alleged or shown to have engaged in any wrongdoing) and was recused from Daibes's prosecution, the fact that the selection process

12

of the chief federal law enforcement officer for New Jersey—an individual who necessarily makes innumerable decisions in numerous cases over the course of their term—was corruptly influenced is nevertheless an extraordinary circumstance. No matter how qualified the U.S. Attorney, this conduct greatly, and unfairly, damaged public confidence in the administration of justice.

### D.    The Obstruction of the Grand Jury's Investigation

Compounding the seriousness of each of the above offenses, the defendant also spearheaded an endeavor to obstruct the grand jury's investigation and prosecution. After becoming aware that the FBI was actively investigating her conduct, including through the searches of her and her husband's residence, the seizures of their cellphones, and the service of multiple grand jury subpoenas, the defendant met with Uribe to come up with a cover story and then agreed with Menendez to generate falsified documents to be provided to the grand jury in an effort to thwart the grand jury's work. *See Menendez*, 2025 WL 2166135, at *17-18. These documents reinforced the very same cover-story that the defendant and Uribe came up with after being served with grand jury subpoenas, a lie Uribe acknowledged telling because he "thought [he] was going to get away with this." (Tr. 1678.) And further demonstrating the defendant's knowing obstruction and persistence in concealing her conduct, the defendant deceived her then-counsel into making false statements directly to the Government, including not just the false statements on the checks provided to the grand jury, but also her claims that Hana's payments on her mortgage and Uribe's payments on the Mercedes Convertible were loans and that Uribe helped pay for the Mercedes Convertible because the defendant was owed money for her work on a water project. (PSR ¶¶ 119, 123.)

Simply put, the defendant's commission of crimes was not an isolated and aberrational episode. It persisted not just for the four years leading up to the FBI's search of her home, but

even for months *after* she was aware she was under such scrutiny. And it was another attempt to pervert the fair and uniform administration of justice. *See, e.g.*, *United States v. Calandra*, 414 U.S. 338, 342-43 (1974) ("The institution of the grand jury is deeply rooted in Anglo-American history. . . . The scope of the grand jury's powers reflects its special role in insuring fair and effective law enforcement.").

## II.    The Presentence Investigation Report

The offense conduct summary set forth in the defendant's PSR is accurate.

The U.S. Probation Office recommends a 96-month sentence for the defendant, a downward variance from her 210- to 267-month Sentencing Guidelines range. (PSR at 74.) In making this recommendation, the Probation Office recognized the defendant's role as a "lynchpin to the entire conspiracy" and her "greed and willful disregard for ethics and laws that govern and guide our elected officials at the highest level," and noted, among other things, the amount of the bribes, the numerous simultaneous aspects of the bribe scheme, her long-term participation in the crimes, and her obstruction of justice as "significant aggravating factors" (*id.* at 75-76). The Probation Office balanced these factors against the defendant's age, difficult upbringing, history of abuse, history of health concerns, and lack of criminal history in arriving at an eight-year recommendation. (*See id.* at 76.)[2]

---

[2] As set forth in connection with the sentencing of the defendant's co-defendants, federal law provides several forms of time credits that likely apply, in whole or in part, to the defendant, which may be relevant to the Court in fashioning an appropriate sentence. (*See* Dkt. 690 at 23-27.)

## DISCUSSION

### I.    THE SENTENCING RANGE SET FORTH IN THE PRESENTENCE REPORT IS ACCURATE

#### A.    Applicable Law

A defendant's Guidelines range, including the amount of loss, is based on all relevant conduct for sentencing purposes.  *See* U.S.S.G. § 1B1.3(a) (specific offense characteristics shall be determined on the basis of relevant conduct).  Pursuant to Section 1B1.3(a), relevant conduct includes, in addition to acts committed, aided, or caused by a defendant:

> (B) in the case of a jointly undertaken criminal activity . . . all acts or omissions of others that were—
>> (i) within the scope of the jointly undertaken criminal activity,
>> (ii) in furtherance of that criminal activity, and
>> (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction [or] in preparation for that offense[.]

U.S.S.G. § 1B1.3(a)(1).

Thus "in order to hold a defendant accountable for the acts of others, a district court must make two findings: 1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the defendant."  *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995).  Those findings need only be supported by a preponderance of the evidence.  *See, e.g.*, *United States v. Lopez*, 768 F. App'x 19, 20 (2d Cir. 2019).  The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision."  *United States v. Moseley*, 980 F.3d 9, 29 (2d Cir. 2020) (internal quotation marks omitted).  Rather, "[i]n calculating the amount of loss under the Guidelines, a sentencing court 'need only make a reasonable estimate of the loss.'"  *United States v. Rigas*, 583 F.3d 108, 120 (2d Cir. 2009) (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)).

15

## B.    Discussion

The detailed and thorough PSR correctly calculates the applicable advisory Sentencing Guidelines range of 210 to 267 months' imprisonment. The calculation is overwhelmingly supported by the extensive trial evidence. The defendant, in attempting to dispute the applicable Guidelines range, resorts to unpersuasively relitigating matters amply proven at trial. In any event, even accepting all of the defendant's arguments about the applicable Guidelines range—which the Court should not—results in a Guidelines range of 121 to 151 months' imprisonment, which is well above the sentence recommended by both the Probation Office and the Government.[3]

### 1.    *Bribe Amounts Attributable to the Defendant*

The defendant seeks, in the guise of disputing the bribe amount, to relitigate the core facts that were established at trial and that form the basis of her guilt. (*See* Def. Mem. 4-11.) The defendant claims that the evidence only supports a loss calculation of approximately $400,000 rather than the "exaggerated" $884,778.39 figure laid out in great detail in the PSR. (*Id.* at 5.)

Although these efforts are not procedurally precluded by the jury's general verdict, they are substantively refuted by the extensive and damning evidence that the verdict was based on. The very evidence the Court already recognized provided sufficient evidence to support that verdict, *e.g.*, *Menendez*, 2025 WL 2166135, at *3, also supports the finding, by at least a

---

[3] Indeed, while the defendant's challenges to the Probation Office's calculation are wrong, the challenges need not be resolved by this Court if they would not affect the defendant's sentence. *See United States v. Borrego*, 388 F.3d 66, 70 (2d Cir. 2004) (A "court is not obliged to waste its time making [Guidelines] findings that would have no effect on the sentence."); *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (when a sentencing dispute has no bearing on the determination of a sentence, courts need not rule on disputed offense level adjustments).

preponderance of the evidence, that the bribes specified in the PSR were provided and that they

were bribe payments attributable to the relevant portions of the scheme.

> a)      Hana's Promised $120,000 Annual Salary to the Defendant Is
> Correctly Included in the List of Items of Value Promised to the
> Defendant

The defendant first contends that the loss calculation for her salary should only be $30,000

rather than $120,000.  (Def. Mem. 5.)  The defendant claims that the annual salary of $120,000 is

"completely unsupported by any evidence" and that she, in fact, "never anticipated that salary."

(*Id.* at 5-6.)  In support of her argument, the defendant argues that the two versions of IS EG Halal's

consulting agreement with Strategic International Business Consultants, LLC, were not executed,

that an earlier version of the agreement, GX 4C1-O, did not contain an annual term of employment,

and that the later version of the agreement, GX 3C-9, contemplated a three-month term.  (*Id.* at 5.)

The defendant is wrong that the loss calculation should include only $30,000 for the salary

she received for her sham consulting job with IS EG Halal.  The Guidelines instruct that "[l]oss is

the greater of actual loss *or intended loss*," U.S.S.G. § 2B1.1(b)(1)(A) (emphasis added), and the

evidence clearly shows by a preponderance that the defendant intended at least a $120,000 "salary"

from Hana as part of the scheme.[4]  Her intent is shown in multiple communications over a period

of months:

- March 26, 2019 text from the defendant to Howard Dorian stating, "I am willing to give 100% and make sure this goes skyhigh on condition that I start getting *my $ 2500/week* and health benefits and Will keeps his promises."  (GX 1352 row 461 (emphasis added)).

---

[4] If anything, by limiting this to a single year when the evidence does not suggest the corrupt agreement was intended to end after one year, this calculation *undercounts* the loss.

- August 12, 2019 contract for $10,000 per month, drafted by the defendant with no end date, and backdated to begin on May 1, 2019. (GX 4C1-O; *see also* Tr. 462 (John Moldovan testimony that he scanned it soon after receiving it from the defendant).)

- September 23, 2019 text from the defendant to Daibes, asking Daibes to have Hana leave the defendant's check in an envelope for her to pick up, and stating "hopefully *starting November1sr* [sic] he will do it automatically" (GX 1352 row 967 (emphasis added)).

As these messages show, the defendant intended to be paid approximately $10,000 per month (or $2,500 per week, which would be slightly higher) for not just three months but on an ongoing basis. Indeed, she told Daibes that beginning on November 1 ("starting November1sr") she hoped Hana would pay her automatically without her needing to involve Daibes—a statement that would make no sense if she intended to receive only three payments from Hana (of which the November payment was the third (*see* GX 1352 rows 919, 989, 997)). The defendant's intent was also consistent with Hana's expectation, shown in the May 28, 2019 text message to his Egyptian contact "HH HH," in which Hana listed the defendant's salary and title as "120 k Vice president." (GX 1352 row 682.) That the IS EG Halal checks to the defendant stopped after only three checks—after Hana's residence was searched on November 25, 2019 by the FBI (*see* Tr. 546)— does not alter the defendant's intent before that date to receive ongoing payments for at least one year.

The defendant points to GX 3C-9, the unexecuted contract drafted by Moldovan, which included a three-month term. But not only was the contract never signed, but also the defendant and Hana never abided by its terms; for example, that contract called for payment "at the culmination of" each month, yet the defendant was paid—as she had requested—at the beginning of each month. (*See, e.g.*, GX 5A-1001B (check dated 9/28/2019 with memo "October payment WH/NA").) And although the contract drafted by Moldovan stated it would begin in August 2019,

the defendant's handwritten ledger to Daibes of what she believed she was owed by Hana (*see* GX 1352 rows 969, 973) included payments going back to May 1 (consistent with the backdated contract, without any term limits, she had drafted), showing her intent to be paid for more than just a three-month term.  Furthermore, Moldovan described the three-month term as a "probation term" or "review period" that he had used in prior contracts for IS EG Halal to allow the company "to see and assess whether or not the person was a good fit for the company."  (Tr. 467.)  Therefore, even under the contract drafted by Moldovan, there was no expectation that the employment would end after three months.  In any event, *Moldovan's* intent is irrelevant to the Guidelines loss calculation for the defendant; *the defendant's* intent, clearly communicated to multiple people, was to receive $120,000 per year (for at least one year), and therefore $120,000 is a well-supported, and conservative, amount of intended loss for the Guidelines loss calculation.

> b)    The Two Bags Containing $95,000 and $100,000 in Cash Are Correctly Included in the List of Items of Value Received by the Defendant

The defendant next claims that the calculation of the bribery benefit incorrectly includes two bags that contained $95,000 and $100,000 in cash found in the basement of the defendant's home.  (Def. Mem. 6.)  She claims that the Government has failed to meet its burden to prove that these bags of cash were bribe payments "attributable to the relevant schemes."  (*Id.* at 7.)

The defendant's objection to the inclusion of this cash in the bribery scheme should be rejected (to the extent it is even reached, which it need not, given that the amount of cash at issue would not change the defendant's Guidelines range in any event).  The bags with $95,000 and $100,000 in cash that were found in the basement were not included in the list of items of value received by the defendant and Menendez based merely on proximity to the bribe cash found in one of Menendez's jackets, as damning as that fact alone is.  (*See, e.g.*, GXs 43, 1F-1259, 1F-1264,

19

1F-1265, 1F-1266; Tr. 252 (describing the yellow plastic bag containing $95,000 as "[j]ust a few inches away" from the jackets that had cash in them).)  It was included because of the highly damning facts regarding the packaging and amounts of the cash which easily support a finding by a preponderance of the evidence that this cash was attributable to the scheme.  Not only were the two bags of cash that the defendant disputes found in close proximity to one of the envelopes with Daibes's fingerprints and one of the envelopes with Nader Moussa's fingerprints (GX 16A-1 at 3, 10; GX 1338 row 1; PSR ¶ 42(vi)), but they also included large amounts of cash wrapped in money bands indicating the cash was withdrawn from a bank at which neither the defendant nor Menendez maintained accounts, during a critical period in the scheme when Daibes was finalizing a plea agreement and providing more gold to the defendant and Menendez.  (GX 2461 (describing the defendant's JPMorgan Chase depository account being closed in January 2022); Tr. 2022-23 (same); GX 1F-1266; Tr. 253 (April 2022 dates on the money bands)).

Contrary to the apparent premise of the defendant's argument, circumstantial evidence such as this can readily suffice to prove the proceeds of a bribe scheme.  "As this Court has previously explained, 'evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions.'"  *Menendez*, 2025 WL 2166135, at *32 n.31 (quoting *Menendez*, 759 F. Supp. 3d at 477); *see also Menendez*, 2025 WL 2166135, at *32 (describing the Government as "well within its rights to present a circumstantial case"); *United States v. Monk*, 418 F. App'x 5, 6 (2d Cir. 2010) ("In deciding upon a sentence, a district court has the discretion to rely on the wide array of

facts available, including circumstantial evidence, and information set forth in the pre-sentence report.").[5]

          c)      <u>The Value of the Two Additional One-Kilogram Gold Bars that the Defendant Sold In Approximately June 2022 Are Correctly Included In the List of Items of Value Received by the Defendant</u>

The defendant claims that the "bribery benefit must be reduced by another $117,283 attributable to alleged loss that has no evidentiary connection to the relevant conduct."  (Def. Mem. 8.)  She claims that the two additional one-kilogram gold bars that the defendant sold for $117,283 should not be included because the Government's argument appears to rely on "temporal proximity."  (*Id.*)  The defendant is wrong that the two additional bars should not be included.

At trial, the jury heard evidence that the defendant possessed and sold multiple one-kilogram gold bars that came from Daibes, and these challenged bars were sold during the exact same time period.  In particular, in or about late March 2022, the defendant, in selling two one-kilogram gold bars, falsely told Khorozian that they came from a family member, when in fact they came from Daibes.  (*See, e.g.*, Tr. 2155-56 (Khorozian testifying that defendant told him gold bars came from her family); GX B201-1A (photograph from defendant's cellphone of two one-kilogram bars taken shortly before meeting with Khorozian); GX 3D-6 (Daibes inventory listing serial numbers matching pictured kilogram gold bars).)

In or about late May 2022, Daibes gave Menendez at least one *additional* one-kilogram gold bar.  (*See* GX 1354 rows 220-229 (Menendez and Daibes arranging to meet and meeting at a

_____

[5] Of course, contrary to the defendant's claim (*see* Def. Mem. 7 n.4), the Government is not contending that the Court's prior finding that these precise bags of cash were in fact bribe money in sentencing Menendez (*see* Dkt. 738 at 6 (adopting the findings of fact as set forth in Menendez's PSR)) is binding on the Court in sentencing this defendant.  But though not binding, that prior finding was manifestly *correct* based on the evidence, which compels the same conclusion here.

restaurant on May 26, 2022); *id.* row 230 (Menendez googling "one kilo gold price" approximately three hours after meeting Daibes).)  In or about June 2022, the defendant sought to and did sell two one-kilogram gold bars—the two that the defendant now claims are unrelated to all of the other gold bars—again with Khorozian's assistance.[6]  (Tr. 2185-86; GX 5A-5001C (June 14, 2022 check to the defendant for one one-kilogram gold bar); GX 5I-603A (June 16, 2022 check to the defendant for one one-kilogram gold bar).)

Finally, when the FBI searched the defendant's house on June 16, 2022, agents found two *more* one-kilogram gold bars, each of which was from Daibes.  (*See, e.g.*, GXs 1F-1164, 1F-1239; GX 1339 rows 1-2; Tr. 161-62, 165.)

Given this striking temporal proximity, it is a far more than fair inference that the two one-kilogram gold bars that the defendant sold through Khorozian in or about June 2022 were one-kilogram gold bars provided by Daibes.  Unlike those sold in March 2022, these two gold bars were not photographed by the defendant so the serial numbers are unknown, but their sale aligns with Menendez's search for "one kilo gold price" just after meeting Daibes in late May.  The Court correctly found in sentencing Menendez that these two gold bars were provided by Daibes—and not (as the defendant would have it) from some other source unrelated to the source of the kilogram gold bars the defendant had sold several months before or kept in her house weeks after.

---

[6] At the defendant's trial, Khorozian testified that the defendant brought those two one-kilogram bars of gold to him to sell in or about June 2022.  (*See* Tr. 2185 ("Q. Approximately when did she bring this third set of gold to you?  A. June 6.  Q. Of 2022?  A. Don't hold the date against me, but yes.").)  At the trial of her co-defendants, Khorozian had testified that the defendant sought his assistance in selling this gold in or about the middle of May 2022, although he was not sure of the precise date.  (*See* Menendez Tr. 5112 ("Q. Approximately when was that? Approximately.  A. It has to be -- sometime in middle of May. I'm not sure.  Q. Is your best estimate here right now, sir, middle of May?  A. Possibly yeah. I'm not sure.").)

Accordingly, the extensive and detailed evidence presented at trial provides overwhelming support for an inference, by at least a preponderance of the evidence, that $117,283, representing the amount for which the defendant sold the two additional one-kilogram gold bars, is properly included in the PSR, and thus that the loss amount is correctly calculated.

d)    <u>The Ten Envelopes of Cash from Daibes Are Correctly Included In the List of Items of Value Received by the Defendant</u>

The defendant asserts that the $82,500 found in ten envelopes of cash with Daibes's fingerprints and/or embossed return address (as well as DNA) has "only an attenuated connection" to the defendant and must be excluded, in part because "the cash relates to the Qatar scheme for which there is insufficient evidence" of the defendant's involvement. (Def. Mem. 8.) Not so.

At the defendant's trial, the Government proved that Daibes provided the defendant and Menendez at least ten envelopes of cash bearing Daibes's fingerprints or Daibes's return address, containing a total of $82,500 (s*ee* GX 1338), and that those envelopes of cash were tied to the bribery conduct related to the federal prosecution of Daibes. Serial number analysis on these envelopes established that the envelopes all had to have been provided at some point between August 24, 2020 and June 16, 2022—*i.e.*, during the period of the scheme. (*See id.*; *see also* Tr. 2461-62.) This temporal proximity powerfully supports the inference that these things of value were connected to the scheme, as this Court reasoned in rejecting a similar argument from Daibes. *See Menendez*, 759 F. Supp. 3d at 495 (rejecting sufficiency challenge, writing, "Daibes gave several envelopes of cash, at least thirteen gold bars, and participated in the delivery of three bribery payments from Hana to Menendez, among other things. Moreover, Daibes made these deliveries *during the course of the scheme*." (emphasis in original)).

23

In a baseless effort to reduce her Guidelines, the defendant tries to claim that the envelopes of cash related *only* to Qatar, a claim that is divorced from the trial record and that all but seeks reconsideration of the Court's holding that the evidence sufficiently proved the New Jersey U.S. Attorney conduct. *See Menendez*, 2025 WL 2166135, at *13 ("The jury heard sufficient evidence to find that Menendez took or promised to take an official act in exchange for things of value for him and defendant, *including cash* and gold bars." (emphasis added)). But at the trial of her co-defendants—which is all that the defendant here relies on—the evidence established that Daibes provided the envelopes of cash for action or promises of action related *both* to the New Jersey U.S. Attorney *and* to Qatar. *Menendez*, 759 F. Supp. 3d at 492.[7] This dual purpose alone refutes the defendant's argument here, since even if those bribes were *partially* motivated by Daibes's attempts to solicit a Qatari investment, they were also motivated by the desire to influence Daibes's federal prosecution, which is sufficient under the law. *See, e.g.*, *United States v. Calk*, 87 F.4th 164, 181 (2d Cir. 2023) (citing cases). (*See also* Tr. 3080-81 (Court instructing the jury, "[a] defendant may be found to have the requisite intent even if she possessed a dual intent—that is, an unlawful intent and also partly a proper or neutral intent.").)

---

[7] As the Court is aware, in an effort to streamline its presentation of the evidence against the defendant, the Government did not present evidence relating to Qatar at her trial. The Government did, however, present evidence relating to Qatar at the trial of her co-defendants over which the Court presided and at which a jury convicted her co-defendants of the relevant counts. It is well within the Court's discretion to consider such evidence. *See, e.g.*, *United States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal."); *United States v. Severino*, 114 F. App'x 428, 430-31 (2d Cir. 2004) (considering evidence from co-defendant's trial in sentencing defendant); *United States v. Cherry*, 541 F. Supp. 3d 407, 411-17 (S.D.N.Y. 2021) (same); *see also, e.g.*, *United States v. Sisti*, 91 F.3d 305, 312 (2d Cir. 1996) ("The sentencing court's discretion is largely unlimited either as to the kind of information it may consider, or the source from which it may come." (internal quotation marks omitted; alteration incorporated)).

2. *The Defendant's Role as a Manager or Supervisor*

Contrary to the defendant's arguments (*see* Def. Mem. 9-11), the Probation Office properly applied the three-point leadership adjustment under U.S.S.G. § 3B1.1(b).  The trial evidence amply shows that the defendant managed or supervised the activities of Uribe and Hana by recruiting them to parts of the scheme and exercising a degree of control over them.  (*See* PSR ¶ 133; *id.* at 71-72.)

As the Sentencing Guidelines explain, a defendant qualifies for this adjustment if she was the "organizer, leader, manager, or supervisor of one or more other participants."  U.S.S.G. § 3B1.1, Application Note 2.  "A defendant may properly be considered a manager or supervisor if he 'exercise[d] some degree of control over others involved in the commission of the offense . . . or play[ed] a significant role in the decision to recruit or to supervise lower-level participants.'" *United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003) (quoting *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002)).  "It is enough to manage or supervise a single other participant."  *Id.* (citing *United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir. 1995)); *see also United States v. Garcia*, 413 F.3d 201, 223 (2d Cir. 2005) ("a defendant need only manage or supervise a single other participant to warrant a § 3B1.1(c) enhancement" (internal quotation marks omitted)).  "Once this management or supervision is found, the adjustment is mandatory."  *Burgos*, 324 F.3d at 92 (citing *United States v. Jiminez*, 68 F.3d 49, 51-52 (2d Cir. 1995)).

With respect to the bribery and foreign influence conduct related to Egypt, while the defendant did not recruit Hana into this portion of the scheme, she supervised him by, among other things, demanding when, how, and how much he should pay her.  The defendant's supervision with respect to this part of the scheme was not limited to Hana; she also supervised Daibes and Uribe by enlisting them to induce Hana into making the payments to bring her mortgage current.

25

(*See, e.g.*, PSR ¶¶ 133(c)(ii)-(iii); *see also* PSR ¶ 133(c)(iv) (defendant complaining to Daibes that Hana was not paying her and Hana issuing a $10,000 check the next day).)

As to the bribery conduct related to the New Jersey state criminal matters, contrary to the defendant's suggestion (Def. Mem. 9-10), the Government never contended that she initiated this portion of the scheme. She did, however, recruit Uribe to participate more actively and also supervised both Hana and Uribe. In particular, while Uribe had participated in conversations and reached an agreement with Hana, Parra, and Bienvenido Hernandez (Tr. 1592), the defendant recruited Uribe into a more active phase of participation by soliciting him to pay for the Mercedes Convertible (*see* GX 1353 row 355 (defendant calling Uribe for 21 minutes and 57 seconds); Tr. 1517-20 (Uribe testimony about that call); GX 1324 rows 1-3 (Uribe texting Fernando Barruos to ask if Barruos had made the "car payment last month"); Tr. 1627-32 (Uribe testifying that the defendant called him about a late payment for the Mercedes Convertible and Uribe calling Barruos to make the payment).)

That the Government described the defendant as a "go-between" (Def. Mem. 10) does not negate her role as a manager or supervisor. The defendant—with direction from Menendez—controlled Uribe's and Hana's access to Menendez. She was the middleman, acting as a gatekeeper to Menendez, directing them where and when to meet, and demanding bribe payments. For example, she texted Uribe to come to her house to meet with Menendez in advance of Menendez's meeting with Grewal (GX 1353 rows 921-24), and then after the meeting, directed Uribe to go to Menendez's apartment building to meet with Menendez (Tr. 1649). And after Uribe continued to make car payments and repeatedly send texts following up on the status of his effort to obtain "peace," the defendant was responsible for Menendez giving Uribe his "peace" despite the fact

26

that nothing had changed in connection with the New Jersey Attorney General's investigation. (*See, e.g.*, GX 1353 rows 996-99, 1002-6; Tr. 1657.)

The defendant's recruitment of Uribe was not limited to the bribery conduct related to the New Jersey state criminal matters, but also extended to the obstruction of justice offenses. The defendant sent an associate into Uribe's office to summon Uribe outside so that they could meet and get their stories straight. (*See* Tr. 1673-77 (Uribe testifying that a man he had never previously met came into his office and led him to meet with the defendant waiting in a car outside, precipitating a meeting later that day in which the defendant asked Uribe what he was going to say if the FBI asked why he was making payments on her car).)

The defendant argues that she could not have exercised control over Hana or Uribe because Hana and the defendant were "long-time friends" who "treated each other as equals" and because Uribe referred to the defendant as "hermana," "indicating the closeness of their relationship." (Def. Mem. 10.) In addition to citing no case imposing any legal standard corresponding to this argument, the defendant's claims are belied by the record, which made clear that the particular terms of address used did not determine the power relationship between the co-conspirators. (*See, e.g.*, Tr. 1589-90 (Uribe describing Hana and the defendant as friends who are "always mad at each other" and Hana complaining that the defendant "only cared about money"); Tr. 1486, 1498 (Uribe describing the defendant as an acquaintance); Tr. 1566 ("Q. And do you typically refer to people as sister, or is that unique to her? A. I refer to people as sisters, brothers, and other family members as they get close to me."); Tr. 1606 (Uribe testifying that he was not close to the defendant before the spring of 2019, but by July 2019, "after we entered into this agreement, we

27

have some interactions.  I'm coming through with my promises.  I got hope that she's going to come through with her promises.  And we started calling each other brother and sister.").)[8]

## II.    A SUBSTANTIAL SENTENCE OF IMPRISONMENT IS WARRANTED

In light of the egregious and unique conduct in this case, a substantial sentence of imprisonment of at least 84 months is warranted.

### A.    Discussion

1.    *The Defendant Should Receive a Sentence of At Least 84 Months' Imprisonment*

The defendant's offenses, and how they were committed, require a substantial sentence. However, the Government does not believe that a Guidelines sentence is necessary in the circumstances of this case.  Rather, based principally upon the defendant's age, history of health conditions, and personal circumstances, as well as the sentences imposed on her co-defendants, a meaningful downward variance would be reasonable.  In order to reflect the seriousness of the offenses, afford deterrence, and promote respect for the law, the defendant should receive a sentence of at least 84 months' imprisonment.

a)    <u>The Nature and Circumstances of the Offenses</u>

As described above, the defendant sought to—and did—participate in the corrupt sale of a high-ranking United States Senator's office.  The offenses in this case involved a series of attempts to corruptly abuse the core sovereign powers of the state (whether the United States or New Jersey) regarding law enforcement and foreign relations.

---

[8] Notably, the defendant has pivoted from her prior objection to the PSR that she could not have controlled Hana or Uribe because "her exchanges with them were fraught with conflict."  (PSR at 71.)

The defendant started participating in this wide-reaching corruption and foreign influence scheme almost immediately after she first started dating Menendez. According to a text message sent by her close friend Antranig Aslanian, the very day after the first date between the defendant and Menendez, the defendant and Hana met and discussed ways in which her relationship with Menendez could result in a paycheck for her. (*See* GX 1352 row 30; *see also, e.g.*, *id.* rows 12-28.) The defendant acted as the go-between, communicating with Hana and passing messages to Menendez, all in exchange for the defendant's and Menendez's promises to use Menendez's power and office in exchange for bribes. The defendant was an integral part of setting up the initial meetings with Egyptian officials (*see, e.g.*, GX 1352 rows 33-40, 46-54, 61-77, 140-55, 199-237, 242-73, 289-91), and providing information, advocacy, and promises of assistance for the Egyptian government (*see, e.g.*, GX 1352 rows 87-108, 128 (Embassy information); *id.* rows 109-27 (information regarding Senator-1 holds); *id.* rows 132-39, 182-90 (ghostwritten letter); *id.* rows 158-80 (small arms ban lifting), *id.* rows 296-317 (promise to approve sale of tank ammunition)).

Indeed, as part of this part of the scheme, the defendant not only promised actions, but also helped arrange and prepare Menendez for his call with Under Secretary McKinney, a call in which Menendez attempted to pressure McKinney to stop fighting against the unwarranted monopoly granted to Hana. (*See, e.g.*, GX 1352 rows 624-47.) And this was no mere theoretical dispute. The monopoly harmed not just Egyptian consumers, but also U.S. certifiers forced out of the business and U.S. exporters, which faced the prospect of a diminished export market because they were forced to pass on Hana's exorbitant fees to price-sensitive consumers. The defendant and Menendez's promises to and Menendez's attempt to pressure the USDA to acquiesce to Hana's

monopoly, done hand-in-hand with the defendant to make sure that they got paid at the expense of the country, were reprehensible.

The defendant also conspired with Menendez and Hana for Menendez to secretly act as a foreign agent. The defendant worked closely with Menendez and Hana to help ensure that Menendez assisted intelligence and military officials of a foreign government, which had a long and controversial human rights record, in opposing Menendez's own colleagues who were raising human rights concerns. As just one example, the defendant arranged for Menendez to meet with Egyptian intelligence officials at a hotel in a secret meeting that Menendez's staff did not know about (GX 1352 rows 1071-73), sent an Egyptian intelligence official an article she received from Menendez about how his then-fellow U.S. Senators were planning to ask about Egypt's involvement in a reported human rights abuse (*id.* rows 1074-75), and then explained that she was sending that article along so that the director of Egyptian intelligence could "prepare [his] answers" and "rebuttals" (*id.* rows 1076-84).

The defendant's corrupt promises that Menendez would attempt to influence and obstruct multiple felony criminal matters, including two pending charged cases, were similarly deliberate. Her promises alone were inherently and gravely serious conduct. But far from merely promises, the defendant repeatedly arranged for and briefed Menendez for actual attempts to pressure the chief state law enforcement officer of New Jersey in an attempt to disrupt pending criminal matters. And the defendant, motivated by her naked greed, picked up $15,000 in cash in a parking lot, had Uribe pay her monthly car payments, and collected one-kilogram gold bars from Daibes in connection with her corrupt promises related to his federal prosecution. The defendant's conduct lays bare the low regard in which she held the criminal justice system.

Exacerbating the defendant's already serious conduct was the series of deliberate lies she told to conceal and perpetuate it. The defendant lied to Mercedes-Benz Financial Services about her job and income to hide that Uribe was going to pay for the car (GXs 7E-1, 2436). She lied to Khorozian about who the one-kilogram gold bars were from, telling him they were from a family member to conceal the fact that they were from Daibes. (*See* Tr. 2155-56; GXs 3D-16, B201-1A.) She lied on her federal tax returns to hide the bribe payments she was receiving from Hana. (Tr. 1804-05; GX 2436). And she agreed to lie to the FBI if asked why Uribe was making the payments on her Mercedes Convertible (Tr. 1673-77), and put those lies to paper in writing supposed repayment checks that were submitted to the grand jury to try to cover up her crimes. (GXs 3B-1-EM, 3B-1A.)

In short, a substantial term of imprisonment is needed to reflect the defendant's egregious and repeated conduct, which involved multiple serious aggravating factors. This scheme unfolded over many years and numerous criminal transactions; it spanned a variety of subject matters; the defendant played a significant leading role in managing or supervising it; she reaped a substantial monetary benefit from it; she used sophisticated, deliberate, and deceptive means, including outright lies, to conceal the scheme while it was ongoing; and she obstructed justice in order to conceal it after being approached by the FBI.

As the Government has explained in prior written submissions and at prior sentencings in this case, what the defendant agreed to do and repeatedly did undermines the foundational principle that public officials should act solely in the interest of the public good, not their financial interest. *See, e.g.*, *United States v. Silver*, No. 15 Cr. 93 (VEC) (July 27, 2018) (ECF No. 460, Sent'g Tr., at 42) ("[C]orruption is a crime that does not just victimize individuals and does not just take

31

money wrongfully from the public fisc. Corruption attacks the very heart of our system of government. The doubt that many Americans harbor about whether our public servants are operating in their own interests or whether their vote is available for purchase to the highest bidder is magnified every time a politician is revealed to be corrupt."); *United States v. Rupnarain*, No. 24 Cr. 125 (VEC) (S.D.N.Y. Aug. 5, 2024) (ECF No. 28, Sent'g Tr., at 25) (corruption is "one of the most serious of all federal offenses," because "[t]his country cannot exist if the public does not trust that public officials are operating as servants of the people and not corruptly for their own personal gain"); *id.* at 26 ("I think society expects public corruption to be treated seriously and for corrupt officials to be punished."); *United States v. Figueroa*, No. 22 Cr. 605 (DLC) (S.D.N.Y. Feb. 9, 2023) (ECF No. 27, Sent'g Tr., at 17) ("[C]orruption is a corrosive, destructive issue. People need to have faith in their government."); *United States v. Costanzo*, No. 22 Cr. 281 (JPO) (S.D.N.Y. Apr. 24, 2024) (ECF No. 253, Sent'g Tr., at 54) ("There are a lot of countries around the world where this sort of corruption is routine, it's part of life, everyone expects it. One of the things that sets our country apart, at least in our aspirations and our ideals, is to be free of this sort of corruption.").

It is difficult to quantify the damage that the defendant did. But the damage caused by corruption is real. The defendant's sentence must account for it.

b)    The History and Characteristics of the Defendant

In her sentencing submission, the defendant seeks a sentence of imprisonment of only a year and a day, based on her background and characteristics, including alleged difficult childhood experiences; her history of health conditions, including a ███████; her ongoing fight with breast cancer; alleged ██████████ challenges; and charitable work. (*See* Def. Mem. 11-19.) The Government considers the defendant's age, health conditions, and personal circumstances to be

32

mitigating factors that support a meaningful degree of leniency, although not the extraordinary leniency she seeks (*see id.* at 1, 4, 13-14, 25). While the Court can and should consider these and all other case- and defendant-specific factors in imposing sentence, none of these factors explains the defendant's deliberate, repeated, and gravely serious conduct, much less excuses it, and none supports the extraordinary sentence she seeks.

The alleged difficult circumstances of the defendant's upbringing do not justify or explain away her conduct in this case. To be sure, the Government is sympathetic to the defendant's claims about her childhood, but those experiences decades ago did not impede the defendant from attending college or obtaining a master's degree. Nor do the defendant's childhood experiences explain her criminal actions in her 50s. Numerous people have experienced difficult childhoods without repeatedly engaging in corruption, foreign influence, and obstruction offenses decades later. As the Court is well aware, many defendants have suffered challenges in their childhood or early adulthood, yet still are sentenced to prison. Likewise, while the defendant's alleged ███████ ███████ challenges and experiences with physical and emotional abuse, including a ███████, should be taken into account by the Court, they do not excuse or explain the defendant's actions.[9]

---

[9] The cases the defendant cites in this portion of her submission in support of her requested sentence (Def. Mem. 14) are inapposite and do not support the leniency she seeks. *See United States v. Gonzalez*, No. 03 Cr. 285 (RWS), 2004 WL 230992, at *5-6 (S.D.N.Y. Feb. 5, 2024) (sentencing defendant—who witnessed his father brutally murder a man, had post-traumatic stress disorder ("PTSD"), suffered head trauma from a fall which "likely resulted in further brain damage and further impairment of his cognitive capacities," was illiterate, and had "limited intellectual functioning"—to 10 months' imprisonment where Guidelines range was 6 to 12 months' imprisonment after two-level downward departure); *United States v. Cantu*, 12 F.3d 1506, 1509, 1513, 1517 (9th Cir. 1993) (remanding case for resentencing because district court erred in ruling it lacked discretion to award defendant a departure under § 5K2.13 and noting that defendant's PTSD "contributed to the commission of his offense" where defendant, who pled guilty to possessing a firearm after a felony conviction, suffered from PTSD from combat experience in

The defendant argues that a sentence of a year and a day is justified because of her health conditions, most significantly, her "ongoing struggle with breast cancer," and the medical care she expects in Federal Bureau of Prisons ("BOP") custody.  (Def. Mem. 14-16.)  The Court can and should take these factors into account, just as the Government has in recommending a significant variance from the applicable Guidelines range.  But while these factors may counsel in favor of less time in prison than recommended by the Guidelines, they do not justify the extraordinary leniency the defendant seeks.  In any event, the BOP has reviewed medical records provided by the defendant and has concluded that it can properly treat her medical conditions.  (*See* Ex. A at 3 ("Based on the information provided to me and my knowledge of the BOP's medical resources, the BOP will be able to provide appropriate care for Ms. Menendez should she be sentenced to a term of incarceration and committed to the custody of the BOP.").)  The BOP did, however, recommend that the defendant "complete the planned ███████ surgery prior to self-surrender to maintain continuity of care."  (*Id.*)  To that end, while, as of the date of the Government's sentencing submission, the breast cancer-related surgeries referenced in her sentencing submission and related exhibits have not yet been scheduled, the Government does not object to the Court

---

Vietnam, which resulted in him having a "fixation on and reliance on weapons for feelings of personal security and safety"); *United States v. Allen*, 250 F. Supp. 2d 317, 321-22 n.4 (S.D.N.Y. 2003) (finding that an eight-level departure was warranted based on the defendant's "mental age and his functioning as a juvenile" where defendant was "in the borderline range with respect to intellectual capacity" and "suffer[ed] from a number of personality defects, the most striking of which is his immaturity," resulting in a Guidelines range of 30 to 37 months' imprisonment and sentencing defendant to 30 months' imprisonment); *United States v. Armstrong*, No. 21-8075, 2022 WL 1040277, at *1-2 (10th Cir. Apr. 7, 2022) (affirming imposition of consecutive sentences of 86 months and 60 months for drug and firearm offenses where defendant, whose Guidelines range was 100 to 125 months' imprisonment, suffered trauma from childhood sexual abuse when he was repeatedly sexually abused at the age of approximately five or six years old and introduced to drugs by his abuser).

setting a surrender date certain that is sufficiently far after sentencing as to allow the defendant—
if she so chooses—to promptly schedule and to complete the recommended surgeries and recovery
prior to commencing her sentence.[10]

The defendant also requests that the Court take her charitable work into account (*see* Def.
Mem. 17-19), but fails to make a showing of charitable works that would warrant a meaningful
downward variance.  *See United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (looking
to "exceptional degree" of public service and good works); *cf.* U.S.S.G. § 5H1.11 ("Civic,
charitable, or public service; employment-related contributions; and similar prior good works are
not ordinarily relevant in determining whether a departure is warranted.").[11]  The defendant's
charitable acts are of course commendable, but do not come close to the extraordinary level that
renders them worthy of the leniency she seeks.  That is for good reason.  The law is reticent to
show leniency to the few defendants who are fortunate enough to have the resources—in time,
money, social standing, or power—to perform such deeds.  *See, e.g.*, *United States v. Vrdolyak*,
593 F.3d 676, 682 (7th Cir. 2010) ("Wealthy people commonly make gifts to charity.  They are to
be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card.");
*United States v. Ali*, 508 F.3d 136, 149 & n.17 (3d Cir. 2007) (charitable service is "evaluated with

---

[10] The defendant cites an "outpatient surgery . . . to address long-standing issues with her nasal
passages that affect her breathing."  (Def. Mem. 14 n.9.)  The Government understands from
counsel to the defendant that this surgery will take approximately 3 hours and is scheduled for
November 13, 2025.  Accordingly, this surgery does not affect the Government's recommendation
related to the defendant's surrender date.

[11] *Canova* is instructive whether this Court considers this factor under the Guidelines or
Section 3553(a).  In the appeal in that case, the initial question was whether the defendant qualified
for a departure under the Guidelines.  *Canova*, 412 F.3d at 358.  But because *Booker* had been
decided between the defendant's sentencing and appeal, and because the Circuit remanded to the
district court on other grounds, the Circuit discussed the propriety of considering the defendant's
public service both under the Guidelines and under Section 3553(a).  *Id.* at 358-59 & n.29.

reference to the offender's wealth and status in life" because defendants "who enjoy sufficient income and community status . . . have the opportunities to engage in charitable and benevolent activities." (citations and quotation marks omitted)); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (prominent community member's public service and charitable activities provided no basis for departure, because although "laudable," they were "neither exceptional nor out of the ordinary for someone of his income and preeminence in a small Minnesota town with a population barely over a thousand."); *United States v. Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure warranted where a defendant's "community works," while "significant," are "not unusual for a prominent businessman"); *United States v. McHan*, 920 F.2d 244, 247 (4th Cir. 1990) ("[T]o allow any affluent offender to point to the good his money has performed . . . suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced. The very idea of such purchases of lower sentences is unsavory[.]"); *Vrdolyak*, 593 F.3d at 683 (quoting *id.*); *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) ("[W]hite collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate and rise to prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social and economic advantages could enable them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence.").

c)    The Purposes of Sentencing

Taking the many serious aggravating factors in conjunction with the mitigating factors of the defendant's age, health conditions, and personal circumstances, a term of incarceration of at least 84 months, which is a substantial downward variance from her 210- to 267-month Guidelines

range, and which is further subject to likely applicable time credits (*see* Dkt. 690 at 23-27), strikes the appropriate balance of accounting for certain personal factors while also reflecting the severity of the defendant's offenses and the powerful need for general deterrence.

In view of the gravity of the offenses, a sentence even remotely approaching the defendant's request for a sentence of a year and a day (Def. Mem. 1, 4, 13-14, 25) would not promote respect for the law or provide for meaningful general deterrence. In seeking a lower sentence (Def. Mem. 22-24), the defendant cherry-picks inapposite examples in which courts imposed different sentences based on very different facts. *See, e.g., United States v. Zukerman*, 897 F.3d 423, 430 (2d Cir. 2018) ("[The defendant's] arguments based on aggregated sentencing data and vague summaries of other cases are unconvincing. The relevant question is not simply whether there are disparities, but whether there are unwarranted sentence disparities as between [the defendant] and others with similar records who have been found guilty of similar conduct. The point merits little discussion because [the defendant] failed to provide sufficient information to compel the district court to find that these other defendants were so similarly situated to himself that any disparity in sentence would be unwarranted." (internal quotation marks, brackets, and citation omitted)).

None of the cases the defendant briefly cites (Def. Mem. 22-24) remotely establishes that the Government's requested sentence in this case would create any unwarranted disparity. *See Zukerman*, 897 F.3d at 430. None involves (i) the corrupt abuse of a Senate committee leadership position (or of any Senate position at all); (ii) a corrupt attempt to influence the nation's foreign policy; (iii) a corrupt attempt to influence a state felony prosecution; (iv) a corrupt attempt to influence a federal felony prosecution; or (v) an agreement for a public official to serve as an agent

of a foreign power—let alone all five of those aggravating factors together.  Even leaving this aside, the Government's recommended sentence would not create any unwarranted disparity with those imposed in each of the very different cases referenced by the defendant.  Adam Skelos (*see* Def. Mem. 22) received a 48-month sentence that was over 90% of the length of the 51-month sentence imposed on his co-conspirator, the public official Dean Skelos, a ratio far higher than the Government seeks here.[12]  Maureen McDonnell's conduct (*see id.* at 23) was far less aggravated than that of her husband and that here, to the extent that the prosecutors in that case sought only an 18-month sentence.  *See United States v. McDonnell*, No. 14 Cr. 12 (JRS) (E.D. Va. 2015) (ECF No. 639 at 1).  John Gray (*see* Def. Mem. 23) had no aggravating role, was involved only in a single bribe, did not attempt to obstruct justice, and correspondingly had a significantly lower Sentencing Guidelines range.  *See United States v. Lindberg* ("*Lindberg* Memo"), No. 19 Cr. 22 (MOC) (W.D.N.C. 2020) (ECF No. 245 at 3).[13]  The sentence imposed on Sinera Jones (*see* Def. Mem. 23) is wholly inapposite, as she pled guilty to a much less egregious scheme and the prosecutors in that case argued that she had a *mitigating* role in the overall scheme, and sought an offense level of 20, far less serious than the defendant here.  *See United States v. Jones*, No. 25 Cr. 127 (CAB) (N.D. Ohio 2025) (ECF No. 17 at 2-3).  And James Sandlin (*see* Def. Mem. 24) engaged in substantially less serious conduct than the defendant here, resulting in a Guidelines range less than half the length of the defendant's here.  *See United States v. Renzi*, No. 08 Cr. 212

---

[12] A sentence of 96 months, the sentence recommended by the Probation Office, for example, would be less than 73% of Menendez's sentence.

[13] The defendant incorrectly cites the offense level and the prosecutor's sentencing recommendation applicable to Gray's co-defendant Greg Lindberg (*see* Def. Mem. 23; *Lindberg* Memo at 2), but that co-defendant received an 87-month sentence (*see United States v. Lindberg*, No. 19 Cr. 22 (MOC) (W.D.N.C. 2020) (ECF No. 261))—*i.e.*, similar to the Government's recommendation for the defendant here.

(DCB) (D. Ariz. 2014) (ECF No. 1378 at 10).

Contrary to the defendant's suggestion, courts routinely impose sentences in the range recommended by the Government, or substantially higher, for private citizens who participate as co-conspirators in serious bribery schemes, even those not implicating foreign relations or the integrity of the federal or state justice system. *See, e.g.*, *United States v. Ferguson*, No. 10 Cr. 20403 (E.D. Mich. 2013) (252-month sentence for contractor following trial conviction for bribing mayor to obtain city contracts); *United States v. Quintanilla*, No. 19 Cr. 522 (S.D. Tex. 2023) (200-month sentence following trial conviction of businessman who paid approximately $85,000 in bribes in connection with the award of city contracts); *United States v. Esquenzi*, No. 09 Cr. 21010 (S.D. Fla. 2011) (180-month sentence following trial conviction of 53-year-old businessman for paying approximately $200,000 in bribes to Panamanian officials in foreign bribery prosecution); *United States v. Wilkes*, No. 07 Cr. 330 (S.D. Cal. 2008) (144-month sentence for 53-year-old defense contractor who paid approximately $700,000 in bribes to Member of Congress in exchange for government contracts); *United States v. Scrushy*, No. 05 Cr. 119 (M.D. Ala. 2007) (82-month sentence for businessman following trial conviction for paying approximately $500,000 in bribes to governor); *United States v. McDonough*, No. 09 Cr. 10166 (D. Mass. 2011) (84-month sentence for lobbyist following trial conviction for participating in paying approximately $65,000 in bribes); *see also United States v. Gilley*, No. 10 Cr. 186 (M.D. Ala. 2012) (80-month sentence for businessman following guilty plea for paying and laundering bribes of approximately $200,000 to state legislators); *United States v. Goss*, No. 19 Cr. 3048 (W.D. Mo. 2022) (72-month sentence for businessman following guilty plea for participating in scheme to bribe state legislators and diverting charity funds).

Far from being in line with comparable sentences as the defendant suggests, leniency such as the defendant requests would itself create an unwarranted and material sentencing disparity. In addition to creating a disparity as to other cases involving less egregious schemes, it would create an unwarranted disparity between the defendant—who was more culpable than both Hana and Daibes—to receive a sentence far less severe than either of them, as she requests. Indeed, her requested sentence of a year and a day would represent such an extraordinary variance from her 210- to 267-month Guidelines range that it approaches a variance the Second Circuit has held substantively unreasonable. *See Watts v. United States*, No. 21-2925, 2023 WL 2910634, at *6 (2d Cir. Apr. 12, 2023) (holding year-and-a-day sentence substantively unreasonable when Guidelines range was 235 to 293 months).

Moreover, the defendant's argument that the bribe amount substantially overstates the seriousness of her offenses (Def. Mem. 19) is deeply misguided. Whatever the merit of deviating from loss-based calculations in fraud cases or those in which losses result from indirect factors such as impersonal market operations, they have no application here, where the bribes were a series of tangible items individually received and stockpiled by the defendant and her partner in crime, a powerful public official, to corruptly induce abuses of power. It is appropriate to hold her accountable for all the bribes she solicited and received during the scheme.

Contrary to the defendant's attempt to downplay the value of general deterrence (*see* Def. Mem. 24), the need for general deterrence also strongly weighs in favor of a substantial sentence. The extensive investigation, pretrial litigation, and presentation of the evidence at trial demonstrates how much effort was required to uncover and redress her conduct. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue

for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of crime and hence the punishment required to deter it."); *Zukerman*, 897 F.3d at 429 (quoting *id.*).

The defendant's suggestion that a sentence of only a year and a day would achieve general deterrence (*see* Def. Mem. 24)—notwithstanding how difficult it is to successfully detect and prosecute cases such as this—flies in the face of case law, logic, and human experience.  Grasping at straws, the defendant claims the goal of general deterrence has been met through, among other things, the "convictions at highly publicized trials, and the steep sentences previously imposed." (*Id.*)  The defendant does not deserve a lower sentence because what she and her co-conspirators did has garnered media attention.  And she certainly does not deserve a lower sentence because of the sentences imposed by this Court on her co-defendants.  The defendant should be sentenced for her own criminal actions—actions that demand serious punishment.

Accordingly, balancing the serious aggravating factors of the offense conduct and the mitigating factors presented by the defendant's history and characteristics, this Court should impose a sentence that reflects the seriousness of the offenses, promotes respect for the law, provides just punishment, and affords adequate deterrence in a critical area.  This Court should redress the defendant's repeated criminal choices with a sentence including a term of incarceration of at least 84 months.

## III.    THE COURT MUST ORDER FORFEITURE AND SHOULD ORDER A FINE

In addition to a term of imprisonment, the Court must order forfeiture to separate the defendant from the proceeds of her offenses, and should order a fine in order to redress and deter such conduct.

A.      **Applicable Law**

1.      *Forfeiture*

"Criminal forfeiture statutes empower the Government to confiscate property derived from or used to facilitate criminal activity.  Such statutes serve important governmental interests such as separating a criminal from his ill-gotten gains, returning property, in full, to those wrongfully deprived or defrauded of it, and lessening the economic power of criminal enterprises." *Honeycutt v. United States*, 581 U.S. 443, 447 (2017) (citation and internal quotation marks omitted; alteration incorporated).

Federal Rule of Criminal Procedure 32.2(b)(1) provides:

> **(A) Forfeiture Determinations.** As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

> **(B) Evidence and Hearing.** The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable. If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty.

Fed. R. Crim. P. 32.2(b)(1).

Criminal forfeiture is "an aspect of sentencing." *Libretti v. United States*, 516 U.S. 29, 49 (1995).  Accordingly, the Government's burden of proof is by a preponderance of the evidence. *See, e.g.*, *United States v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005).

42

The Federal Rules of Evidence do not apply at a hearing pursuant to Rule 32.2(b)(1)(B), and accordingly "'information,' in addition to evidence, may be taken at" such a hearing. *United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007). In order to be considered at a hearing, information must be accepted by the Court as "relevant and reliable," Fed. R. Crim. P. 32.2(b)(1)(B), but if it is, there is no prohibition on relying upon hearsay or documentary submissions not admissible under the Rules of Evidence in place of live testimony. *See Capoccia*, 503 F.3d at 110 (allowing use of hearsay); *United States v. Stathakis*, No. 04 Cr. 790 (CBA), 2008 WL 413782, at *14 n.2 (E.D.N.Y. Feb. 13, 2008) (relying on hearsay).[14]

The United States is entitled to forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title [*i.e.*, Title 18]), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C).[15] Specified unlawful activity includes any violation listed in 18 U.S.C. § 1961(1), *see* 18 U.S.C. § 1956(c)(7)(A), which in turn includes any "act which is indictable under any of the following provisions of title 18, United States Code . . . 201 (relating to bribery) . . . 1343 (relating to wire fraud) . . . 1503 (relating to obstruction of justice) . . . [and] 1951 (relating to . . . extortion)," 18 U.S.C. § 1961(1)(B). This forfeiture is mandatory. *See, e.g.*, *United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases

---

[14] The Advisory Committee Notes for Rule 32.2 contemplate the use of live testimony only in "some instances" where it is "needed to determine the reliability of proffered information." Fed. R. Crim. P. 32.2 adv. comm. notes (2009 Amendments) ("The Committee foresees that in some instances live testimony will be needed to determine the reliability of proffered information.").

[15] "While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal proceedings via 28 U.S.C. § 2461(c)." *Stevenson*, 834 F.3d at 85.

where the statute applied."); *United States v. Torres*, 703 F.3d 194, 204 (2d Cir. 2012) (forfeiture and restitution both are mandatory).

The Second Circuit has acknowledged, consistent with common sense, that "[t]he calculation of forfeiture amounts is not an exact science." *United States v. Treacey*, 639 F.3d 32, 48 (2d Cir. 2011). Accordingly, "'[t]he court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information.'" *Id.* (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)). "A court is permitted to use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *Treacey*, 639 F.3d at 48.

The purpose of forfeiture is "punitive rather than restitutive," and as a result "district courts are not required to conduct an investigative audit to ensure that a defendant is not deprived of a single farthing more than his criminal acts produced." *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011) (internal quotation marks omitted). Absent Eighth Amendment concerns, the defendant's ability to pay a money judgment is irrelevant. *United States v. Awad*, 598 F.3d 76, 78-79 (2d Cir. 2010); *United States v. Viloski*, 814 F.3d 104, 114-15 (2d Cir. 2016) (upholding forfeiture money judgment exceeding $1 billion as consistent with defendant's future ability to "earn[] a living upon his release from prison."); *United States v. Bonventre*, 646 F. App'x 73, 92 (2d Cir. 2016) (upholding forfeiture money judgment exceeding $19 billion in Madoff Ponzi scheme).

In *Honeycutt v. United States*, the Supreme Court explained that an individual defendant may only be required to forfeit criminal proceeds that she personally acquired or controlled. 581

U.S. at 445-54; *see also United States v. Bergstein*, 788 F. App'x 742, 748 (2d Cir. 2019).  As courts, including the Second Circuit, have made clear both before and after *Honeycutt*, however, proceeds of a crime "need not be personally or directly in the possession of the defendant . . . in order to be subject to forfeiture," but "must have, at some point, been under the defendant's control . . . in order to be considered acquired by him."  *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) (citation and internal quotation marks omitted); *United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019).  Moreover, temporary control is sufficient, and the defendant need not retain the proceeds.  *See Tanner*, 942 F.3d at 68; *Rajaratnam v. United States*, 736 F. App'x 279, 284 (2d Cir. 2018) (although proceeds of insider trading were subsequently distributed to investors, with the defendant personally retaining only a percentage as management fees, defendant acquired those proceeds for forfeiture purposes where he "had authority over disbursements, and, thus, exercised control over the proceeds at some point" (internal quotation marks omitted)); *United States v. Ohle*, 441 F. App'x 798, 803 (2d Cir. 2011) (rejecting challenge to forfeiture order that "appears to rest on the mistaken premise that [defendant] can only be required to forfeit fraud proceeds that he personally kept"); *Uddin*, 551 F.3d at 181 (affirming forfeiture order based on entire amount of proceeds initially received by defendant, "[w]hether or not Uddin shared the cash he received"); *see also* 21 U.S.C. § 853(p)(1)(B) (permitting forfeiture of substitute assets from defendant where he has caused forfeitable property to be "transferred or sold to, or deposited with, a third party").

### 2.    *Fine*

Section 3572(a) of Title 18, United States Code, sets forth the factors to be considered by a district court before imposing a fine, in addition to the factors set forth in Section 3553(a).  Such factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the

burden that the fine will impose upon the defendant and any of her dependents; (3) any pecuniary

loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need

to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs

to the government of any imprisonment.  18 U.S.C. § 3572(a).  Section 5E1.2 of the Guidelines

states that a district court "shall impose a fine in all cases, except where the defendant establishes

that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).  In

determining the size of any fine, a district court shall consider:

1. the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

2. any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

3. the burden that the fine places on the defendant and his dependents relative to alternative punishments;

4. any restitution or reparation that the defendant has made or is obligated to make;

5. any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;

6. whether the defendant previously has been fined for a similar offense;

7. the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

8. any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d).  The Guidelines further provide that, "[t]he amount of the fine should always

be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  *Id.*

The Second Circuit has held that "a defendant's wealth and earning capacity are pertinent

considerations in assessing an appropriate fine," *Zukerman*, 897 F.3d at 431-32, and has affirmed

the imposition of above-Guidelines fines, *see, e.g.*, *id.* at 426 (affirming imposition of $10 million

fine based on § 3572(a) factors); *United States v. DiNapoli*, 844 F. App'x 426, 430 (2d Cir. 2021)

(affirming imposition of above-Guidelines $250,000 fine). The defendant bears the burden of

demonstrating an inability to pay a fine. *See United States v. Camargo*, 393 F. App'x 796, 798

(2d Cir. 2010); *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001).

     **B.**    **Discussion**

        1.   *The Defendant Must Forfeit the Proceeds of Her Crimes*

The proposed forfeiture order attached hereto as Exhibit B, and consistent with the order

the Court previously imposed on Menendez (*see* Dkt. 730), requires the defendant to forfeit the

proceeds of her crimes. The proposed order specifies a money judgment established by the trial

record, and the forfeiture order requires the forfeiture of specific property that the defendant

received as bribes during the course of the scheme.

        a)   The Forfeiture Order

The defendant's forfeiture order imposes a money judgment of $922,188 (*i.e.*, the same

amount as imposed on Menendez), and requires her to forfeit all of her right, title, and interest in

a series of items of specific property, all as established by the trial record.

The forfeitability of each of the items of specific property is readily ascertainable from the

trial record. The items of specific property listed in the order of forfeiture, together with supporting

citations from the trial record and the PSR, are:

1.    All of the defendant's right, title, and interest in the 2019 Mercedes-Benz C-Class C300 automobile, vehicle identification number WDDWK8EB7KF873859, including $31,938.94 in insurance proceeds that the defendant received from her insurance company on September 5, 2024 after reporting that the 2019 Mercedes-Benz C-Class C300 automobile received flood damage in August 2024 (the "Mercedes Check") (Ex. B ¶ a; Tr. 1532; GX 1353 row 1030; GXs 5I-102-1, 5I-

47

103, 7F-6, 7F-7; *see also, e.g.*, *Menendez*, 2025 WL 2166135, at *10-11; PSR ¶ 209);[16]

2.  Two one-kilogram gold bars with serial numbers matching Daibes's gold inventory seized in the search of the defendant and Menendez's residence, *i.e.*:

    a)  A one-kilogram Swiss Bank gold bar bearing serial number 590005 (Ex. B ¶ d.i; GXs 42, 1F-1126, 1F-1129, 1F-1164, 1F-1165, 3D-6; GX 1301; *see also, e.g.*, *Menendez*, 2025 WL 2166135, at *14); and

    b)  A one-kilogram Metaux Precieux SA Metalor gold bar bearing serial number 890581 (Ex. B ¶ d.ii; GXs 56, 1F-1023, 1F-1237, 1F-1239, 3D-6; GX 1301; *see also, e.g.*, *Menendez*, 2025 WL 2166135, at *14);[17]

3.  The contents of seven envelopes of cash bearing fingerprints or the return address and DNA of Daibes and seized during the search of the defendant and Menendez's residence, *i.e.*:

    a)  $10,000 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B28 and

---

[16] Citations to alphabetically designated paragraphs in the forfeiture order refer to subparagraphs of the paragraph beginning on page 3 of that order, which is the last paragraph on that page. For example, the citation to "Ex. B ¶ a" refers to the subparagraph on page 3 that begins "a. The Mercedes." For purposes of calculating the money judgment, Uribe's $48,867.88 in payments toward the car were used.

[17] For purposes of calculating the money judgment, a publicly listed price of a kilogram of gold as of the approximate time at which the Government provided information to the U.S. Probation Office in or about August 2024 in connection with the sentencing of Menendez (who is subject to a corresponding order of forfeiture), or $77,156.54, was used. *See, e.g.*, *Treacey*, 639 F.3d at 48 ("The court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." (internal quotation marks omitted)). The use of the gold price at that point in time not only simplifies the calculation of forfeiture, by avoiding the need to continually recalculate the money judgment figure in advance of sentencing, but benefits the defendant, as the current price of a kilogram of gold as of the time of the writing of this memorandum is approximately $30,000 higher than the price used in the calculation. Contrary to the information the Government inadvertently erroneously provided to the Probation Office as memorialized on page 70 of the PSR, the value of the gold was based not on its value at the time of the June 16, 2022 search, but at the time the Government collected information to provide the Probation Office in the summer 2024 in connection with the sentencing of Menendez. In any event, the differences would not affect the defendant's Guidelines range and are highly favorable to the defendant compared to using the current price of gold.

1B73 (Ex. B ¶ b.i; GXs 28, 73, 1F-1259, 1F-1273, 1F-1274, 1F-1276; GXs 1301, 1338);

b)      $9,100 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B34 and 1B78 (Ex. B ¶ b.ii; GXs 34, 78, 1F-1126, 1F-1129, 1F-1170, 1F-1171; GXs 1301, 1338);

c)      $7,400 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B35 and 1B79 (Ex. B ¶ b.iii; GXs 35, 79, 1F-1126, 1F-1129, 1F-1166, 1F-1167, 1F-1168, 1F-1169, 1F-15001; GXs 1301, 1338);

d)      $5,300 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B49 and 1B84 (Ex. B ¶ b.iv; GXs 49, 84, 1F-1126, 1F-1129, 1F-1178, 1F-1179, 1F-1180; GXs 1301, 1338);

e)      $9,500 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B44 and 1B86 (Ex. B ¶ b.v; GXs 44, 86, 1F-1126, 1F-1129, 1F-1196, 1F-1197, 1F-1198, 1F-1202, 1F-1203; GXs 1301, 1338);

f)      $10,000 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B58 and 1B88 (Ex. B ¶ b.vi; GXs 58, 88, 1F-1126, 1F-1129, 1F-1175, 1F-1176, 1F-1177; GXs 1301, 1338); and

g)      $1,200 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B64 and 1B90 (Ex. B ¶ b.vii; GXs 64, 90, GXs 1F-1017, 1F-1019, 1F-1236, 1F-1246, 1F-1247; GXs 1301, 1338);

4.      The contents of three envelopes of cash bearing fingerprints of Daibes and seized during the search of the defendant's safe deposit box, *i.e.*, $30,000 in U.S. currency seized from envelopes and logged into the FBI's Evidence Management System under numbers 1B13 and 1B94 (Ex. B ¶ c.i; GXs 1D-132, 1D-133, 1D-134; GX 1338);

5.      The contents of three envelopes of cash with fingerprints of Hana's associates Nader Moussa and Gazmend Lita seized during the search of the defendant and Menendez's residence, *i.e.*:

a)      $7,500 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B19 and

49

1B70 (Ex. B ¶ b.viii; GXs 19, 70, 1F-1311, 1F-1312, 1F-1313, 1F-1314, 1F-15002; GXs 1301, 1334);

    b)    $700 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B64 and 1B90 (Ex. B ¶ b.ix; GXs 64, 90, GXs 1F-1017, 1F-1240, 1F-1250; GXs 1301, 1334); and

    c)    $1,350 in U.S. currency seized from an envelope and logged into the FBI's Evidence Management System under numbers 1B64 and 1B90 (Ex. B ¶ b.x; GXs 64, 90, GXs 1F-1017, 1F-1240, 1F-1246; GXs 1301, 1334);

6.    The contents of two bags of cash found in close proximity to one of the envelopes with Daibes's fingerprints and one of the envelopes with Moussa's fingerprints, and including large amounts of cash in money bands indicating it was withdrawn from a bank at which neither the defendant nor Menendez maintained accounts, seized during the search of the defendant and Menendez's residence, *i.e.*:

    a)    $95,000 in U.S. currency seized from a yellow plastic bag and logged into the FBI's Evidence Management System under number 1B43 (Ex. B ¶ b.xi; GXs 43, 1F-1264, 1F-1265, 1F-1266; GX 1301); and

    b)    $100,000 in U.S. currency seized from a paper bag and logged into the FBI's Evidence Management System under number 1B37 (Ex. B ¶ b.xii; GXs 37, 1F-1259, 1F-1260, 1F-1261, 1F-1262, 1F-1263; GX 1301);

7.    The contents of five envelopes of cash stored next to and packaged similarly to the envelopes of cash bearing Daibes's fingerprints, seized during the search of the defendant's safe deposit box, *i.e.*, $44,200 in U.S. currency seized from envelopes and logged into the FBI's Evidence Management System under numbers 1B13 and 1B94 (Ex. B ¶ c.ii; GX 13, 1D-132, 1D-133, 1D-134);

8.    The contents of envelopes of cash seized from jackets and footwear stored in close proximity with, and packaged similarly to, one of the envelopes with Daibes's fingerprints and one of the envelopes with Moussa's fingerprints, *i.e.*:[18]

    a)    $5,350 in U.S. currency located in a right red shoe in the basement and logged into the FBI's Evidence Management System under

---

[18] Indeed, one of these envelopes was in fact in the same jacket as one of the envelopes with Daibes's fingerprints on it. (*See* Ex. B ¶ b.xvi; *see, e.g.*, GXs 1F-1275, 1301, 1338.)

number 1B23 (Ex. B ¶ b.xiii; Tr. 228-30; GXs 1F-1312, 1F-1317, 1F-1318);

b)  $20,000 in U.S. currency seized located in a left red shoe in the basement and logged into the FBI's Evidence Management System under number 1B26 (Ex. B ¶ b.xiv; Tr. 230-32; GXs 1F-1321, 1F-6009, 1F-6010, 1F-6011, 1F-6012, 1F-6013, 1F-6014, 1F-6015);

c)  $7,000 in U.S. currency located in a left brown boot in the basement and logged into the FBI's Evidence Management System under number 1B72 and 1B22 (Ex. B ¶ b.xv; Tr. 236-38; GXs 22, 72, 1F-1311, 1F-1312, 1F-1315, 1F-1316, 1F-15003; GX 1301);

d)  $11,000 in U.S. currency seized from a manila envelope and logged into the FBI's Evidence Management System under numbers 1B28 and 1B73 (Ex. B ¶ b.xvi; GXs 28, 73, 1F-1259, 1F-1273, 1F-1274, 1F-1275, 1F-1276; GX 1301);

e)  $6,000 in U.S. currency seized from an envelope found in a black leather jacket and logged into the FBI's Evidence Management System under numbers 1B29 and 1B74 (Ex. B ¶ b.xvii; GXs 29, 74, 1F-1259, 1F-1270, 1F-1271, 1F-1272; GX 1301); and

f)  $4,300 in U.S. currency seized from an envelope located in a Congressional Hispanic Caucus jacket in the basement and logged into the FBI's Evidence Management System under numbers 1B30 and 1B75 (Ex. B ¶ b.xviii; GXs 30, 75, 1F-1259, 1F-1267, 1F-1268, 1F-1269; GX 1301);

9.  Nine one-ounce gold bars with serial numbers matching Daibes's gold inventory seized in the search of the defendant and Menendez's residence, *i.e.*:

a)  A one-ounce Credit Suisse gold bar bearing serial number 162424 (Ex. B ¶ e.iii; GXs 42, GXs 1F-1126, 1F-1129, 1F-1164, 1F-1165, 3D-6; GX 1301);

b)  A one-ounce Credit Suisse gold bar bearing serial number 938081 (Ex. B ¶ e.iv; GXs 42, GXs 1F-1126, 1F-1129, 1F-1164, 1F-1165, 3D-6; GX 1301);

c)  A one-ounce Valcambi Suisse gold bar bearing serial number AA143952 (Ex. B ¶ e.v; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);

d)      A one-ounce Valcambi Suisse gold bar bearing serial number AA143957 (Ex. B ¶ e.vi; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);

e)      A one-ounce Valcambi Suisse gold bar bearing serial number AA143959 (Ex. B ¶ e.vii; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);

f)      A one-ounce Valcambi Suisse gold bar bearing serial number AA143961 (Ex. B ¶ e.viii; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);

g)      A one-ounce Valcambi Suisse gold bar bearing serial number AA143962 (Ex. B ¶ e.ix; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);

h)      A one-ounce Valcambi Suisse gold bar bearing serial number AA143963 (Ex. B ¶ e.x; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301); and

i)      A one-ounce Valcambi Suisse gold bar bearing serial number AA143974 (Ex. B ¶ e.xi; GXs 39, 1F-1126, 1F-1129, 1F-1181, 1F-1182, 1F-1183, 1F-1184, 1F-1188, 1F-1189, 3D-6; GX 1301);[19]

10.     Six one-ounce bars of gold with serial numbers adjacent or near-adjacent to serial numbers in photographs of Hana gold bars, either seized during the search of the defendant and Menendez's residence or found pictured on the defendant's cellphone, *i.e.*:

a)      A one-ounce Asahi gold bar bearing serial number A124806 (Ex. B ¶ e.i; Tr. 1167-73; GXs 38, 1F-1126, 1F-1129, 1F-1204, 1F-1205, 1F-1208, 1F-1209, 3C-20, 3M-1, B201-17; GX 1301);

b)      A one-ounce Asahi gold bar bearing serial number A124824 (Ex. B ¶ e.ii; Tr. 1167-73; GXs 38, 1F-1126, 1F-1129, 1F-1204, 1F-1205, 1F-1208, 1F-1209, 3C-20, 3M-1, B201-17; GX 1301);

---

[19] For purposes of calculating the money judgment, a publicly listed price of an ounce of gold as of the approximate time at which the Government provided information to the U.S. Probation Office in or about August 2024 in connection with Menendez's sentencing, or $2,399.60, was used with respect to these gold bars. *See, e.g.*, *Treacey*, 639 F.3d at 48. As with the price of a kilogram of gold, the use of this price is favorable to the defendant, as the price in August 2024 is almost $1,000 lower than today's price.

c)      A one-ounce Asahi gold bar bearing serial number A124818 (Ex. B ¶ e.xii; Tr. 1167-73; GXs 3C-20, 3M-1, B201-17);

d)      A one-ounce Asahi gold bar bearing serial number A124819 (Ex. B ¶ e.xiii; Tr. 1167-73; GXs 3C-20, 3M-1, B201-17);

e)      A one-ounce Asahi gold bar bearing serial number A124820 (Ex. B ¶ e.xiv; Tr. 1167-73; GXs 3C-20, 3M-1, B201-1A);

f)      A one-ounce Asahi gold bar bearing serial number A124825 (Ex. B ¶ e.xv; Tr. 1167-73; GXs 3C-20, 3M-1, B201-17); and

g)      A one-ounce Asahi gold bar bearing serial number A125992 (Ex. B ¶ e.xvi; Tr. 2142-51; GXs 3L-1, B201-17);[20]

11.     One Vision Fitness S7100 HRT Suspension Trainer (Ex. B ¶ f; *see, e.g.*, GXs 1F-1015, 3C-11, A103-3); and

12.     One Blueair Classic 605 air purifier (Ex. B ¶ g; GXs 1F-1084, 7N-2, C218-1).[21]

The value of the defendant's money judgment is also readily ascertainable from the trial record.  As set forth in the PSR (*see* PSR ¶¶ 229-30), the money judgment amount consists of the value of the items of specific property set forth above, together with the value of several items of specific property that are not believed to still be in the defendant's possession.[22]  The additional items accounted for in the defendant's money judgment, together with supporting citations to the trial record, are:

---

[20] For purposes of calculating the money judgment, the same ounce of gold price was listed for these gold bars as for the nine one-ounce gold bars matching Daibes's gold inventory discussed in footnote 19, above.

[21] The above-described list of specific property does not include all of the cash seized in the course of the searches.  The Government reserves the right to seek forfeiture, under 21 U.S.C. § 853(p), of additional seized cash or other assets as substitute assets for crime proceeds, including for proceeds that the defendant transferred to third parties, but does not herein ask the Court to issue any order with respect to those additional quantities of cash at this time.

[22] The final forfeiture of the specific property will be applied towards the satisfaction of the money judgment.  (*See* Ex. B at 9.)

1.  $30,000 derived from checks marked with numbers 1055, 1072, and 1097 from IS EG Halal Certified Inc. to Strategic International Business Consultants, LLC (*see, e.g.*, GXs 5A-1001A, 5A-1001B, 5A-1001C; *see also, e.g.*, *Menendez*, 2025 WL 2166135, at *5);

2.  $23,568.54 derived from cashier's check marked with number 6759202328 from Wells Fargo Bank N.A. to Nationstar Mortgage d/b/a Mr. Cooper (*see, e.g.*, Tr. 414-16; GX 5C-200; *see also, e.g.*, *Menendez*, 2025 WL 2166135, at *5-6);

3.  A one-kilogram Johnson Matthew gold bar with serial number G114008 and a one-kilogram Royal Canadian Mint gold bar with serial number A002006, depicted in an image recovered from the Nadine Menendez Cellphone (*see, e.g.*, Tr. 2155-61, 2165-71; GX 1339, GXs B201-1A, 5A-5001A, 5A-5001B; *see also, e.g.*, *Menendez*, 2025 WL 2166135, at *22);[23] and

4.  Two one-kilogram gold bars sold by the defendant through Vasken Khorozian in or about June 2022 (*see, e.g.*, Tr. 2185-88; GX 5A-5001C; GX 5I-603A).[24]

## 2. *The Defendant Should Pay a Substantial Fine*

The Probation Office determined that the defendant has the ability to pay a fine and recommends that the Court impose a $40,000 fine.  (*See* PSR at 77; *see also* PSR ¶¶ 208-10 (finding the defendant to have a total net worth of over $885,000 and her husband to have a total net worth of over $3.7 million).  Given that the defendant's crimes were financially motivated and the Probation Office's assessment that the defendant is able to pay a fine, the Court should impose a fine consistent with the defendant's ability to pay in order to deter financially motivated conduct.

---

[23] The money judgment is calculated based on the value of the checks that the defendant received in exchange for the gold (*see* GXs 5A-5001A, 5A-5001B), and not the (higher) price of gold at the time of the preparation of the offense conduct summary for the Probation Office.

[24] As discussed above, the money judgment is calculated based on the value of the checks that the defendant received in exchange for the gold (*see* GXs 5A-5001C, 5I-603A), and not the (higher) price of gold at the time of the preparation of the offense conduct summary for the Probation Office.

## **CONCLUSION**

For the foregoing reasons, the Court should impose a significant sentence of imprisonment of at least 84 months and significant financial penalties that reflect the seriousness of the defendant's crimes, the immeasurable harm she has caused to the public trust, and the need to deter others from engaging in such egregious conduct.

Dated: New York, New York
       August 21, 2025

                    Respectfully submitted,

                    JAY CLAYTON
                    United States Attorney

By:    s/_____
                    Eli J. Mark
                    Daniel C. Richenthal
                    Paul M. Monteleoni
                    Lara Pomerantz
                    Catherine Ghosh
                    Assistant United States Attorneys
                    (212) 637-2431/2109/2219/2343/1114
                    Christina A. Clark
                    Special Assistant United States Attorney
                    (202) 307-5191